UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. 2:04-cv-47-FtM-29 SPC

WHITNEY INFORMATION
NETWORK, INC., a Colorado corporation,

    Plaintiffs,

v.

XCENTRIC VENTURES, LLC., an
Arizona limited liability company;
BADBUSINESSBUREAU.ORG, an
Arizona limited liability company; and
ED MAGEDSON, an individual,

    Defendants.

_____/

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiff, WHITNEY INFORMATION NETWORK, INC. ("WIN"), by and through their undersigned counsel, file this, their Complaint for damages and injunctive relief against Defendants, XCENTRIC VENTURES, LLC, ("XCENTRIC"), BADBUSINESSBUREAU.ORG, ("BBB.ORG") and ED MAGEDSON and allege:

### INTRODUCTION

This is an action for Defendants', XCENTRIC, BBB.ORG and ED MAGEDSON, unlawful publication of defamatory material concerning Plaintiff throughout its website, so that consumers and potential consumers searching the Internet for Plaintiff's products and services are subjected to defamatory material published by Defendants regarding Plaintiff and its business.

## JURISDICTION

1.     This is an action for injunctive and other relief for Defendants' defamation of Plaintiff's and its business.

2.     Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. The amount in controversy is greater than $75,000.00 exclusive of interest, attorneys' fees and costs.

3.     This Court has supplemental jurisdiction over the state law claims for defamation pursuant to 28 U.S.C. § 1367(a).

4.     Defendant, XCENTRIC VENTURES, LLC., is subject to the jurisdiction of this Court because it:

   (a)   Operates, conducts, engages in or carries on a business or business ventures within this state through its Internet websites; and

   (b)   Committed and continues to commit a tort in Florida by publishing false and defamatory information on its websites about Plaintiffs, directed at Florida and causing injury in Florida that gives rise to a potential claim cognizable in Florida.

5.     Defendant, BADBUSINESSBUREAU.ORG, is subject to the jurisdiction of this Court because it:

   (a)   Operates, conducts, engages in or carries on a business or business ventures within this state through its Internet websites; and

   (b)   Committed and continues to commit a tort in Florida by publishing false and defamatory information on its websites about Plaintiffs,

directed at Florida and causing injury in Florida that gives rise to a potential claim cognizable in Florida.

6. Defendant, ED MAGEDSON, an individual, is subject to the jurisdiction of this Court because he:

    (a) Operates, conducts, engages in or carries on a business or business ventures within this state through his Internet websites; and

    (b) Committed and continues to commit a tort in Florida by publishing false and defamatory information on his websites about Plaintiffs, directed at Florida and causing injury in Florida that gives rise to a potential claim cognizable in Florida.

7. This Court has personal jurisdiction over all Defendants as they intentionally published defamatory material concerning Plaintiff in Florida on their Internet website. Defendants' use of such defamatory material is for interstate commercial activity and such use is a substantial aspect of Defendants' conduct giving rise to Plaintiff's claims.

## VENUE

8. Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(c) in that a substantial part of the events giving rise to the claims asserted herein occurred in and are causing injury in Lee County, Florida.

9. Defendants intentionally and/or recklessly published defamatory information about Plaintiff, a Florida corporation and Florida resident, and published same via the Internet within Lee County, Florida.

10. Defendants intentionally and/or recklessly published defamatory information and clearly directed said information at a corporation in Florida, via their Internet websites, regarding Plaintiff's business, resulting in significant injury and harm to Plaintiff and its reputation. The bulk, if not all of the harm has occurred and will continue to occur in Florida.

11. At all times material hereto, Defendants engaged in and continue to engage in substantial activity within the State of Florida by, *inter alia,* engaging in and continuing to engage in solicitation or service activities within the State of Florida.

## THE PARTIES

12. Plaintiff, WHITNEY INFORMATION NETWORK, INC. ("WIN"), is a corporation duly organized under the laws of the State of Colorado, with its principal place of business in Lee County, Florida.

13. Upon information and belief, Defendant, XCENTRIC, is a limited liability company duly organized under the laws of the State of Arizona, with its principal place of business in the State of Arizona.

14. Upon information and belief, Defendant, XCENTRIC, publishes a website that is available and has been visited by persons, in Lee County, Florida, throughout the United States and the world.

