

1

CAUSE NO. 06-12231

| | |
|---|---|
| GW EQUITY, L.L.C., | ) IN THE DISTRICT COURT |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) DALLAS COUNTY, TEXAS |
| | ) |
| DIXON WOODARD, et al., | ) |
| | ) |
| Defendants. | ) 116TH JUDICIAL DISTRICT |

------------------------------------------------

ORAL DEPOSITION OF

DICKSON EARL WOODARD

VOLUME 1 OF 2

MAY 3, 2007

------------------------------------------------

ORAL DEPOSITION OF DICKSON EARL WOODARD, produced as

a witness at the instance of the plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on the 3rd of May, 2007, from 10:03 a.m. to 5:22 p.m.,

before Julia E. Whaley, CSR, CRR, RMR, and Notary Public

in and for the State of Texas, reported by machine

shorthand, at the law offices of McCreary & Stockford,

L.L.P., 18333 Preston Road, Suite 150, Dallas, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

**EXHIBIT**

2

1   people off and not --

2        A.   Oh, absolutely.  I mean the complaints filed

3   just with the Better Business Bureau, which was something

4   I should have looked at to begin with, is that -- there's

5   a little clause in there that will guarantee they will

6   get you a job in 90 days.

7        But after the first nine days after the work

8   has been done on the resumes, it's kind of a sliding

9   scale toward that 90 days.  If you're still there after

10  90 days, they don't owe you any money because, you know,

11  they're already doing work for you at the end of 90 days.

12       What they'll do is redo your resume for you for

13  another 90 days.  But I mean as far as the money-back

14  guarantee for you being employed in 90 days, it's

15  complete bullshit.

16       Q.   So did Ed believe --

17       A.   That was his problem.

18       Q.   Did Ed believe that McKenzie Scott was also

19  ripping people off?

20       A.   He knew -- he knew way before -- I mean he's

21  the one that explained to me in detail I mean how this

22  was being done.  And when I researched into it, he

23  couldn't have been any more accurate.

24       Q.   So it was Ed who told you they were ripping

25  people off, McKenzie Scott was ripping people off?

1    A.    He said, I don't know what you're so mad at me

2   for.    These guys are ripping people off.

3    Q.    Do you realize that if you go onto Rip Off

4   Report today and you look up McKenzie Scott, there's a

5   banner from Ed saying that he has looked into this and

6   researched this matter and that McKenzie Scott's actually

7   a great company?

8    A.    They paid him off, then.

9    Q.    Okay.    So Ed's willing to write that if you pay

10  him enough money?

11    A.    Yeah.    Absolutely.    He takes it off.    And not

12  only does he take off the negative report.    He replaced

13  them with positive reports.    He's writing them, himself.

14  So everything that's in the negative, he will spin it and

15  say the company feels terrible about this situation

16  happening and we -- we rectify it the best we possibly

17  can, and it looks like you're -- you're timely in your --

18  in your response to the general public.

19          So he takes you from zero to hero.    And now if

20  they pull up Rip Off Reports, you're one of the few

21  positive things on there.    These other people have got

22  negative reports.    Man, this company is -- I mean he has

23  got nothing bad to say about them at all.    He makes his

24  money off --

25    Q.    Ed will actually write the reports, though?

148

1      A.    Yes.

2      Q.    He'll write the reports, and he'll write the

3  headings on the report?

4      A.    Yeah.   I mean that's part of what he does, is

5  the background and the due diligence, and probably more

6  than highly likely hacking into the networks that would

7  afford him the necessary data to produce details or --

8  and/or he does have some complaints that he can -- he can

9  kind of combine or make -- make with the data that he

10 does have and what he -- the result is a very readable,

11 believable sounding, heart-wrenching story about

12 somebody's getting shafted.

13      But he only needs, like, two complaints or just

14 to get into their net -- somebody's network, and he's

15 got, you know, all of their clients.   And if there's any

16 kind of Better Business Bureau, he's checking courthouse

17 records, anything he can compile that will even remotely

18 look like it could possibly be based on fact.

19      I think you said there's a Bill or somebody in

20 Wisconsin or something.   I'm sure there's a Bill in

21 Wisconsin, you know.   It -- typically more a -- a little

22 bit more detailed than that as far as how it fits into

23 whatever the person that's looking for the due diligence

24 that it's going to make sense to them.

