1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

CASE NO.: 2:04-cv-47-FtM-34-SPC


WHITNEY INFORMATION NETWORK, Inc., )      **ORIGINAL**
a Colorado corporation,            )
                                   )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )
                                   )
XCENTRIC VENTURES, LLC, an         )    Phoenix, Arizona
Arizona limited liability company; )    August 1, 2007
BADBUSINESSBUREAU.ORG, an,         )      10:00 a.m.
Arizona limited liability company; )
and, ED MAGEDSON, an individual,   )
                                   )
                                   )
                    Defendants.    )
_____)



THE VIDEOTAPED DEPOSITION OF EDWARD MAGEDSON

VOLUME 1

Pages 1 - 126




DEBORAH L. TUCKER
Certified Reporter
Certificate No. 50464

**U.S. Legal Support**
**(305) 373-8404**

Dockets.Justia.com

I N D E X

EXAMINATION:                                          PAGE

By Mr. Lippman                                         17

By Ms. Speth                                          252

By Mr. Lippman                                        260

EXHIBITS                                              PAGE

No.  1   8-page Rip-Off Report internet printout      27

No.  2   2-page Rip-Off Report internet printout;
         Pages 1 and 2 of 8                            90

No.  3   4-page Rip-Off Report internet printout;
         Helping Victims Collect                       96

No.  4   4-page Rip-Off Report internet printout;
         advertising information                      109

No.  5   3-page Rip-Off Report internet printout;
         "We need your help"                          112

No.  6   8-page Rip-Off Report internet printout;
         Frequently Asked Questions                   131

No.  7   7-page Rip-Off Report internet printout;
         File a report                                138

No.  8   3-page Rip-Off Report internet printout;
         Russ Whitney entries                         144

No.  9   5-page Rip-Off Report internet printout;
         Do-It-Yourself Guide                         153

No. 10   5-pgae Rip-Off Report internet printout;
         Rebuttal Rules have changed                  181

No. 11   1-page Rip-Off Report internet printout;
         Some Rebuttal Notes from the EDitor          184

No. 12   Two pages of e-mail series May and June
         2003 between EDitor and Jeff LeJune          189

No. 13   11-page e-mail series; May 2006 re:
         Energy Automation Systems                    193

EXHIBITS    (continued)

No. 14    1-page e-mail series, October 2005
          between Russ Whitney and EDitor
          Bates No. XCN WHT-00044                        197

No. 15    11-page document; "class Action Lawsuit
          Framework in Process"
          Bates Nos. XCN WHT-0053 through 00064          200

No. 16    3-page e-mail series, June 2006 between
          EDitor and Robert Paisola
          Bates Nos. XCN WHT-00278 through 020           210

No. 17    1-page e-mail from EDitor to Robert
          Paisola
          Bates No. XCN WHT-000321                       213

No. 18    1-page e-mail from XD700@aol.com to
          info@RipOffReport.com, October 2006
          Bates No. XCN WHT-00328                        214

No. 19    7-page e-mail series, January, February
          and May 2007 between M.A. Yates and EDitor
          Bates Nos. XCN WHT-00331 through 00337         217

No. 20    3-page e-mail series, February  2006
          between cream bar and EDitor
          Bates Nos. XCN WHT-00325 through 00327         225

1      THE VIDEOTAPED DEPOSITION OF EDWARD MAGEDSON

2 taken on August 1, 2007, at 12:08 p.m., in the offices

3 of Jaburg & Wilk, PC, 3200 North Central Avenue, Suite

4 2000, Phoenix, Arizona, before Deborah L. Tucker, a

5 certified reporter, Certificate No. 50464, for the State

6 of Arizona, pursuant to the Rules of Civil Procedure.

7      The Plaintiff, Whitney Information Network,

8 was represented by its attorneys, Rothstein, Rosenfeldt,

9 Adler, by Mr. Steven L. Lippman and Mr. Shawn L. Birken.

10      The Defendants, Xcentric Ventures,

11 Badbusinessbureau.org, and Mr. Magedson, were

12 represented by their attorneys, Jaburg & Wilk, by

13 Ms. Maria Crimi Speth and Mr. Adam S. Kunz.

14

15

16

17

18

19

20

21

22

23

24

25

```
1                                          Phoenix, Arizona
2                                          August 1, 2007
                                           10:00 o'clock a.m.
3

4             (The proceedings commenced at 12:08 p.m.)
5                    P R O C E E D I N G S

6

7             JUDGE FRAZIER:  This is Judge Frazier.
8        Who's present?
9             MS. SPETH:  Your Honor, this is Maria Speth.
10       I represent the defendants in this case and the deponent
11       in this issue.
12            MR. LIPPMAN:  Your Honor, this is Steve
13       Lippman.  I represent the plaintiff in this action.
14            JUDGE FRAZIER:  All right.  Do you have the
15       capability to take this verbatim, by virtue of your
16       being in a deposition, to include what I'm about to say
17       or not say?
18            MS. SPETH:  Yeah, the court reporter can take
19       it down, absolutely.
20            JUDGE FRAZIER:  Okay.  That's what I want to
21       happen.
22            MS. SPETH:  She's ready.
23            JUDGE FRAZIER:  Okay.  This matter is before
24       me, understanding that I am not the assigned magistrate
25       judge because the assigned magistrate judge is not
```

available.  I have received an oral request referring
this matter to me by the District Court Judge, that's
Judge Howard, just a few minutes ago.

So I understand there's some issue concerning
the presence of someone at this deposition.  I have
reviewed the protective order of confidentiality, as
well as an order issued by Judge Chapel that denied
certain aspects of a protective order.

So, does one of the parties have a motion to
tender to the court?

MS. SPETH:  My motion, Your Honor, would be to
enforce the protective order.  The protective order
indicates that if I designate something as attorney's
eyes only under the protective order then it is
available only to counsel of record and those
supervising staff and, you know, administrative
assistants that are working directly under their
control.

I believe that that protective order is very
clear that it would not include an employee of the
plaintiff.  And these parties are now asking that an
employee of Whitney Information Systems, who is an
attorney, I understand, but he is an employee of the
company, they're asking that he sit in on the deposition
telephonically.