15. Upon information and belief, Defendant, BBB.ORG, is a limited liability company duly organized under the laws of the State of Arizona, with its principal place of business in the State of Arizona.

16.     Upon information and belief, Defendant, BBB.ORG, publishes a website that is available and has been visited by persons, in Lee County, Florida, throughout the United States and the world.

17.     Upon information and belief, Defendant, ED MAGEDSON, is a resident of the State of Arizona.

18.     Upon information and belief, Defendant, ED MAGEDSON, is a principal of Defendant, XCENTRIC, and he is the editor, publisher and promoter of the websites known as "www.ripoffreport.com" and "www.ripoffrevenge.com" and has controlled and directed the activities of Defendant, XCENTRIC, and Defendant, BBB.ORG.

## GENERAL ALLEGATIONS

19.     Plaintiff, WHITNEY INFORMATION NETWORK, was created in 1996 by its CEO, RUSS WHITNEY, to provide post-secondary educational and training products and services in the areas of real estate investing, business development, financial investment and asset protection real estate to students world-wide.

20.     Plaintiff conducts approximately 150 real estate free preview training programs per month with approximately 24,000 new students registered each month.

21.     Furthermore, Plaintiff spends millions of dollars each year on infomercials and other advertising to promote its products and services.

22.     Plaintiff's training programs are designed to present their students with the maximum amount of education by offering cutting-edge real estate and investing materials and educational trainings to facilitate success for their students.

23. Plaintiff is the owner of statutory rights, in addition to common law rights, for "RUSS WHITNEY," "WHITNEY," "WHITNEY INFORMATION NETWORK," and "WHITNEY EDUCATION GROUP," (collectively referred to as "Plaintiffs' Marks") in connection with educational and training services in the fields of real estate investing, business development, financial investment and asset protection.

24. Plaintiff, WIN, is the owner of pending service mark applications for "RUSS WHITNEY" and "WHITNEY" in the United States Patent and Trademark Office, Serial Nos. 76179948 and 75889257 respectively.

25. For many years prior to the acts of Defendants complained of herein, Plaintiff has achieved wide-spread and substantial sales of their products and services designated by Plaintiff's Marks in commerce.

26. Plaintiff's Marks are, and have been, so widely used by Plaintiff and others to identify Plaintiff's products and services that said products and services are now, and long prior to the acts of Defendants complained of herein, generally known among the trade and the public by Plaintiff's Marks.

27. By virtue of long and continuous use by Plaintiff, and since long prior to the acts of Defendants complained of herein, Plaintiff's Marks have developed secondary meaning and significance, and have been readily recognizable by the public and the trade as a designation associated with Plaintiff.

28. Plaintiff's Marks are now, and since long before the acts of Defendants complained of herein, associated in the public mind exclusively with Plaintiff and its

products and services. Plaintiff's Marks have come to identify Plaintiff's products and services and to distinguish said products and services from those of others.

29. As a means to promote their products and services, Plaintiff created Internet websites to enable consumers to learn about Plaintiff's programs, and to provide a conduit for prospective and current students to learn about and register for Plaintiff's educational and training services as well as to purchase educational materials created by and distributed by Plaintiff.

30. Plaintiff relies on consumers' knowledge of its famous Marks when consumers are searching for Plaintiff's products and services on the Internet. Consumers can find Plaintiff's website by entering Plaintiff's Marks in any Internet search engine and the search engine will list search results, which should rank Plaintiff's website as the top website for information based on Plaintiff's Marks.

31. However, Defendants' website appears as a search result on various search engines when consumers input Plaintiff's Marks in the Internet search engine causing consumers to mistakenly be diverted to Defendants' website when they intended to access one of Plaintiff's websites.

32. Defendants publish websites known as "www.ripoffreport.com" and "www.ripoffrevenge.com" for commercial and economic gain.

33. Defendants hold themselves out to the public as a "worldwide consumer reporting website and publication, by consumers for consumers" to file and document consumer complaints about "companies or individuals who rip off consumers."

34. Despite Plaintiff's excellent reputation for services in the community and

amongst its customers, Plaintiff became a target for an attempted extortion scheme by Defendants, in part because of Plaintiff's nationwide success and clientele.

35. Upon targeting Plaintiff, Defendants commenced their illicit extortion scheme by posting false and slanderous "complaints" on their website, www.ripoffreport.com.