25      He's got to know enough about their business,

1    what they do, to undermine the confidence the person has

2    in them.  And that's how he puts these people out of

3    business.

4        Q.    So why would Ed do this?

5        A.    He actually has completely -- I mean -- and I

6    believe this honestly.  He actually believes that he is

7    conducting a -- a -- an endeavor that's helping the

8    general public.  And his rationalization for this

9    thinking is if it wasn't so insane, it would be

10   brilliant.

11            But he -- and he's had a hard life.  He got

12   screwed over early at 17 by some major corporation, and

13   somebody stole his bicycle or something.  And he changed

14   his name to Ed Magedson when he was 17, and he's been Ed

15   ever since.  And he just -- some people do look at him as

16   the quickest way for consumer protection out there and --

17       Q.    That's interesting that you say that, Dickson,

18   because just five minutes ago, we were talking about how

19   even though he believed McKenzie Scott was this big

20   fraud, he was willing to change his opinion and write

21   good things about them to the detriment of consumers if

22   they paid him money.

23       A.    And I have a perfect explanation for that, too.

24   You're exactly right.  I mean I'm not saying the man is

25   not an extortionist, but he does have the Robin Hood

1   maintains that he has never posted anything either.  So

2   gnomes are putting it on there.

3       Q.   What?

4       A.   Gnomes like cobblers.  He maintains that he's

5   never written one before in his life, but there's --

6       Q.   You already testified that he told you that he

7   wrote some of those reports?

8       A.   Exactly.

9       Q.   Okay.  So that was --

10      A.   It's a completely different conversation, I

11  mean.

12      Q.   But I'm asking you, when you get onto the web

13  site, ripoffreport.com, do you have to sign in and, like,

14  write your user name, or can you sign in as an

15  unregistered guest, or how does that work?

16      A.   I don't know.  It's a public web site.  It's

17  like Better Business Bureau.  You don't have to sign in

18  to anything.

19      Q.   So I can just get on there and post whatever I

20  want?  I don't have to provide an e-mail address --

21      A.   I don't --

22      Q.   -- or -- I don't have to provide an e-mail

23  address or anything?

24      A.   I don't know about posting.  I just know if you

25  want to search via his little Google thing in there for

236

1     Q.   I don't care how many days later it was,

2     Dickson.  Did you, in fact, go and look into filing class

3     action lawsuits after you got the idea from Jeff Robinson

4     that it was a lucrative industry?

5     A.   Yes.  That would be -- that would be -- that

6     would be good.

7     Q.   Thank you.

8     A.   I mean that's a good question to ask me if it

9     wasn't tripping over itself with inconsistencies.

10         MR. STOCKFORD:  Objection; nonresponsive.

11         THE WITNESS:  You can object your ass off.

12         MR. STOCKFORD:  Objection; nonresponsive.

13    Q.   (By Ms. Pannell)  Okay.  I'm going to hand you

14    now, Dickson, what has been marked Plaintiff's Exhibit

15    No. 2.  This is a printout of a posting that has been

16    made on www.ripoffreport.com.  Do you see at the top of

17    this posting, Dickson, where it says, "Submitted on

18    11/2/2006 at 5:14 a.m."?

19         At the very top of your page there, the top

20    right-hand corner, do you see where it says submitted?

21    A.   Yeah, I do.

22    Q.   Okay.  Did you, in fact, author or post or

23    write any part of this report?

24    A.   Absolutely not.  Let me read it first.  I

25    mean -- I mean this is the same one you put in the

1   complaint.  This is something that 200 -- numbers -- $120

2   million -- I think we've already established that it's

3   not --

4       Q.   Okay.  Did you write this?

5       A.   I did not write this.

6       Q.   Okay.

7             MR. STOCKFORD:  Do you know who did?

8             THE WITNESS:  I'm positive I know who did.

9             MR. STOCKFORD:  Who did it?

10       Q.  (By Ms. Pannell)  Who did?

11       A.   I mean --

12             MR. STOCKFORD:  Who did it?

13             THE WITNESS:  Of course Ed did it.

14             MR. STOCKFORD:  Thank you.

15       Q.  (By Ms. Pannell)  Ed Magedson made this post?

16       A.   Yeah.  He's the -- this is his -- this is his

17   gift.