1    He had it on speaker phone.  He had an
2   assistant in his office that we had to ask to leave.
3   And the reason that this is a big deal, Your Honor, is
4   because my client has been the subject of many, many
5   death threats.  And I realize that you don't have the
6   whole big picture here and so it's difficult when you
7   haven't been involved in the case.
8    But the bottom line is -- and I don't, by the
9   way, accuse the plaintiffs of being the people who have
10  made those death threats, just to be clear.  But my
11  client has been the subject of many, many death threats
12  because he runs a website that is very popular and very
13  controversial.
14   We have paid an off-duty police officer to
15  guard this deposition.  My client takes this very, very
16  seriously.  I have been the subject of death threats
17  myself.  And we need to keep this information
18  confidential as to when this deposition is happening and
19  what is being said.  And I don't see any reason why
20  in-house counsel needs to be involved.  They already
21  have two attorneys, outside counsel, here.
22   JUDGE FRAZIER:  All right.  Counsel for
23  Whitney, your response?
24   MR. LIPPMAN:  Yes, sir, Your Honor.
25   We would like to have, in essence, our client

1    through his in-house counsel attend the deposition.

2              (Court reporter clarification.)

3         MR. LIPPMAN:  In essence, we would like to

4    have our client appear to be able to assist us in this

5    deposition by having its in-house counsel appear by

6    telephone so that we can confer with him.

7         There has never been a motion for a protective

8    order, of any protective order sought to preclude

9    anybody from attending any deposition.  And we would

10   oppose such an order.

11        There was a motion for protective order filed

12   which sought to limit who we could show a video

13   deposition that we had subpoenaed that was taken in

14   another case.  That was the protective order that Judge

15   Chapel had entered that precludes us from showing that

16   video deposition to anybody else outside the case.  We

17   had no problem with that because we have no interest in

18   showing it to anybody else.

19        With regard to Mr. Magedson's deposition, they

20   had previously sought a motion for protective order with

21   regard to procedures concerning the confidentiality and

22   where this deposition is going to take place, and Judge

23   Chapel denied that.  She said, to the extent that it

24   applies, my prior protective order would govern.

25        And we have no intention of showing anybody

1    the video or the transcript of this deposition, which

2    would be covered under Judge Chapel's order absent an

3    additional order from her.

4          But absent from any of these items and silent

5    of any of these items is any request to preclude our

6    client from being able to assist and attend the

7    deposition, or any order doing so.

8          Now, with regard to the death threats, I don't

9    know the veracity of the claim that death threats have

10   been made.  Certainly, there has been no -- there's no

11   allegation that us or our client made any of these

12   threats.  But Mr. Magedson feels uncomfortable.  He

13   wants to have a police officer here.  I have no problem

14   with that.

15         He didn't want us to disclose where this

16   deposition was being taken to other people.  We have not

17   done so.  We've been willing to coordinate with them.

18   Our client knows the call-in number with permission we

19   gave him here.

20         So, having our client attend and assist us, I,

21   quite frankly, don't see a connection between that and

22   any death threat that was made to Mr. Magedson or any --

23   any, you know, notification of where this deposition is

24   being taken place.

25         I certainly would be willing to represent on

1   the record, and I feel very confident that our -- the

2   in-house counsel would represent, as well, on the record

3   that he will not disclose to anybody the number that he

4   called in or where we're at, to the extent he knows

5   that, so that takes care of their issue with regard to

6   the death threats or where we're located.

7        But we're entitled to have our clients here.

8   We're entitled to have the assistance of our clients.

9   There's no restriction on who the defendant can have

10  here to assist him.  It's fairly normal in depositions.

11       JUDGE FRAZIER:  I'm looking at the agreement.

12  In Paragraph 5 it says, "limited to authorized persons

13  solely in the performance of their duties in connection

14  with trial preparation, authorized persons or counsel of

15  record who have consented and signed the promise of

16  confidentiality, paralegal, secretarial, administrative

17  and legal personnel working under the direction and

18  control of those counsel of record, outside experts and

19  consultants retained by counsel of record who have

20  consented and signed the promise.  And further access

21  may be agreed to by the parties documented in writing or

22  requested by any party by a motion filed with the court

23  and approved by this court."

24       MR. LIPPMAN:  Yes, sir.  And --

25       JUDGE FRAZIER:  "Authorized persons shall not

1    include" -- and then it sounds like this has to do with

2    some group that would make information available on a

3    contract basis.

4         My concerns are these.  While in-house counsel

5    may be considered the client, there's no -- as far as I

6    see, and no one's told me, that there was any effort

7    made until now at the last minute to bind him to this

8    agreement, to have him sign the promise of

9    confidentiality that everyone would have had to have

10   done prior to this occurring.

11        I also recognize that paralegal, secretarial

12   and administrative and legal personnel working under

13   your direction would be allowed to at least view or have

14   access to the confidentiality material.

15        You're telling me that counsel is not present,

16   correct?

17        MR. LIPPMAN:  Yes, Your Honor.  And if I may,

18   to allude to one of your points, we did agree in advance

19   that the person who was going to attend was going to be

20   bound by the protective order.  He has reviewed the

21   protective order and he is prepared to state on the

22   record that he is bound by the protective order.

23        JUDGE FRAZIER:  And he is not present,

24   correct?

25        MR. LIPPMAN:  He is not present.  He's going

1    to be appearing by telephone, yes.

2            JUDGE FRAZIER:  All right.  Briefly, response

3    from counsel for defendants.

4            MS. SPETH:  Yes, Your Honor.  I want to say

5    that although I don't blame Whitney Information Systems

6    for any of the threats, I do have in front of me a

7    plaintiff company that has been accused of a great deal

8    of wrongdoing, the subject of an SEC investigation, has

9    been accused of a whole host of dishonest behavior.

10           I do not believe this is a company that I can

11   trust.  I certainly trust their attorneys, and I

12   appreciate that their attorneys need to be present and

13   need to do their job, but in-house counsel is an

14   employee of the company and it's just a whole different

15   host of -- you know, you have a whole different

16   situation, and I do not trust that company.

17           I know from our discovery in this case that

18   the people that they hire in that company, you know,

19   have honesty issues, and we have lots and lots of

20   information like that.  So, completely uncomfortable

21   with it.

22           But from a pure legal point of view, Your

23   Honor, the protective order says counsel of record and

24   their staff.  This gentleman is not counsel of record.

25   He is an in-house employee of the company.

1      MR. LIPPMAN:  Your Honor, if I may --

2      JUDGE FRAZIER:  The problem I have is that it

3  doesn't say that authorized persons are the parties.