36. The illicit extortion scheme involved the Defendants encouraging "clients" to complain about companies such as Plaintiff's businesses. Defendants actively solicit these "clients" to submit complaints about any company that has allegedly "ripped" the consumer off. Once Defendants receive the complaints from the consumers they review them and actively select which complaints to publish on their website, "www.ripoffreport.com."

37. In Defendants' selection process, they include a large number of negative comments but omit a large number of positive comments.

38. Defendants' publication of these consumer complaints is with reckless disregard for the truth as Defendants do not verify such complaints for accuracy; rather they simply publish the chosen complaints and include additional language to imply that the company named in such complaint is "ripping off" consumers.

39. In addition to failing to verify the accuracy of the chosen complaints, Defendants often tailor and re-write the complaints themselves, adding words such as "ripoff," "dishonest," and "scam," notwithstanding the nature of the complaint, after which Defendants would have the "client" anonymously post the complaint on Defendants' website.

40.     Furthermore, and upon information and belief, Defendants would also create fictional complaints themselves, which were then attributed to people with false names or "anonymous" titles from fictional locations around the United States, despite knowing that such complaints were fabricated by Defendants themselves, and were false and slanderous.

41.     The posting of multiple complaints about a particular business allows Defendants to advance their extortion scheme. The contrived numerosity of the complaints gives the appearance of legitimacy to the complaints, and the multiple complaints are absorbed by search engines on the Internet, resulting in higher placement of the defamatory material on Internet search engines. Consequently, the defamatory material would be viewed by greater numbers of Plaintiff's customers and potential customers, and ultimately, Plaintiff. This was done in an effort to damage the targeted company and bring it closer to Defendants' extortion scheme.

42.     If a targeted company contacts Defendants to rebut the information on Defendants' websites, Defendants' either refuse to post the rebuttals, or step up the campaign of targeting the company with additional defamatory complaints to silence such rebuttal statements.

43.     If a targeted company persists in its effort to rebut Defendants' false and defamatory postings, the Defendants then launch an illicit extortion scheme whereby the targeted company is requested to pay a "fee" to cease the publication of such defamatory material. Defendants never succeeded in their attempts to extort Plaintiff because Plaintiffs commenced this action before Defendants had an opportunity to seek such

payment from Plaintiff, and in any event, Plaintiff would have refused to pay any extortion fees for the removal of the defamatory material.

44. Furthermore, while on Defendants' website, "www.ripoffreport.com," consumers can click on a link titled "Rip Off Revenge" where consumers are directed to Defendants' second website, "www.ripoffrevenge.com."

45. Through Rip Off Revenge, Defendants offer to sell consumers either a service wherein Defendants will "help victims collect in a few days or hours," or consumers can pay $19.95 and receive a "Do-it-Yourself Guide: How to get Rip-Off Revenge and your money back too…"

46. Defendants' website, "www.ripoffreport.com," also offers advertising banner ads for sale, which advertisers can pay Defendants money and their company name and logo will appear on Defendants' website.

47. Further, Defendants solicit Internet consumers for "donations" "for the high cost of providing [the] service."

48. Here, Defendants publish and make available for viewing more than a dozen false stories about Plaintiff, the content of which the Defendants themselves largely created, with reckless disregard for the truth of such stories.

49. As consumers search for Plaintiff's products and services on the Internet by using Plaintiff's Marks, they are directed to Defendants' website as a result of the search, and once consumers are on Defendants' website, they are subjected to the false and defamatory articles published by Defendants about Plaintiff.

50. Defendants have misappropriated the goodwill associated with Plaintiff's Marks, for their own commercial use and for their own illegal financial benefit.

51. Defendants are using the false and defamatory material about Plaintiff's for the purpose of, amongst other things, diverting "hits" and attention of Internet users, initially searching for Plaintiff's goods and services, away from Plaintiff's website and directing them to Defendants' website.

52. Defendants' diversion of "hits," and their publication of false and defamatory "complaints" about Plaintiff, with reckless disregard for the truth of such "complaints," has caused numerous consumers to mistakenly believe that Defendants' engage in false and deceptive business practices.

53. Such diversion has resulted in, and continues to result in, substantial and irreparable harm to Plaintiff in Lee County, Florida.