18       Q.   How do you know Ed Magedson did this post?

19       A.   Because I'm pretty sure he's one of the only

20   people that posts on his own web site.  I mean there may

21   be some people that complain, but not to the quantity

22   he's talking about.

23       Q.   How are you -- how do you get this information?

24       A.   As far as him doing the postings?

25       Q.   Yeah, as far as him posting.

1      A.    Just the adamancy to which he -- he objects

2   to -- objects to posting of himself.  I mean he just --

3   you know, I think he does protest too much.  You know, he

4   told me a hundred thousand times, I don't do any of the

5   postings.

6            So many times, and the fact that -- coupled

7   with his -- his ability to access sensitive databases of

8   large corporations, it's just -- it's a hybrid of

9   complaints, stuff found in public -- in the public

10  sector, and then stuff that he hacks into on his -- on

11  his own.

12           I mean together, the three make -- with his

13  creative ability can -- can weave a pretty hideous --

14  some of this stuff about McKenzie Scott was like -- I was

15  mad knowing it was a lie.  I was like, Dang, did we do

16  that?  No, that was me.

17      Q.    Okay.  So it's your testimony today that you

18  did not author this, that Ed Magedson authored this post?

19      A.    I'm telling you that anything that's on his web

20  site regarding GW Equity is a combination of exactly the

21  things I -- that I just explained to you, it's got

22  nothing to do with me.

23      Q.    Okay.  Let's go through this post, then,

24  Dickson.  If you look at the very beginning, it says, "GW

25  Equity is actually a $120 billion enterprise called

283

CAUSE NO. 06-12231

| GW EQUITY, L.L.C., | ) | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff, | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| DIXON WOODARD, et al., | ) | |
| Defendants. | ) | 116TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF DICKSON EARL WOODARD, VOLUME 1

MAY 3, 2007

I, Julia E. Whaley, CSR, CRR, RMR, and Notary Public
in and for the State of Texas, hereby certify to the
following:

That the witness, DICKSON EARL WOODARD, was duly
sworn by the officer and that the transcript of the oral
deposition is a true record of the testimony given by the
witness;

That the original deposition transcript was
submitted on the _____ day of May, 2007, to the witness
for examination, signature, and return to the court
reporter by June _____, 2007;

That the amount of time used by each party at the
deposition is as follows:

Ms. Pannell - 4 hours, 55 minutes

That pursuant to information given to the deposition
officer at the time said testimony was taken, the

284

1    following includes all parties of record:

2    FOR THE PLAINTIFF:

3        MS. KRISTEN M. PANNELL
         and MR. BRAD E. STOCKFORD
4        McCreary & Stockford, L.P.
         18333 Preston Road
5        Suite 150
         Dallas, Texas  75252
6
     APPEARING PRO SE:
7
         MR. DICKSON EARL WOODARD
8        5317 Anchor Bay Drive
         Garland, Texas  75043
9

10       I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties in the

12   action in which this proceeding was taken, and, further,

13   that I am not financially or otherwise interested in the

14   outcome of the action.

15       Further certification requirements pursuant to Rule

16   203 of TRCP will be certified to after they have

17   occurred.

18       Sworn and certified to by me this _____ day of May,

19   2007.

20
                         Julia E. Whaley, CSR NO. 2961
21                       LONE STAR REPORTING
                         723 Woodlake Drive
22                       Coppell, Texas  75019
                         (972) 402-9885  Fax (972) 393-3611
23                       Firm registration number 379
                         Certification Expires 12-31-07
24                       Notary Comm. Expires 11-20-09

25

285

1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

2          The original deposition was/was not returned to the

3     deposition officer on                              ;

4          If returned, the attached changes and signature page

5     contains any changes and the reasons therefor.

6          If returned, the original deposition was delivered

7     to Ms. Kristen M. Pannell, Custodial Attorney.

8          That $_____ is the deposition officer's

9     charges for preparing the original deposition transcript

10    and any copies of exhibits, charged to Ms. Kristen M.

11    Pannell, Attorney for Plaintiff.

12         That the deposition was delivered in accordance with

13    Rule 203.3 and that a copy of this certificate was served

14    on all parties shown herein and filed with the Clerk.