4      MR. LIPPMAN:  And if I may --

5      JUDGE FRAZIER:  It doesn't say, I mean,

6  Xcentric Ventures, Badbusinessbureau.org, the named

7  defendant.  I mean, it looks like all of those people

8  are not covered.

9      MS. SPETH:  That's correct.  It's attorney's

10  eyes only.

11      MR. LIPPMAN:  And if I may, Your Honor, part

12  of the problem is that this motion for protective order

13  was entered in response to the defendant's objection to

14  a subpoena that we had served on a third party to obtain

15  from them a copy of a video deposition that was

16  conducted.

17      JUDGE FRAZIER:  All right.  What's the nature

18  of the lawsuit that the plaintiffs have brought, just

19  briefly?

20      MS. SPETH:  They have brought a claim for

21  defamation against my client.  My client operates a

22  website, and there have been hun- -- maybe not hundreds,

23  dozens, dozens of postings on my client's website by

24  third parties who claim that Whitney Information Systems

25  ripped them off, was dishonest, harmed them in some way.

1    Whitney Information Systems is trying to hold my client

2    liable for that defamation as the host of the website.

3         JUDGE FRAZIER:  All right.  Well, I'm going to

4    put you on hold for just a second, hang on.

5         (Recess taken from 12:18 p.m. to 12:19 p.m.)

6         JUDGE FRAZIER:  All right.  I've considered

7    the matter, and it appears to me that this agreement

8    does not contemplate that parties would be present, I

9    believe, in depositions, because that would have been a

10   provision, or should have been a provision if that was

11   contemplated.

12        Secondly, as to the plaintiffs, if there is

13   any prejudice, there will be, of course, be the

14   deposition.  I think it is being videotaped, it appears.

15        MS. SPETH:  It is.

16        JUDGE FRAZIER:  And so at a subsequent

17   opportunity, upon litigation of this issue, wherein

18   there's more time for both parties and the Court to

19   review the issue, then the in-house counsel would be

20   able to avail himself of seeing the material, hearing

21   the deposition, and the parties could seek to reopen the

22   deposition if you could show good cause why that should

23   happen.

24        So I'm going to deny allowing the

25   participation of in-house counsel because I find that

1    he is a party and that was not contemplated in the

2    protective order, but leave for the parties to

3    re-litigate this issue when the Court has sufficient

4    time to take it under advisement and make a better and

5    more, perhaps, well-reasoned decision.  I just don't

6    find that there's any great prejudice.  So that's my

7    ruling and go ahead and proceed.

8                MS. SPETH:  Thank you, Your Honor.

9                MR. LIPPMAN:  Thank you, Your Honor.

10               JUDGE FRAZIER:  All right.  Bye.

11               (Recess taken from 12:21 p.m. until 12:25

12   p.m.)

13

14                    P R O C E E D I N G S

15

16               VIDEOGRAPHER:  My name is Mark Gonsalves with

17   Atwood Reporting Service.  This is the videotaped

18   deposition of Ed Magedson in the matter of Whitney

19   Information Network, Inc., v. Xcentric Ventures, LLC,

20   et al.

21               This matter is being held in the United States

22   District Court, Middle District of Florida, Cause

23   No. 2:04-cv-47-FtM-34-SPC.

24               Our location is the offices Jaburg & Wilk at

25   3200 North Central Avenue, Suite 2000, Phoenix, Arizona.

The court reporter is Debbie Tucker with Atwood

Reporting.   This deposition is being videotaped at all

times unless specified to go off the record.   The

deposition is now beginning at 12:25 p.m. on Wednesday,

August 1st of 2007.

             Counsel, would you please identify yourself

and whom you represent, starting with plaintiff's

counsel?

             MR. LIPPMAN:   This is Steve Lippman along with

Shawn Birken.   We represent the plaintiff.

             MS. SPETH:   This is Maria Speth.   I'm

representing defendant Xcentric Ventures and Ed

Magedson.

             VIDEOGRAPHER:   Thank you, counsel.

             The court reporter will swear in the witness,

please.



             EDWARD MAGEDSON,

called as a witness herein, after having been first duly

sworn, was examined and testified as follows:



             MS. SPETH:   And before you start, I'd like to

designate this as confidential pursuant to the

protective order.

1          MR. LIPPMAN:  Very well.

2          And let me just state for the record that we

3    -- it's just about 12:30 now, but we actually got

4    started with the deposition around 11:30, and we spent

5    between 11:30 and 12:00 o'clock addressing the issue of

6    Mr. Lewis' participation.  So, we started a little late,

7    but not quite as late as where we are right now.

8

9                         EXAMINATION

10   BY MR. LIPPMAN:

11       Q.    **Sir, would you state your name, please?**

12       A.    Edward Magedson.

13       Q.    **Mr. Magedson, I know you've had your**

14   **deposition taken before, but if you wouldn't mind, I'm**

15   **going to go through, for lack of a better term, the**

16   **ground rules for this deposition this morning.**

17          **As I'm sure you know from your prior**

18   **experiences, this is an opportunity for me to ask you**

19   **questions while you're under oath pertaining to the**

20   **issues in this lawsuit that we are here for today.**

21          **But it's very important that we make sure that**

22   **we understand each other in asking and answering**

23   **questions.  And so, consequently, if at any point in**

24   **time I ask you a question and you have any problem**

25   **whatsoever with the question I ask you, either you don't**

1    understand it or you think there's a premise in the

2    question that's inaccurate, perhaps I've totally bored

3    you to death by that time point in time that you just

4    weren't paying attention to me, or whatever else the

5    problem is, please, then, if you have a problem with any

6    question, don't answer it.  Let me know what the problem

7    is, and I will either repeat the question or ask it in a

8    different way so that you can understand it and respond

9    to it.  Okay?

10        A.    Okay.

11        Q.    The flip side of that is, if I ask you a

12   question and you respond to it, then I'm going to

13   assume, and anybody who reads the transcript of this

14   deposition can assume, then, that you heard my question

15   and you understood it and your answer is in response to

16   it.  Okay?

17        A.    Okay.

18        Q.    I would ask you if you would try to be mindful

19   of waiting until I complete my answers (sic) and I will

20   try and do the same for you so that it makes it a little

21   bit easier for the court reporter to take everything

22   down.  Okay?