54. Defendants' aforesaid acts have harmed Plaintiff's reputation, severely damaged Plaintiff's goodwill, and have diverted substantial sales from Plaintiff.

55. Plaintiff has no adequate remedy at law.

## COUNT I – DEFAMATION PER SE OF BUSINESS REPUTATION

56. Plaintiff realleges and reavers paragraphs 1 through 55 as if fully set forth herein.

57. Defendants' websites were created for commercial and economic gain and thus the selected stories published by Defendants are designed to entice customers to purchase Defendants' product, services and advertising opportunities.

58. The stories published by Defendants regarding Plaintiff are false and were published with malice and reckless disregard for the truth or falsity of such stories with the intent to injure Plaintiff, its business reputation and to illegally divert customers away from Plaintiff.

59. Defendants do not verify the truth or accuracy of the stories contained on their website, Defendants simply publish the stories and hold Plaintiff out to the public as "ripping off" their customers. In addition to failing to verify the accuracy of the chosen complaints, Defendants often tailor and re-write the complaints themselves, adding words such as "ripoff," "dishonest," and "scam," notwithstanding the nature of the complaint, after which Defendants would have the "client" anonymously post the complaint on Defendants' website.

60. Furthermore, and upon information and belief, Defendants also create fictional complaints themselves, which were then attributed to people with false names or "anonymous" titles from fictional locations around the United States, despite knowing that such complaints were fabricated by Defendants themselves, and were false and slanderous.

61. The stories published by Defendants contain false information about specific products and services produced and provided by Plaintiff, specifically claiming, *inter alia*, "Russ Whitney Lied about the 3 day seminar ripoff Cape Coral, Florida," "Russ Whitney ripoff Cape Coral, Florida," Russ Whitney, Scam Report," "Russ Whitney Deceptive Business Practices," and "Russ Whitney ripoff, dishonest, fraudulent, no service, ripped off and scammed, screwed others too…" just to name a few.

62. The false statements of fact published on Defendants' website are clearly unambiguous and when read and construed by Internet users searching for Plaintiff's products and services, the libelous nature of such statements are clear.

63. Defendants charge Plaintiffs' business and CEO, Russ Whitney, as unscrupulous, dishonest and unworthy of confidence through the publication of such false and defamatory stories.

64. As a direct and proximate result of Defendants' publication of the defamatory information, Defendants have inflicted an immeasurable amount of damage and injury upon Plaintiff's business and reputation, including, but not limited to, loss of significant profits and loss of goodwill.

65. As Plaintiff's principal place of business is located in Cape Coral, Lee County, Florida, the bulk of the damages and injury to Plaintiffs business and reputation has occurred in Florida.

66. Defendants' statements have, at all times material hereto, been directed and continue to be directed to a citizen of the State of Florida.

**WHEREFORE**, Plaintiff, WHITNEY INFORMATION NETWORK, INC., demand judgment be entered in their favor against all Defendants, jointly and severally, for compensatory and consequential damages, punitive damages, post judgment interest, and injunctive relief, court costs and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff requests trial by jury on all issues so triable.

Respectfully submitted,

By: /s/ Christopher C. Sharp
Scott W. Rothstein, Esq.
FBN: 765880
Shawn L. Birken, Esq.
FBN: 418765
Christopher C. Sharp, Esq.
FBN: 996858
ROTHSTEIN ROSENFELDT ADLER
**Counsel for Plaintiffs**
300 Las Olas Place, Suite 860
300 S.E. Second Street
Fort Lauderdale, Florida 33301
Tele: 954/522-3456
Fax: 954/527-8663

Dated: September 27, 2005         E-Mail: srothstein@rra-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, by mail, this 27th day of September, 2005, to: Michael L. Gore, Esq., Shutts & Bowen LLP, P.O. Box 4956, Orlando, Florida 32802-4956; Maria Crimi Speth, Esq. 3200 North Central Avenue, Suite 2000, Phoenix, AZ 85012; Jonathan P. Ibsen 7047 East Greenway Parkway, Suite 140, Scottsdale, AZ 85254.

ROTHSTEIN ROSENFELDT ADLER

By: /s/ Christopher C. Sharp
    Scott W. Rothstein, Esq.
    Shawn L. Birken, Esq.
    Christopher C. Sharp, Esq.

H:\swrdocs\03-8471\First Amended Complaint.doc