15         Certified to by me this      day of              ,

16    2007.

17

18

19                    Julia E. Whaley, CSR NO. 2961
                      LONE STAR REPORTING
20                    723 Woodlake Drive
                      Coppell, Texas  75019
21                    (972) 402-9885  Fax (972) 393-3611
                      Firm registration number 379
22                    Certification Expires 12-31-07
                      Notary Comm. Expires 11-20-09

23

24

25

286

CAUSE NO. 06-12231

1

2  GW EQUITY, LLC,              ) IN THE DISTRICT COURT
          Plaintiff,            )
3                               )
   VS.                          ) 116TH JUDICIAL DISTRICT
4                               )
   DIXON WOODARD, et al.,       )
5        Defendants.            ) DALLAS COUNTY, TEXAS

6

7

8  ******************************************************

9            VIDEOTAPED ORAL DEPOSITION OF
                  DICKSON EARL WOODARD
10                     VOLUME 2
                     MAY 8, 2007
11
   ******************************************************
12

13

14

15       ORAL DEPOSITION OF DICKSON EARL WOODARD,

16  produced as a witness duly sworn by me at the

17  instance of the Plaintiff, taken in the above-styled

18  and -numbered cause on the 8th day of May, A.D.,

19  2007, from 9:11 a.m. to 2:43 p.m., before Carla J.

20  Shanks, Certified Shorthand Reporter No. 5054 in and

21  for the State of Texas, at the offices of McCreary &

22  Stockford, located at 18333 Preston Road, Suite 150,

23  in the City of Dallas, County of Dallas and State of

24  Texas, in accordance with the Texas Rules of Civil

25  Procedure and the provisions stated on the record.

293

```
 1        A.    I mean, submitted by the original author,
 2  you're saying Jim was one and Greg was another
 3  version?
 4        Q.    Right.
 5        A.    It doesn't match.
 6        Q.    It doesn't match, you're right.  Did you
 7  author this post?
 8        A.    No.
 9        Q.    Did you direct Ed to author this post?
10        A.    No, not at all.
11        Q.    Okay.  Do you know who made this post?
12        A.    No, I couldn't, I couldn't, I couldn't
13  honestly give you an answer.  I mean, I've got my
14  suspicions, but it's -- I don't have any --
15        Q.    What are your suspicions?
16        A.    -- direct evidence.  I mean, it's just --
17  it just looks like the same guy that wrote all of
18  them.
19        Q.    And who would that be?
20        A.    It's -- in my opinion, it's Ed.
21        Q.    Is Ed familiar with where you live?
22        A.    He's familiar with where my parents used
23  to live.
24        Q.    Which is where?
25        A.    They used to live in Rockwall.
```

300

1    the search engines.

2        Q.    So Ed has told you that he needs to have

3    four or five posts before he can manipulate search

4    engines?

5        A.    Yeah, I think so.

6        Q.    Is that something he told you?

7        A.    I think it's on his website.

8        Q.    What website, the Rip-Off Report?

9        A.    That wouldn't be on the website.  That

10    would not make any sense.

11        Q.    No.

12        A.    He's alleging that he's doing this for

13    free.  It would have had to have been in a

14    conversation that I had with him.

15        Q.    Okay.  Well, look at the headings on

16    these, on these two.  Do you see the headings are

17    different?

18        A.    It looks like this one is an absolute

19    duplication of the same thing.

20        Q.    The same post, but look at the headings,

21    the big bold print at the top.

22        A.    GW Equity, Citibank, CitiGroup, Citi -- I

23    don't -- GW.

24        Q.    I mean, do you see that the headings are

25    different?  There are two different headings.

480

1  himself, because he has nowhere else to put it, and

2  the admission to this little program was that -- I

3  was surprised to see that last night.  That was the

4  first time I had seen anything that he admitted to

5  becoming part of some kind of a plan.  I mean, he

6  denied that even to me, you know, until I read that.

7  He always denied taking money for, for -- I mean,

8  taking money for taking the reports off his site.

9        But I mean, there was just too many people

10  out there complaining about him about the same thing,

11  just enough to know that he's -- it's got to come up

12  as extortion.  I mean, he's got some kind of legal

13  defense against it, but to me it's just -- it's

14  extortion.  There is no way out of it.