23        A.    Okay.

24        Q.    And one other thing I would ask you to be

25   mindful of is to please answer vocally.  We all nod our

1   heads yes or no.  We all say uh-huhs and huh-uhs.  And

2   there's nothing wrong with that.  I'm not trying to

3   chastise you.  Every one of us does it in our casual

4   speech pattern.  But because we want this record to be

5   very clear as to what your responses are, I may prompt

6   you a couple times, "Is that yes?  Is that a no?" just

7   so that we know the transcript is very clear.  Okay?

8       A.    Okay.

9       Q.    Now, Mr. Magedson, what is your home address?

10          MS. SPETH:  I'm sorry, I was still thinking

11   about the phone being on "Do not disturb."  I'm going to

12   object to that question as not relevant to this case.

13   If you need to reach Mr. Magedson, you can reach him

14   through my office.

15          MR. LIPPMAN:  Okay.  So anything we want to

16   serve or any time we want to reach Mr. Magedson, it can

17   be done through your office?

18          MS. SPETH:  With respect to this case,

19   absolutely.

20       Q.    MR. LIPPMAN:  Okay.  Mr. Magedson, are you a

21   college graduate?

22       A.    No.

23       Q.    Did you attend college at all?

24       A.    Yes.

25       Q.    Where did you attend college?

1     A.     El Centro College.

2     **Q.     I'm sorry?**

3     A.     El Centro College.

4     **Q.     "El" like e-l?  El Central?**

5     A.     Um-hum.  "Centro."

6     **Q.     Centro.**

7     A.     Actually, I'm not sure.  It's so many years

8  ago.  El Central, El Centro.

9     **Q.     Okay.  But like E-l, next word C-e-n-t-r-o,**

10  **El Centro?**

11     A.     I think so.

12     **Q.     Okay.  And where is that located?**

13     A.     In Dallas, Texas.

14     **Q.     And how long did you go to college?**

15     A.     Not very long.

16     **Q.     A year?**

17     A.     No, about six months.

18     **Q.     Okay.**

19     A.     I think.

20     **Q.     One semester?**

21     A.     I think so.

22     **Q.     Okay.  You are a high school graduate, right?**

23     A.     No.

24     **Q.     You're not a high school graduate?**

25     A.     No.

1    Q.    And you went to college?

2    A.    Yes.

3    Q.    Oh.  Do you have a G.E.D., like a high school

4  equivalent?

5    A.    No.

6    Q.    So you never -- you never graduated high

7  school?

8    A.    Um-hum.

9    Q.    Is that correct?

10    A.    Correct.

11    Q.    And you don't have like -- did you go to high

12  school in Texas?

13    A.    No.

14    Q.    Where did you go to high school?

15    A.    In East Meadow.

16    Q.    New York?

17    A.    Yes.

18    Q.    Okay.  And how long did you go through high

19  school?

20    A.    Tenth grade.

21    Q.    Okay.  And -- is it called El Centro College?

22    A.    Yeah.  And I can't remember how long I was

23  there for.

24    Q.    Okay.

25    A.    Because it's so -- but I remember I was

1   admitted there, paid, and I -- it just didn't last long.

2   I was there just for a short time.

3       Q.    Is El Centro College -- and I apologize, I'm

4   not familiar with it.  Is it a four-year institution?

5       A.    I don't know.

6       Q.    Or like a junior college maybe?

7       A.    Maybe.  I don't -- can't remember.  It's

8   over --

9       Q.    A while ago?

10      A.    A while ago, so -- it's over 30, 40 years ago.

11      Q.    How do you get into college not being a high

12   school graduate?

13      A.    Umm, I -- I won a -- I won some sort of a

14   scholarship, and I actually was able to talk my way into

15   letting me use the scholarship.

16      Q.    Good for you.  Now, you are presently

17   employed?

18      A.    Yes.

19      Q.    Self-employed?

20      A.    Yes.

21      Q.    You work for entities that you own?

22      A.    Xcentric Ventures.

23      Q.    I'm sorry?

24      A.    Xcentric Ventures.

25      Q.    Xcentric Ventures.  Okay.  One of the

1    defendants in this case?

2        A.    Yes.

3        Q.    And that is Xcentric Ventures, LLC, right?

4        A.    Correct.

5        Q.    Okay.  Can we just call that Xcentric for

6    purposes of this deposition?

7        A.    Absolutely.

8        Q.    So we'll understand if we use the term

9    Xcentric we're referring to the defendant Xcentric

10   Ventures, LLC?

11       A.    Fine.

12       Q.    We'll save ourselves a little bit of breath

13   that way.

14       A.    Okay.

15       Q.    Now, you are one of the owners of Xcentric?

16       A.    No.

17       Q.    You're the sole owner of Xcentric?

18       A.    No.

19       Q.    Do you have any ownership interest in

20   Xcentric?

21       A.    I'm a manager of Xcentric.

22       Q.    Okay.  Any other position in Xcentric

23   besides --

24       A.    No.

25       Q.    -- manager?

1    A.    No.

2    Q.    **And as a manager you have no ownership**

3    **interest in the entity?**

4    A.    No.

5    Q.    **Who owns Xcentric?**

6    A.    Umm, I'm not sure I understand the structure.

7    When -- I -- I'm not sure I understand the structure of

8    -- of the company.

9    Q.    **Well, who gives you directions as the manager**

10   **as to how to run the company?**

11        MS. SPETH:  Object to form.

12        But you can answer.  Just because I object

13   doesn't mean you can't answer.

14        THE WITNESS:  What was the question?

15   Q.    **BY MR. LIPPMAN:  You're the manager of**

16   **Xcentric Ventures, right?**

17   A.    Correct.

18   Q.    **Is the manager the highest person at Xcentric**

19   **Ventures?**

20   A.    I think so, yes.

21   Q.    **Okay.  And somebody other than yourself owns**

22   **Xcentric Ventures, right?**

23   A.    I don't own it.

24   Q.    **Okay.  Well -- but who, from an ownership**

25   **standpoint, gives you direction as the manager as to how**

1    to carry out the functions of Xcentric?

2        A.    Nobody does.

3        Q.    **Who do you report to as the manager from an**

4    **ownership side?**

5            MS. SPETH:  Object to form.

6            THE WITNESS:  Who do I report -- I report to

7    myself.

8        Q.    **BY MR. LIPPMAN:  You don't report to anybody**

9    **on the ownership side of the business?**

10       A.    No.

11       Q.    **Okay.  And you don't even know who owns the**

12   **business?**

13       A.    I have -- it -- I don't understand how -- I --

14   I can't remember and understand how the entity is set

15   up.