15     Q.    So what I've gathered from all of your

16  testimony, Dickson, is that Ed Magedson has

17  indirectly told you that he is responsible for making

18  posts about companies.  He will make these posts.

19     A.    Yes.

20     Q.    And then he will manipulate the search

21  engines; is that true?

22     A.    No question about the search engines.

23  That's where the money is made.

24     Q.    Okay.  So --

25     A.    Because he doesn't take anything off his

481

1  website, but whoever -- whatever they're paying for

2  is the search-engine-related agreement deal.

3      Q.    Okay.

4      A.    That part.

5      Q.    So he will manipulate search engines after

6  he may make some of these posts himself about these

7  companies?

8      A.    There is no question he's doing it.

9      Q.    So he's -- no question Ed is making these

10  posts about these companies, and then he's

11  manipulating them in the search engines, and then

12  he'll go and try to get money from these companies --

13      A.    I don't --

14      Q.    -- to remove them or to manipulate the

15  search back into their favor?  Is that kind of how he

16  operates?

17      A.    I don't believe that he ever approaches --

18  that I know of.

19      Q.    Okay.

20      A.    That he ever approaches the victims.  I

21  think he just waits until they come to him.  I don't

22  know that for sure.

23      Q.    What do you mean by victims?  What are

24  you, what are you talking about?

25      A.    I'm saying the big victims like McKenzie

504

CAUSE NO. 06-12231

GW EQUITY, LLC,                    ) IN THE DISTRICT COURT
        Plaintiff,                 )
                                   )
VS.                                ) DALLAS COUNTY, TEXAS
                                   )
DIXON WOODARD, et al.,             )
        Defendants.                ) 116TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF DICKSON EARL WOODARD

TAKEN ON MAY 8, 2007

        I, Carla J. Shanks, Certified Shorthand
Reporter in and for the State of Texas, hereby
certify to the following:
        That the witness, DICKSON EARL WOODARD,
was duly sworn by the officer and that the transcript
of the oral deposition is a true record of the
testimony given by the witness;
        That the deposition transcript was
submitted on    5/17/07    to the witness or to the
attorney for the witness for examination, signature,
and return to LONE STAR REPORTING by    6/7/07   ;
        That the amount of time used by each party
at the deposition is as follows:

MS. PANNELL:      3 hrs. 47 mins.


        That pursuant to information given to the
deposition officer at the time said testimony was
taken, the following includes all parties of record:

Ms. Kristen Pannell and Mr. Brad Stockford, Attorneys
for Plaintiff,
Mr. Dickson Earl Woodard, Pro Se.

        I further certify that I am neither
counsel for, related to, nor employed by any of the
parties in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.
        Further certification requirements
pursuant to Rules 205 and 206 of TRCP will be
certified to after they have occurred.

505

1
2        Sworn to by me on this the    16th    day of
         May      , 2007.

3

4                      Carla J. Shanks, Texas CSR 5054
                       Certification expires 12/31/08
5                      LONE STAR REPORTING
                       723 Woodlake Drive
6                      Coppell, Texas  75019
                       Firm Registration No. 379
7                      (972) 402-9885  fax (972) 393-3611
                       Date Reported:   5/8/07
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

506

1    CERTIFICATION UNDER RULES 205 AND 206 TRCP

2            The original deposition was/was not

3    returned to the deposition officer on              ;

4            If returned, the attached Changes and

5    Signature page contains any changes and the reasons

6    therefor;

7            If returned, the original deposition was

8    delivered to Ms. Kristen Pannell, Custodial Attorney;

9            That $   1159.70  is the deposition

10   officer's charges to Ms. Kristen Pannell for

11   preparing the original deposition transcript and any

12   copies of exhibits;

13           That the deposition was delivered in

14   accordance with Rule 203.3, and that a copy of this

15   certificate was served on all parties shown herein

16   and filed with the Clerk.

17           Witness my hand this        day of

18            , 2007.

19

20

21

22           Carla J. Shanks, Texas CSR No. 5054
             Expiration Date:  12/31/08
23           LONE STAR REPORTING
             723 Woodlake Drive
24           Coppell, Texas  75019
             Firm Registration No. 379
25           Expiration Date:  12/31/07
             (972) 402-9885    fax (972) 393-3611