16       Q.    **Okay.**

17       A.    So I -- I just don't know.

18       Q.    **Why don't you explain to me, as best you know**

19   **and as best you understand, what the ownership is of**

20   **Xcentric Ventures.**

21       A.    I -- I can't explain any more than I just did.

22   I don't know.  You would have to refer to counsel to ask

23   -- umm, to explain that, because I -- I don't

24   understand.  I'm not the one that set up my structure.

25       Q.    **Is it another entity that is the owner of**

1    Xcentric?

2        A.    I would think so.

3        Q.    Okay.  And do you have an ownership interest

4    in the entity that owns Xcentric?

5        A.    No, I don't.

6        Q.    Okay.  Is it a series of entities?  In other

7    words, is there a company one that owns company two that

8    owns company three that owns company four that owns

9    Xcentric?

10            MS. SPETH:  Object to form.

11            Go ahead.

12            THE WITNESS:  I don't understand.

13        Q.    BY MR. LIPPMAN:  You don't know?

14        A.    No, I don't.

15        Q.    Okay.  And you don't -- as you sit here today

16    you don't even know if you personally have any ownership

17    interest in any entity that has an ownership interest in

18    Xcentric?

19            MS. SPETH:  I'm going to object to form and

20    foundation -- well, just form.

21            THE WITNESS:  So what does that mean?

22            MS. SPETH:  Just ignore me.  I'm just making a

23    record.

24            THE WITNESS:  Okay.

25        Q.    BY MR. LIPPMAN:  She's earning her pay.

1        MS. SPETH:  See, I told you I was.

2        THE WITNESS:  She earns her pay.

3        Umm, I'm not -- I can't answer because I don't

4    know.

5        MR. LIPPMAN:  All right.  Do you mind -- are

6    these exhibits?  Do you mind if I just stick them on?

7        **Q.    BY MR. LIPPMAN:  Now, Xcentric operates the**

8    **Rip-Off Report website, right?**

9        A.    Correct.

10       (Deposition Exhibit No. 1 was marked for

11   identification.)

12       **Q.    BY MR. LIPPMAN:  And explain to me what the**

13   **Rip-Off Report website is.**

14       MS. SPETH:  Form.

15       Just -- you have to ignore me.

16       THE WITNESS:  Explain to you what the website

17   is?

18       **Q.    BY MR. LIPPMAN:  Yeah.**

19       A.    It's -- my website is by consumers for

20   consumers to report what they feel is -- has -- is --

21   has been wrong to them.  Like consumers can file

22   anywhere on the internet on a blog or -- on Rip-Off

23   Report to specifically state what a company might have

24   done wrong to them.

25       **Q.    Okay.**

A.    And to help educate consumers.  And it's also
there for businesses to show how they have taken care of
those problems, especially when there's a number of
complaints that come in.

The website allows a business at any time to
rebut positive or negative, a company insider can come
in and tell.  Because that's the way the internet is
today.  Everything is out there.  We're all going to be
blogged sooner or later.  Right or wrong, good or bad,
we're all going to get blogged.

Q.    **And would you refer -- would you characterize
the Rip-Off Report website as a blog?**

A.    Umm, no.  I mean, I think it's more respectful
than just a blog because we do hold back and delete a
lot of things that are nonsense.  And so...

Q.    **What kind of things that are nonsense does
Rip-Off Report hold back or delete that would otherwise
go on a blog?**

A.    Foul language, things that just don't make
sense.  You know, we just try to -- just that it --

Q.    **What do you mean by things that just don't
make sense?**

A.    Well, there's people that try and file things
that make absolutely no sense that are just jibberish.
And it's...

1    Q.    **Can you give me an example of something that's**
2    **filed that just doesn't make any sense that would be**
3    **precluded from being posted on the Rip-Off Report?**
4    A.    Oh, people just try to post links to porn
5    sites, child porn sites, just things that just are total
6    nonsense.  Total jibberish.
7         Just like if you were to go test a typewriter
8    and type it out, people just do that just to see if they
9    can go ahead and, like, let it get through.
10   Q.    **Okay.**
11   A.    Or they'll just say total nonsense.  It just
12   -- it doesn't make any sense whatsoever.
13   Q.    **They'll -- they'll put something on there and**
14   **it's, to you or whoever's reviewing it, it's**
15   **incomprehensible?**
16   A.    Exactly.
17   Q.    **Okay.**
18   A.    Threats also, we don't allow.  I mean, if
19   we're talking about, you know, things that we don't --
20   threats of violence, social security numbers --
21   Q.    **Um-hum.**
22   A.    -- bank account numbers.
23   Q.    **Okay.**
24   A.    I will try, you know, blank out numbers or,
25   you know, put Xs or something that's there, or it will

1  say the word "redacted" --

2     **Q.    Okay.**

3     A.    -- with a couple of brackets around that word

4  redacted.

5     **Q.    Um-hum.  Anything else?**

6     A.    There could be.  I can't think at the moment,

7  but...

8     **Q.    I know you mentioned that one of the things**

9  **you prevent from being posted on the Rip-Off Report is**

10  **links to pornography?**

11     A.    Links basically going anywhere but government

12  websites or news stations.  So there's people that try

13  to put links to, like, places that will just freeze up

14  your computer.  If it's not recognized by us or checked

15  out, it -- we redact those links.

16     **Q.    Okay.  So, in other words, it's more than just**

17  **links to pornography.  If I was to post a report and**

18  **link to, I don't know, like my company's website, you**

19  **might --**

20     A.    If you were the owner of the company and you

21  were rebutting, absolutely you could post a link to your

22  website, a link to positive comments, and things about

23  your business, absolutely.

24     **Q.    Okay.  But if I was a -- somebody posting an**

25  **initial report and I wanted to link to something -- like**

1    maybe I wanted to link to the company I was complaining

2    about.   Would that be precluded or --

3        A.     No, no, because that's what you're talking

4    about.

5        Q.     Okay.  So somebody's looking at this and

6    making a determination as to whether the link is

7    appropriate or not?

8        A.     Yes.  And "appropriate" meaning appropriate.

9    X-rated or something that could be violent or freeze up

10   somebody's computer, which is common that people try to

11   do all the time.

12       Q.     Okay.  Now, how long have you been the manager

13   at Xcentric?

14       A.     Well, since Xcentric started.

15       Q.     And that was when?

16       A.     If you offered me a million dollars to give

17   you even the year, I wouldn't get that million dollars.

18   I have no clue.  I can't remember.

19       Q.     Okay.

20       A.     I don't remember what year.

21       Q.     Do you do anything else work-wise other than

22   serving as a manager at Xcentric?

23       A.     I don't understand the question.

24       Q.     Well, when I asked you earlier what you do for

25   work you told me you're the manager of Xcentric?

 1        A.     Right.

 2        Q.     Is that your only job that you do, the only

 3   thing you do for work?  Do you have other business

 4   ventures you're involved in --

 5        A.     No.

 6        Q.     -- things of that nature?

 7        A.     No.

 8        Q.     You don't work for somebody else or have any

 9   other -- anything else going on?

10        A.     No.

11        Q.     Okay.  Now, other than your work at Xcentric,

12   what was the last time you were involved in any other

13   business venture, either self-employed or work for

14   somebody else, that you did for work?

15        A.     That I worked for somebody else?

16        Q.     No, I said whether you worked -- were

17   self-employed or you worked for somebody else.  When's

18   the last time you did anything else for work?

19             MS. SPETH:  You mean for Xcentric or before

20   Rip-Off Report?

21             MR. LIPPMAN:  Well, Xcentric is Rip-Off

22   Report.

23             MS. SPETH:  Yeah, but that's two different

24   questions so I'm -- I'm going to object to form.

25        Q.     BY MR. LIPPMAN:  Okay.  I mean, you already

1  told me that Xcentric runs the Rip-Off Report, right?

2          MS. SPETH:  Currently?

3          THE WITNESS:  Currently, yes.

4      Q.    BY MR. LIPPMAN:  Okay.  Well, is it -- did

5  somebody else ever run the Rip-Off Report before

6  Xcentric?

7      A.    Yes.

8      Q.    Who used to run the Rip-Off Report?

9      A.    I -- I -- I think it was Bad -- it was Bad

10 BadBusinessBureau.com or BadBusinessBureau.com, LLC, or

11 something.  I'm not sure.

12     Q.    And when did Xcentric started running --

13     A.    I told you --

14     Q.    Let me finish because it's a little different

15 question.

16          When did Xcentric start running the Rip-Off

17 Report?

18     A.    I can't remember what year it was.

19     Q.    More than three or four years ago?

20     A.    Yeah, I would say more than three for sure.

21     Q.    More than three for sure?

22     A.    Yeah.  It could be four.  It could be five.

23 It could be six.  I can't -- you know, time is -- it

24 just -- I don't know.

25     Q.    Okay.  And I just want to clarify,

1    **Mr. Magedson -- and perhaps your counsel might want to**

2    **chime in on this, as well.**

3          **But your -- the deposition we're taking right**

4    **now is, in addition to you appearing in your individual**

5    **capacity, you are also appearing as the corporate**

6    **representative for Xcentric Ventures for those areas**

7    **that we have designated in our notice, correct?**

8          MS. SPETH:  That is my understanding.  And I

9    would just like to say for the record that

10   Mr. Magedson's last name is "Magedson."

11         MR. LIPPMAN:  Am I mispronouncing it?

12         MS. SPETH:  You are.

13         MR. LIPPMAN:  I apologize.

14         THE WITNESS:  It --

15         MS. SPETH:  It doesn't matter to him, I guess.

16         THE WITNESS:  It's gone -- it doesn't make a

17   difference.  People butcher it all the time.  It doesn't

18   make a difference.

19         **Q.    BY MR. LIPPMAN:  If I do --**

20         A.    Okay.  That's all right.

21         **Q.    If I continue to do it, I will try my best --**

22         A.    "Magedson" is the right way.

23         **Q.    Say it again slowly.**

24         A.    Magedson with a "G."

25         MS. SPETH:  With a soft --

```
 1     Q.    BY MR. LIPPMAN:  Mag --

 2     A.    "Magedson."

 3     Q.    Magedson.

 4     A.    Magedson.

 5     Q.    I'll try --

 6     A.    That's fine.

 7     Q.    I'll try my best.

 8     A.    I didn't notice you -- there was a problem,

 9 but it's okay.

10          MS. SPETH:  It's a soft "G" and you were

11 saying "Magedson."

12     Q.    BY MR. LIPPMAN:  I apologize.  I -- no

13 disrespect intended.

14          MS. SPETH:  I'm sure.  I just figured since

15 there's a video you'd want it to be right.

16     Q.    BY MR. LIPPMAN:  I apologize.

17          Let me try this a little different way.  But

18 do you recall when it was you were in El Centro College?

19 You don't look that old.

20     A.    '60 -- I don't look that old?  Thanks.  Those

21 compliments are not going to get you -- no, I'm -- I was

22 there.  I know what the I.D. looks like and I can

23 remember that it's -- I want to say '68, '69.

24     Q.    Okay.

25     A.    And I don't remember how -- I could have been
```

1    there a month.  I could have been there five or six

2    months.  And I can't recollect, for some reason, the

3    amount of time.

4         Q.    No problem.  Let's just use like 1970 as a

5    benchmark.

6         A.    No, I -- it wasn't '70.

7         Q.    And I'm not even saying that.  Let's just use

8    1970 as a benchmark?

9         A.    It was just before 1970, for sure.

10        Q.    Okay.  Where did you go -- you leave El Centro

11   College.  What did you start doing for work?

12        A.    I started a business.  I started business of

13   kids on street corners selling flowers.

14        Q.    Okay.  And where was that located?

15        A.    Dallas.

16        Q.    Was that a corporate entity?

17        A.    Flower Children, Inc., or something.

18        Q.    Okay.  And for how long did you do that?

19        A.    Through, I want to say, 1979.

20        Q.    Okay.  And that was your sole -- your sole

21   work was running -- I'm sorry, what was the name of it?

22   Flowers --

23        A.    Flower Children, Inc.

24        Q.    Flower Children, Inc.?

25        A.    Um-hum.

1  Q.    So, from about 1970, or sometime earlier than

2  1970, through 1979 you were running Flower Children,

3  Inc.?

4  A.    Yeah, it could have been till '80 --

5  Q.    Okay.

6  A.    -- or even '81 I still had stores, I think.

7  Q.    Okay.

8  A.    I can't remember.

9  Q.    Okay.  And what happened that caused you to

10  stop Flower Children, Inc.?

11  A.    I just got rid of the stores and wanted to do

12  something else.

13  Q.    Did you sell them?

14  A.    Sold them.

15  Q.    Okay.  And what was the next business venture

16  you entered into?

17  A.    I went into housing, co-invented a product.

18  This is like 1980.

19  Q.    Um-hum.

20  A.    In the 1980s.

21  Q.    Are those two different things, housing and

22  co-inventing a product?

23  A.    Yeah.

24  Q.    Okay.

25  A.    Two different things.

1    Q.    So housing, we're talking you bought

2    apartments or houses and rented them out?

3    A.    Yes.

4    Q.    Okay.  And was that done in a corporate form?

5    A.    Yes.  Some, yes, some not, um-hum.

6    Q.    And where were these houses located?

7    A.    In New York.

8    Q.    Okay.  Where in New York?

9    A.    Long Island and upstate New York.

10   Q.    Okay.  And what was the item that you

11   co-invented?

12   A.    Stained glass.  A way to make any window into

13   stained glass without using real lead or having to cut a

14   window.

15   Q.    And was that invention done just by yourself?

16   Well, you said you co-invented it so you did it with

17   somebody else.

18   A.    Somebody came to me from -- from, you know,

19   from, I want to say elementary to junior high school

20   days, came to me and asked, you know, what I thought,

21   and, you know, would I be interested in investing money

22   and -- and I re-packed it.  I made it -- I packaged the

23   product and automated it, went to different companies to

24   have the product mass manufactured and got it in

25   J.C. Penney's, Sear's, and it sold.

1    Q.    Okay.

2    A.    I did it on trade shows and I did it myself.

3    Q.    Was that a corporation that you --

4    A.    Yes.

5    Q.    -- and your friend owned?

6    A.    And I don't remember the name of the cor- -- I

7    want to think of the name of the corporation.  I knew

8    you were going to ask me.

9    Q.    What was the friend's name?

10   A.    What's that?

11   Q.    What was the friend's name?

12   A.    All I can remember is Eric.  And I can't

13   remember the last name.

14   Q.    Did you guys make a lot of money off this?

15   A.    What's that?

16   Q.    Did you guys make a lot of money off this?

17   A.    To some degree.

18   Q.    Millions?

19   A.    No.

20   Q.    And when did you sell your interest in this

21   stained glass window business?

22   A.    I can't remember.

23   Q.    Sometime in the '80s?

24   A.    Sometime in the '80s, and I can't remember.

25   It's foggy to me, so I just -- I can't.

1   Q.    Okay.  And the housing that you were doing,

2   the purchasing of houses or apartments and leasing those

3   out, for how long did you do that?

4   A.    Till about '89.  Before I came to Arizona.

5   Q.    Okay.  And between the time you were doing the

6   housing and the stained glass window business until the

7   time you came out to Arizona, were there any other

8   business ventures that you were involved in?

9   A.    I involved myself in some underground

10  newspapers, alternative -- back then they were called

11  underground newspapers.  They're alternative newspapers.

12  Q.    As an investor?

13  A.    Yes.

14  Q.    You weren't writing the newspapers?

15  A.    I forget.  I -- there was -- I was so busy.  I

16  mean, you know, I tried to be involved, but I was --

17  umm, yeah.  What -- what's the question?

18  Q.    You weren't a regular writer or a publisher or

19  editor of this newspaper?

20  A.    No, I was never a writer.

21  Q.    Or publisher of or editor of these newspapers?

22        MS. SPETH:  Object to form.

23        THE WITNESS:  I could have been.  I can't

24  remember.

25  Q.    BY MR. LIPPMAN:  Okay.  Did you work there on

1    a daily basis?

2        A.    I can't -- yeah, this back -- you know, I --

3    not, no.  On a daily basis, no.  This is just something

4    I dabbled in on the side.

5        Q.    Okay.  More as an investment?

6        A.    Right.

7        Q.    In any of this period, did you ever work --

8    have you ever worked for anybody else besides yourself?

9        A.    Yes.

10        Q.    Who did you work for?

11        A.    Lone Star Donut when I was 17 when I went to

12    Dallas.

13        Q.    In Dallas or in New York?

14        A.    In Dallas, when I went to Dallas.  And before

15    that I worked for a baker --

16        Q.    Okay.

17        A.    -- part time when I was, you know, 15 years

18    old.

19        Q.    Okay.  So since the time you left El Centro

20    College you've always worked for yourself?

21        A.    Umm, well, technically I -- well, yes.

22        Q.    Okay.  Now, you said you came to Arizona in,

23    was it '79?

24        A.    Well, I came to Arizona originally in '70 -- I

25    want to say '1, '2, or '3 and opened up -- because I was

1    opening up flower stores all over the United States.  So

2    I came here, I want to say, '71, '72, '73, I think it

3    was.  You know, I think before here I was in El Paso.

4    And from here I went to Tucson and went to California,

5    so...

6         Q.    **Were you living here?**

7         A.    There was a big earthquake in California.  I

8    was there for it after I left here.  So what year was

9    that earthquake?  That's the year it was.

10        Q.    **Did you come out to Arizona to open more of**

11   **these Flower Child --**

12        A.    Yes, I did.

13        Q.    **-- stores?**

14        A.    That's why I came here, yes.

15        Q.    **And that's why you were going to all these**

16   **various entities, El Paso and then to California, was to**

17   **open up stores?**

18        A.    Right.

19        Q.    **And so was the view that, for instance, you**

20   **would come to Arizona, and in your mind you said, "I'll**

21   **be here for six months.  I'll open a bunch of stores.**

22   **And then I'll go to the next place for six months and**

23   **open a bunch of stores"?**

24        A.    Not six months.  There was no time.

25        Q.    **Whatever.  But you weren't -- were you -- you**

1    weren't intending to come here permanently, you were

2    coming here to open up some stores and then move on to

3    the next location?

4         A.    Right.

5         Q.    Okay.  This is when you originally came in the

6    early '70s?

7         A.    Right.

8         Q.    And then I think you said, was it '79 that you

9    permanently moved out to Arizona?

10        A.    No, in '90.

11        Q.    '90, I apologize.

12              And what made you want to come out to Arizona

13   in 1990 as a permanent --

14        A.    I made a wrong turn.

15        Q.    You made a wrong turn?

16        A.    Yeah.

17        Q.    Where were you heading?

18        A.    My parents had retired out here.  And then I

19   came out here to take care of my parents so they

20   wouldn't go into an old age home, which they didn't, and

21   I took care of them.

22        Q.    You just decided to stay?

23        A.    So I -- well, I got involved with one thing

24   and another and so I'm here and -- I'm here.

25        Q.    Okay.  Now, what was the first business you

1    got involved in here in Arizona after you moved here in

2    1990?

3        A.    I opened up indoor swap meets.

4        Q.    Indoor swap meets?

5        A.    Um-hum.

6        Q.    Those are like, like a flea market type of

7    thing?

8        A.    Yeah, swap market, flea market.  Same thing.

9        Q.    Okay.

10       A.    But they were more sophisticated with more

11   respectful looking -- than what you would see at a swap

12   meet.  You've got them in Florida.  You know what I'm

13   talking about.

14       Q.    Isn't there like a saying, like one man's junk

15   is another man's something or another, something like

16   that?

17       A.    No, no.  It's -- well, people could sell used.

18   There was always -- I always had an area for used areas

19   -- for used items, but it was very -- only a small

20   percentage --

21       Q.    Okay.

22       A.    -- that was allowed to come in.

23       Q.    These are primarily new items that were being

24   sold?

25       A.    Right.

1          You've got one of the best ones down in

2     Florida.

3          Q.     **Is that the Swap Shop?**

4          A.     It's on -- off the 95.  I want --

5          Q.     **Sure.**

6          A.     I think it's north of Miami somewhere.

7          Q.     **Probably, if it's over there.**

8          A.     West Palm Beach or --

9          Q.     **I don't know.  You have to ask my wife.**

10         A.     Let's call her and ask her.

11         Q.     **And how long were you running these indoor**

12    **flea markets?  Is there more than one?**

13         A.     Yes.

14         Q.     **Okay.  Multiple locations in the --**

15         A.     Yes.

16         Q.     **-- Phoenix area?**

17         A.     Yes.

18         Q.     **Okay.  And how long were you running that?**

19         A.     I want to say from about '91 to about '94 or

20    '5 or '6.

21         Q.     **Okay.  And did you have any partners in this**

22    **venture?**

23         A.     No.

24         Q.     **Just you?**

25         A.     Yep.

1    Q.    **And was this done in a corporate form?**

2    A.    Yes.

3    Q.    **Do you recall the name of that entity?**

4    A.    They were called Shoppers World Compartment

5    Stores.

6    Q.    **I like that.**

7    A.    Well, because the little compartments.

8    Q.    **I like that.  Very nice.**

9    A.    And I can't remember the name of the corporate

10   entity that I had.

11   Q.    **Okay.**

12   A.    It will maybe come to me.

13   Q.    **Okay.  If you recall --**

14   A.    If I recall, I will --

15   Q.    **Yell it out.**

16   A.    I will tell you.

17   Q.    **Okay.  So, early to mid '90s you stopped the**

18   **indoor flea markets, and what's the next business you**

19   **do?**

20   A.    Well, I started Rip-Off Report.  And I started

21   building it in '97 and went live in '98.

22   Q.    **Okay.**

23   A.    Early '98, like January.

24   Q.    **So, between '94 and '97 you were retired,**

25   **weren't doing anything?**

A.    Well, I was dealing with issues with my mother and father and was trying to think of what I wanted to do.

**Q.    Okay.**

A.    So, you know, I had other plans, was going to do something else.

**Q.    You weren't doing anything work-wise during that period of time?**

A.    I wasn't doing anything else.

**Q.    Okay.**

A.    No, I wasn't -- no.

**Q.    Okay.  And since '97 through today's date your sole work has been involved with the Rip-Off Report?**

A.    Yes.  Pretty much, yes.

**Q.    Whether it was through Xcentric Ventures or its prior ownership?**

A.    Yes.

MS. SPETH:  I know we're just getting started, Steve, but lunch is here and it got here early.  I don't care.  I just figured I'd let you know.

THE WITNESS:  I'm okay if you guys are okay.

MS. SPETH:  You make your own decision.  The only -- I wish we had went with cold sandwiches now, but we went with hot sandwiches.

MR. LIPPMAN:  We won't go too far.

1          MS. SPETH:  Something to think about.

2      Q.    BY MR. LIPPMAN:  Let me show you what I've

3  marked as Exhibit 1.

4          And I have a copy for you as well.

5      A.    And which would you like me to look at?

6      Q.    I have -- I assume you've seen this before,

7  right?

8      A.    Of course, yes.

9      Q.    This is just somebody printing out on a piece

10  of paper what -- a portion of what was on the Rip-Off

11  Report internet site?

12     A.    Okay, um-hum.  I'm familiar with it.

13     Q.    Correct, that's what this is, right?

14     A.    Yes.

15     Q.    Okay.  Now, I know over time the -- the format

16  of what's on the Rip-Off Report -- and I apologize.  I'm

17  a -- I'm a computer idiot so I may not use the right

18  terms at times, if you can bear with me a little bit.

19     A.    I'm not that educated either.

20     Q.    But I know when you -- the layout of the way

21  things are and things from time to time on the Rip-Off

22  Report has changed?

23     A.    Right.

24     Q.    Okay.  What -- what you're looking at right

25  now, this piece of paper that's marked as composite

1    Exhibit 1, this is not -- if I pulled up the Rip-Off

2    Report today, this is not what it would look like,

3    right?

4         A.    Right, the format's changed.

5         Q.    The format's a little bit different?

6         A.    Um-hum, yes.

7         Q.    Okay.  And this, what we're looking at right

8    now as Exhibit 1, would this be what would be referred

9    to as the home page for the Rip-Off Report at the time?

10        A.    Yes, at one time.

11        Q.    Okay.  Like the first page that you would see?

12        A.    Right.

13        Q.    Okay.  Kind of like -- I mean, to me, a home

14   page to me is almost like a -- it's like the general

15   information and the table of contents and stuff?

16        A.    Right.

17        Q.    Is that a fair characterization?

18        A.    Yes.

19        Q.    Okay.  Now, I'm just curious.  The use of the

20   term Rip-Off in the title Rip-Off Report, I assume that

21   that term was used to send out to the public that the

22   purpose of this internet site is dealing with consumers

23   who believe they were, quote, unquote, ripped off?

24        A.    Correct.

25        Q.    Okay.  And we see -- in fact, it actually says