1   that.  If you look on the first page, you will see in

2   the first paragraph, it even says, "Victim of a consumer

3   rip-off?" with a question mark.  "Want justice?" with a

4   the question mark.  "Rip-Off Report is a worldwide

5   consumer reporting website and publication by consumers,

6   for consumers, to file and document complaints about

7   companies or individuals who rip off consumers," right?

8       A.    Correct.

9       Q.    That's kind of a good, like -- I guess people

10  could say it's like a mission statements or something?

11  It's a general description of what the Rip-Off Report's

12  about?

13      A.    Yes.

14      Q.    I assume that's something you wrote, or

15  somebody at Rip-Off Report wrote this?

16      A.    I probably created that content.

17      Q.    Okay.  Now, I also -- if you look at the

18  right-hand side of these pages, you'll see there's

19  little pictures --

20      A.    Right.

21      Q.    -- with little descriptions of people on

22  there.  Do you see that?

23      A.    Um-hum.

24      Q.    These little -- the pictures and the little,

25  little descriptions, these refer to people who have been

Dockets.Justia.com

1    reported on the Rip-Off Report?

2        A.    Yes.

3        Q.    I think I saw this term somewhere.  It's

4    almost like the -- like the FBI's top 10 list.  This is

5    the Rip-Off Report's top guys list?

6        A.    Yeah, but go ahead.  Go ahead.  But not

7    really.

8        Q.    Okay.  Is this just an example of people

9    who've been reported on the Rip-Off Report?

10       A.    They're different.  There's a difference,

11   though.

12       Q.    Okay.  Please explain that to me.

13       A.    We don't choose what goes on there.

14       Q.    Okay.

15       A.    At one time -- and there have been new

16   requests, but we're too busy with lawsuits and other

17   things like that, but -- but there are many requests to

18   put their -- they send pictures and could you please put

19   my photo on there.

20       Q.    People put -- people send --

21       A.    Consumers.

22       Q.    Okay.

23       A.    They have to -- they have to request --

24       Q.    Okay.

25       A.    -- you know, that their -- you know, their --

1    can they get, you know, space on the front page.

2        Q.    Okay.  And somebody decides, though, who gets

3    on the front page or not on the front page, right?

4        A.    Right.  Right, um-hum.

5        Q.    And is that -- is this like we see on the

6    first page of Exhibit 1, what's on the right-hand side,

7    the pictures and the little descriptions, that's what

8    you call the front page?

9        A.    Of the home page, yeah.

10       Q.    Okay.

11       A.    Front page.

12       Q.    But you call this section of it the front

13   page, or is there a term that you use for this little

14   section with --

15       A.    Home page or front page.

16       Q.    Okay.  And so various consumers send in a

17   request to the Rip-Off Report saying, "Hey, I was ripped

18   off by Jim.  I'd like you to put Jim's picture in this

19   report on the front page"?

20       A.    Right.

21       Q.    And then somebody at Rip-Off Report looks at

22   those various requests from the consumers and decides

23   which ones are going to go on the front page and which

24   ones aren't?

25       A.    Correct.

1    Q.    Okay.  And like, for instance, I'm just

2  looking midway through here, there's one.  There's a

3  picture of a gentleman and it says underneath it,

4  "Carolina Furniture, Henry Lee" -- and I know I'm

5  butchering his name -- "Privette, Fraud North Carolina,

6  Attorney General, 200 complaints against Privette's

7  Furniture Company."  Do you see that?

8    A.    Yeah.  That was -- actually, this guy was

9  busted by the FBI.

10    Q.    Okay.  The -- the picture that's on there, I

11  guess the consumer sends that picture in?

12    A.    Yes.

13    Q.    And the little caption that's underneath it,

14  who writes that?

15    A.    The consumer.

16    Q.    Okay.  So the consumer submits both the

17  picture and the caption to Rip-Off Report?

18    A.    Right, yes.

19    Q.    And then Rip-Off Report decides which picture

20  and caption it's going to put on the front page?

21    A.    Correct.

22    Q.    All right.

23    A.    Do you have any suggestions for design?  I'll

24  take them.

25    Q.    I don't know that you really want my

1    suggestions.  I'm not very -- I'm not very artistic.

2        A.    That's all right.  I'm kidding.

3              MS. SPETH:  He was thinking of a blank page.

4        Q.    BY MR. LIPPMAN:  A blank page works.  Anything

5    without the word Whitney on it would be very good.

6        A.    I don't think Whitney's on there.

7        Q.    On the front page?

8        A.    Whitney's not there.

9        Q.    I don't believe so.

10             And if I could have you turn to the second

11   page of Exhibit 1 and you'll see about two-thirds of the

12   way down, there's a category heading.  It says "Filing a

13   class action lawsuit and notifying the authorities."  Do

14   you see that?

15       A.    Okay.

16       Q.    Do you see that, sir?  You with me, sir?

17       A.    Yes, sir.

18       Q.    Okay.  I'm sorry.

19       A.    Um-hum.

20       Q.    See where it says "Filing a Rip-Off Report is

21   important because you are helping us to help you and

22   others like you achieve justice.  We are able to

23   accomplish this by working with the proper authorities

24   for prosecution and working with lawyers by using your

25   report to help organize lawsuits."  Do you see that?

1    A.    Correct.

2    Q.    **Okay.  And I assume that the Rip-Off Report is**

3    **trying to encourage consumers who feel they've been**

4    **ripped off to file reports, right?**

5    A.    I don't know about encourage.  The internet is

6    a big place.

7    Q.    **Okay.  But you want people, consumers who feel**

8    **like they've been ripped off, to place postings on the**

9    **Rip-Off Report website, right?**

10    A.    Right.  They could place a blog somewhere or

11    make their own space on My Space and do whatever, or

12    they could come to a place that is used regularly by the

13    authorities.

14    Q.    **Okay.  And you want consumers to use the**

15    **Rip-Off Report website?**

16    A.    I want consumers to be able -- be able to take

17    action for themselves --

18    Q.    **Okay.**

19    A.    -- who have been ripped off.

20    Q.    **And when you say in here, "We are able to**

21    **accomplish this," the "we" is Rip-Off Report, right?**

22    A.    Correct.

23    Q.    **Okay.  It says, "We are able to accomplish**

24    **this by working with the proper authorities for**

25    **prosecution."  Do you see that?**

1    A.    Correct.

2    Q.    **Okay.  And how does Xcentric or Rip-Off Report**

3    **work with proper authorities for prosecution?**

4    A.    Authorities call us all the time.

5    Q.    **Okay.**

6    A.    All the time.

7    Q.    **And when you say "authorities," who -- what do**

8    **you mean by authorities?**

9    A.    FTC, SEC, FBI, Homeland Security, U.S. Postal

10   Inspectors, attorney generals in almost every state.  I

11   can't think of one state where we haven't worked with

12   the attorney generals.  Local and state authorities for

13   -- and with all kinds of cases, from child abuse to

14   fraud and everything, so...

15   Q.    **We're talking about government agencies?**

16   A.    All government agencies.

17   Q.    **Okay.  And what --**

18   A.    And, actually, out of the United States, as

19   well.  United kingdom, Australia, you know, and other

20   countries, as well.

21   Q.    **But even if we're talking about non-U.S.**

22   **authorities, we're talking about government agencies?**

23   A.    Correct.

24   Q.    **Okay.  And what does Xcentric do with these**

25   **government agencies to help prosecute people?**

1    A.    They're viewing the reports and they contact

2  the victims.

3    **Q.    But other than an authority going online and**

4  **looking at the report and then contacting the victim,**

5  **does Xcentric do anything else to --**

6    A.    Well, we give them the contact information.

7    **Q.    Okay.  And when you say "We're able to**

8  **accomplish this by working with the proper authorities**

9  **for prosecution," is the way that Xcentric is**

10  **accomplishing this solely by giving the authorities the**

11  **contact information for people that are on the Rip-Off**

12  **Report or that post something on the Rip-Off Report?**

13    A.    Some have posted on Rip-Off Report looking for

14  -- you know, they'll put somewhere, you know, they'll

15  file like a rebuttal or, you know, that will ask, you

16  know, for information, and people should contact.  A lot

17  of times I think they even ask another victim to go

18  ahead and, if they can, post something and give my phone

19  number, or whatever.  So...

20    **Q.    But I'm -- I'm -- and I apologize, but I'm**

21  **just trying to focus on this statement that says that**

22  **"Xcentric's able to accomplish this by working with**

23  **proper authorities for prosecution."  And I'm trying to**

24  **understand what it is that Xcentric does to assist the**

25  **authorities to prosecute people.**

1    **And I know you told me that you give them the**
2    **contact information for people who posted things on the**
3    **Rip-Off Report.  I assume there's more to it than that,**
4    **right?**
5    A.    Umm, yeah.
6    MS. SPETH:  Form.
7    **Q.    BY MR. LIPPMAN:  What is --**
8    A.    Sometimes a government agent will call and say
9    that we're looking at a certain industry.
10   **Q.    Do you have information about it that you can**
11   **provide to them?**
12   A.    Well, we -- we -- we tell them, A, we don't
13   write the reports.  We don't have time to look at them.
14   And we're not looking at them for -- umm, we're not
15   looking at them for -- to know really what the company's
16   doing.  There's no time for that.
17   **Q.    Does Rip-Off or Xcentric ever do the opposite**
18   **of that?  Does it ever assemble together materials on a**
19   **particular business or a particular industry or a**
20   **particular person that had been filed on the Rip-Off**
21   **Report and submit those to a governmental agency and,**
22   **you know, "Hey, you might be interested in this"?**
23   A.    I have in the past.  And I can't -- I'm trying
24   to think of which ones it could be.  But, umm -- and I
25   -- so, we have in the past.

59

1      Q.     **Okay.**

2      A.     And I can't --

3      Q.     **Okay.**

4      A.     -- remember, you know, because I haven't been

5      able to do this -- do that in several years already --

6      Q.     **Okay.**

7      A.     -- do that.  But strictly we've got a

8      reputation with the authorities that they contact us --

9      Q.     **All right.**

10     A.     -- for information --

11     Q.     **Okay.**

12     A.     -- for victim information.

13     Q.     **But there have been instances in the past**

14     **where Xcentric has gathered together information on**

15     **either a particular entity or person or business --**

16     A.     Just like the Better Business --

17            MS. SPETH:  Ed --

18            THE WITNESS:  -- Bureau would do, yes.

19            MS. SPETH:  -- wait until his question is

20     done.

21     Q.     **BY MR. LIPPMAN:  But there have been instances**

22     **in the past where Xcentric has gathered information on a**

23     **particular business or person, or maybe industry, and**

24     **forwarded that information to some governmental**

25     **authority who, under the guise of "You may have interest**

1  in looking into this or pursuing this"?

2       A.    If I have, it was very few times, yeah.

3       Q.    **Okay.**

4       A.    The answer would be yes.

5       Q.    **Okay.**

6       A.    But it was not that many times.

7       Q.    **Okay.  And is that what you're -- is referred**

8  **to here when we talk -- when it talks about Xcentric**

9  **working with authorities?**

10      A.    Not necessarily.  They -- we work with them

11  because they call us.

12      Q.    **Okay.  And it continues in here, it also says,**

13  **besides working with proper authorities for prosecution,**

14  **it also says, among one of the other things that are**

15  **done, is that Xcentric, and it's quote, "working with**

16  **lawyers by using your reports to help organize**

17  **lawsuits."  Do you see that?**

18      A.    Correct.

19      Q.    **Okay.  And how does Xcentric work with lawyers**

20  **using reports that are posted to help organize lawsuits?**

21      A.    Lawyers would contact us.

22      Q.    **And say what?  Want contact information for**

23  **people who posted things?**

24      A.    Maybe -- they're probably looking for more

25  plaintiffs -- or, not looking for plaintiffs, they

61

1    usually have their plaintiffs.  Like, they're looking

2    for witnesses.

3        Q.    Um-hum.  But you say in here that it's not

4    just that you provide lawyers with witnesses, you say in

5    here that you work with lawyers using reports to help

6    organize lawsuits.

7        A.    Correct.

8        Q.    How do you help organize lawsuits with these

9    lawyers?

10       A.    You know how lawyers are, they look at, you

11   know, possibly where there's a buck to be made.  They

12   see a lawsuit.  They say, oh, wow, this is pretty bad.

13   I practice that area of law.  And, gee whiz, I -- I'd

14   like to see if I can get in touch with these people and

15   see if, you know, I could help them.

16       Q.    Have you, meaning Xcentric, in the past done,

17   similar to what you've done, you told me you've done

18   with authorities in the past --

19       A.    Um-hum.

20       Q.    -- have you put together materials of items

21   that have been posted on the Rip-Off Report with regard

22   to a particular person or entity or industry and

23   provided them to attorneys along the lines of, "Hey,

24   here's something you might be interested in pursuing"?

25            MS. SPETH:  Form.

62

1         THE WITNESS:  At their request.

2    Q.    **BY MR. LIPPMAN:  At the attorney's request?**

3    A.    Right, yeah.

4    Q.    **You've never --**

5    A.    We don't contact the attorney.

6    Q.    **You've never done it unsolicited?**

7    A.    No.

8    Q.    **Okay.**

9    A.    Never done it -- what did you say?

10    Q.    **You've never done it unsolicited?**

11    A.    Right, um-hum.

12    Q.    **In other words, you've never put a package**

13 **together and called a lawyer unsolicited and said, "You**

14 **may want to look into this.  This might be something you**

15 **might want to pursue"?**

16    A.    Sounds like a good idea, but, no.

17    Q.    **But the flip side, if a lawyer has said, "Hey,**

18 **are you aware of anything out there that we might want**

19 **to look into," you may have put together a package on a**

20 **person or an entity or an industry that you think they**

21 **might want to look into pursuing?**

22    A.    We do get asked that question by a lot of

23 different people.  What seems to be the new trend, you

24 know, with phone scams in the mail, to anything else

25 like that, so --

Q.     Okay.

A.     -- that question is asked.

Q.     **And when you get that question, you would put
materials like this together for them and provide it to
them?**

A.     No.  They would physically ask the question.
They would ask the question, and maybe later on they
would ask for -- for information to go ahead and so we
can contact those -- those victims, alleged victims.

Q.     **Okay.  And, again, I -- I apologize, but I'm
just having a hard time --**

A.     Don't apologize.

Q.     **-- understanding what it is that you do.  I
mean, you're telling -- you're telling the consuming
public out there that, hey, one of the reasons why you
ought to file your report and participate in this is
because you, Xcentric, use it by working with lawyers,
by using your reports to help organize lawsuits.**

**And I'm just at a loss to understand what it
is that you do to help organize the lawsuits other than
being there for the lawyers to look at them.**

A.     We're hosting the information and compiling
it, because most other entities don't let you see what
the complaints are, like the Better Business Bureau.  So
here they get to see the complaints.  And being that

1    this is the worldwide web and everything -- the world

2    has changed --

3        Q.    Okay.

4        A.    -- and everything is out there.  That's why

5    these complaints stay the way they do.  People --

6    businesses could make right by them and/or, you know, if

7    they're not making right, the company -- that's why

8    you're here as a lawyer, you know, companies out there

9    either -- you know, they hire lawyers to either defend

10   them or they go ahead and take care of business and take

11   care of their customer and will show how they take care

12   of their customer.

13       Q.    Okay.

14       A.    Everything's out there on the worldwide web

15   today.

16       Q.    **So you're not really working together with the**

17   **lawyers to help organize the lawsuits, you just are**

18   **hosting the comments that lawyers might get interested**

19   **in and might pursue?**

20       A.    No.

21            MS. SPETH:  Form.  That misstates his

22   testimony.

23            THE WITNESS:  Did you -- did you state a

24   question, an answer -- did you --

25       Q.    **BY MR. LIPPMAN:**  Well --

1    A.    You said --

2    Q.    **What is it that you -- I mean, how do you work**

3    **with the lawyers other than -- other than giving them**

4    **the names of the people who posted something that they**

5    **may have interest in?**

6    A.    You know, if you're -- you're a lawyer how --

7    how important it is to be able to get witnesses and

8    victims.

9    Q.    **Okay.  But -- so a lawyer can look on your**

10   **website and see somebody who posts something and contact**

11   **you guys and say, "I'd like to contact this person.  Can**

12   **you give me their information?"**

13   A.    They would make arrangements with us to do

14   that.

15   Q.    **Okay.  Anything other than that you do to work**

16   **with lawyers to help organize lawsuits?**

17   A.    Well, we don't know -- we don't take interest

18   in what the company does or doesn't do.

19   Q.    **Well, I'm trying to understand.**

20        MS. SPETH:  Just answer the question.

21   Q.    **BY MR. LIPPMAN:  I'm just trying to understand**

22   **the statement --**

23   A.    So what is the question?

24   Q.    **-- that --**

25        **(Court reporter clarification.)**

1    Q.    BY MR. LIPPMAN:  I'm just trying to understand

2    the statement that says that one of the things Xcentric

3    does is work with lawyers using your report to help

4    organize lawsuits.

5    A.    Okay.

6    Q.    And I know you told me that one of the things

7    you do is, when lawyers say, "I want to contact this

8    person as either a potential party to a lawsuit or a

9    witness," or whatever, that you would provide --

10   A.    There's --

11   Q.    -- contact information?

12   A.    There's nothing more that we do.

13   Q.    That's it?

14        MS. SPETH:  Ed --

15        THE WITNESS:  That I can think of.

16        MS. SPETH:  -- you need to wait until he's

17   done with his question so that, first of all, if I want

18   to object, I need time.  Second of all, the court

19   reporter cannot talk -- cannot take you both down

20   talking at the same time.

21        THE WITNESS:  She's good.  She said she can

22   handle it.

23        MS. SPETH:  I see that it's quarter past -- a

24   quarter of, if we want --

25        MR. LIPPMAN:  All right.  Why don't we just

1  take our break.

2      MS. SPETH:  -- we're going to have cold

3  sandwiches.

4      MR. LIPPMAN:  So it's quarter after one, and

5  we'll take a break for 45 minutes.  We'll start up at

6  2:00.

7      MS. SPETH:  Yeah, but we can't be off the

8  record until Mark says we're off the record.

9      VIDEOGRAPHER:  Off the record.  The time is

10  1:17 p.m.

11      (Whereupon, the lunch recess was taken from

12  1:17 p.m. to 2:07 p.m.)

13      (Mr. Kunz does not return.)

14  **Q.    BY MR. LIPPMAN:  Mr. Magedson, we talked**

15  **earlier about your participation as a member --**

16  A.    Talk a little bit louder, I'm sorry.

17  **Q.    Sure.**

18  **We talked earlier about your participation as**

19  **a member in Xcentric Ventures.**

20  A.    A member?

21  **Q.    Yeah, didn't you tell me -- oh, I'm sorry,**

22  **manager.  I apologize.**

23  A.    Okay.

24  **Q.    You were the manager of Xcentric Ventures.**

25      MS. SPETH:  Ed, just let him finish the

1   question.  Even if it's wrong, let him finish the

2   question.

3            THE WITNESS:  Okay.  Sorry.

4       Q.   **BY MR. LIPPMAN:  There's another entity that's**

5   **a defendant in this case.  It's BadBusinessBureau.org,**

6   **which I understand is an Arizona limited liability**

7   **company.  Is that the entity that previously operated**

8   **the Rip-Off Report?**

9       A.   No.

10      Q.   **Do you have any involvement with that entity?**

11      A.   That entity really doesn't exist.  It's

12  stagnant.  It never did anything.

13      Q.   **Okay.  It was an entity that was formed --**

14      A.   It was formed --

15      Q.   **-- and filed, but never did anything?**

16      A.   Right.

17      Q.   **Okay.**

18           MS. SPETH:  Ed, please wait till the question

19  is finished.

20           THE WITNESS:  Sorry.

21      Q.   **BY MR. LIPPMAN:  And so the entity that**

22  operates the Rip-Off Report is Xcentric Ventures, LLC?

23      A.   Correct.

24      Q.   **And what was the entity that operated Rip-Off**

25  **Report prior to Xcentric Ventures, LLC?**

1     MS. SPETH:  Asked and answered.

2     But go ahead.

3     THE WITNESS:  I believe it was -- would have

4 been BadBusinessBureau.com, LLC.

5   **Q.** **BY MR. LIPPMAN:  A different Arizona limited**

6 **liability company?**

7   A. I think so.

8   **Q.** **Okay.**

9   A. I can't remember.

10   **Q.** **Okay.**

11   A. So I'm not sure.

12   **Q.** **And I just want to be clear.  I think you had**

13 **answered this, but I just want to make sure I ask this.**

14 **You still live here in Arizona, right?**

15   A. Correct.

16   **Q.** **Okay.  I'm still looking at Exhibit 1.  And,**

17 **if you wouldn't mind -- let me see if I can find it.  If**

18 **you wouldn't mind, just turn to the third page.  It says**

19 **right on the top, right in the corner, Page 3 of 8.  Do**

20 **you see that?**

21   A. Go ahead.

22   **Q.** **And at the top, the first full sentence in**

23 **there, it says, "The more reports filed on a company or**

24 **individual, the more likely it is that the authorities**

25 **and attorneys will want to take action."  Do you see**

1  that?

2      A.    No.   Where is that on there?   I'm familiar

3  with the saying, but I don't know --

4      Q.    I'm just going to point over here.  Right in

5  here.  Right there at the top.  Do you see it?

6      A.    Okay.

7      Q.    Okay.  And this, again, was part of the --

8  part of Xcentric and running the Rip-OffReport.com --

9  I'm trying to find the right word because you didn't

10 like when I used the word "enticed" earlier, I think

11 earlier, but at least soliciting or encouraging

12 consumers to post their reports on the Rip-Off Report?

13         MS. SPETH:  Form.

14         THE WITNESS:  No more than the internet

15 entices everyone to get onto the internet and My Space

16 it or do something.

17     Q.    BY MR. LIPPMAN:  Okay.

18     A.    It's -- you know --

19     Q.    I guess my --

20     A.    -- we deal with -- with -- with complaints.

21     Q.    Okay.  I've never been on My Face (sic), but I

22 guess My Face is trying to encourage --

23     A.    "My Space."

24     Q.    My Space.

25         My Space is trying to encourage people to be

1    on --

2        A.    That might be a good one.

3        Q.    **I don't know.  I'm --**

4            MS. SPETH:  Give him about a week.  He'll have

5    a new website up.

6        Q.    **BY MR. LIPPMAN:  I'm a little too old for**

7    **this, but, you know, I assume there's other internet**

8    **sites out there that are trying to encourage people to**

9    **do whatever it is they do, right?**

10       A.    Yeah, umm, I don't think that we're

11   encouraging.  But I'm not -- what's your question?

12       Q.    **You don't think this language is trying to**

13   **encourage people to post their reports on the Rip-Off**

14   **Report?**

15       A.    They're going to post somewhere.

16       Q.    **And if they're going to post somewhere, you'd**

17   **like them to post on the Rip-Off Report, right?**

18       A.    And if we weren't -- right.

19       Q.    **Okay.  And if you'll see the next section down**

20   **where it says "Media Attention," do you see that --**

21       A.    Um-hum.

22       Q.    **-- on the same Page 3?  And it says "Rip-Off**

23   **Report works regularly with most TV, news magazines and**

24   **networks and their affiliates, NBC, CBS, ABC, Fox News**

25   **and local and national newspapers, including the New**

1    York Times and Wall Street Journal to Automotive News."

2    Do you see that?

3         A.    Correct.

4         Q.    And how does the Rip-Off Report work regularly

5    with the New York Times?

6         A.    They call us regularly.

7         Q.    Reporters from the New York Times --

8         A.    Correct.

9         Q.    -- call you regularly?

10        A.    Correct.

11        Q.    When was the last time you got a call from a

12   reporter from the New York Times?

13        A.    Probably within the last three months.

14        Q.    And who called you?

15        A.    What's that?

16        Q.    Who called you?

17        A.    You're joking, right?

18        Q.    No, I'm not.

19        A.    I have no clue.

20        Q.    You can't recall who called you --

21        A.    Absolutely not.

22        Q.    -- from the New York Times?

23        A.    I deal with --

24        Q.    So within the last --

25        A.    I get tons of calls and -- I get tons of calls

1    a day.

2          MS. SPETH:  Ed, imagine that you were the one

3    trying to take this down.  Imagine you're the court

4    reporter.

5          THE WITNESS:  She said she can handle it.

6          MS. SPETH:  I know.  You know what, you can't

7    talk --

8          THE WITNESS:  All right.  All right.  All

9    right.  All right.

10          MS. SPETH:  -- at the same time as him or she

11    can't --

12          THE WITNESS:  I need to realize -- okay.  He

13    can realize.  Okay.

14    Q.    **BY MR. LIPPMAN:  Do you recall the last time**

15    **you spoke with somebody from the Wall Street Journal?**

16    A.    Exactly, no.

17    Q.    **And when this person called from the**

18    **New York Times three months ago, what happened?  Tell me**

19    **about the phone call.**

20    A.    I would not re- -- couldn't -- there's no way

21    I could remember.

22    Q.    **You don't remember what it was about?**

23    A.    Absolutely not.

24    Q.    **Don't remember what they asked for?**

25    A.    Absolutely not.

1    Q.    Did they call maybe to sell you a subscription
2    to the Times?
3    A.    No.
4    Q.    You know it wasn't calling for --
5    A.    No, I --
6    Q.    -- to sell a subscription?
7    A.    -- don't get calls for a subscription except
8    for the Arizona Republic.
9    Q.    Okay.  Were they calling to get you to place
10   an ad in the New York Times?
11   A.    No.
12   Q.    They were calling you to --
13   A.    They were a reporter.
14   Q.    A reporter was calling for information --
15   A.    Right.
16   Q.    -- about a particular entity?
17   A.    Correct.
18   Q.    And did you provide this person with
19   information about that entity?
20   A.    More than likely.
21   Q.    Okay.  Information that came off of Rip-Off
22   Reports that have been posted?
23   A.    Correct.
24   Q.    And the same thing is what you would do with
25   the Wall Street Journal?

1    A.    I thought that's what we were talking about.

2    Q.    **I thought we were talking about the call you**

3    **recall from the Times that you didn't recall who it was**

4    **with.**

5    A.    Oh, I thought you were -- well, either one.

6    It doesn't make a difference.  I can't -- there's no way

7    I could remember.

8    Q.    **Okay.  But whenever you get a call from the**

9    **New York Times or the Wall Street Journal or another**

10   **newspaper seeking -- a reporter seeking information, you**

11   **would provide them information based upon what was --**

12   **has been reported on the Rip-Off Report?**

13   A.    They would be calling about a specific report.

14   Q.    **And you would provide them information?**

15   A.    Correct.

16   Q.    **Or information about the person or entity or**

17   **industry that was subject to that report?**

18   A.    Right.

19   Q.    **And is that at least -- and Rip-Off Reports,**

20   **from their perspective, another reason why people should**

21   **post their complaints on the Rip-Off Report because it**

22   **may get to a newspaper reporter or a television reporter**

23   **and become a story?**

24   A.    Yes.  Most people -- yes.

25   Q.    **And you help facilitate that connection**

1  between the people who are posting the reports and

2  getting to the media when they -- when they make

3  inquiries?

4      A.    Correct.

5      Q.    On the bottom of Page 3 of Exhibit 1, do you

6  see there's a paragraph that's entitled "Employee

7  Insider, slash, Xcentric Employee Information"?  Do you

8  see that?

9      A.    Um-hum.

10     Q.    And it says "If you are an employee or

11 ex-employee with privileged information about the

12 company or individual reported and you can provide,

13 quote, unquote, insider information, please click on the

14 rebuttal box at the end of the specific Rip-Off Report

15 you wish to give information on.  This sort of

16 information is often very helpful to an investigation

17 and always needed."  Do you see that?

18     A.    Yes, I do.

19     Q.    Okay.  And so you understand what privileged

20 information is?

21     A.    Yeah, probably.  I don't even remember that

22 wording there, and I'm not sure if it still even says it

23 that way.  But that would not be correct.

24     Q.    You no longer encourage people to --

25     A.    I don't know.  I'm -- not privileged

1   information.

2         (Court reporter clarification.)

3     Q.    BY MR. LIPPMAN:  Disclose privileged

4   information.

5     A.    No, it shouldn't be.  And, umm, you maybe just

6   alerted me to a mistake that's there.

7     Q.    Okay.  Privileged information, you understand,

8   is something --

9     A.    It's privileged.

10    Q.    -- that somebody learns that they're under a

11  lawful obligation to keep private?

12    A.    Yeah.

13    Q.    Right?

14    A.    I think the word "privileged" at the time may

15  have been used in -- in not realizing what the word

16  "privileged" means, as far as like privileged

17  information or something that would be -- well, anyway,

18  it's -- probably that wording shouldn't even be there

19  like that.

20    Q.    Okay.  But you now understand that the

21  reference to privileged information could include

22  information that somebody knows and has a lawful

23  obligation to maintain confidential?

24    A.    Right, but I don't know if it completely means

25  that.

78

Q.    Okay.  It could mean that?

A.    It could -- it absolutely could mean that,
and --

Q.    It could mean other things, as well?

A.    Right.  And I think I should -- if that's
still there, actually, I should look at that.  That
shouldn't be there like that.

Q.    You would agree that that's not something
appropriate to do?  It's not appropriate to encourage
somebody --

A.    Not necessarily.

Q.    -- to disclose information that they are under
a lawful obligation to maintain confidential?

A.    Today, now being in lawsuits --

Q.    Yeah.

A.    -- and involved in lawsuits, versus when this
copy was created -- and it could have been changed
already --

Q.    Um-hum.

A.    -- that would not have been -- I wouldn't have
known or understood that --

Q.    All right.

A.    -- that somebody could interpret, possibly,
that way.

Q.    But you would agree with me, though, that the

1    concept that -- it would be inappropriate to encourage

2    somebody to disclose information that they are under a

3    legal obligation to maintain confidential?

4            MS. SPETH:   Form.

5        Q.    BY MR. LIPPMAN:   Would you agree with that?

6        A.    Yes.

7        Q.    Okay.

8        A.    But I just want to explain that because I

9    don't know if you -- I don't think you did it

10   intentionally, but you may have -- you may be twisting

11   me to something else that -- I don't understand that

12   meaning to be that way, especially then.  I would more

13   so take a look at it and maybe say maybe somebody could

14   interpret it the way that you're -- you're interpreting.

15   Because I would not want to encourage anybody to put

16   something that would be -- you know, they're under a

17   court order, that kind of thing.  So I'm not sure.  I

18   would have to consult with counsel on that --

19       Q.    Okay.

20       A.    -- to really what does that mean and is it

21   wishy-washy or, you know, so...

22       Q.    Okay.  I appreciate that.  Actually, that's

23   the way I took your answer.

24       A.    Okay.

25       Q.    If you'll look on the bottom of Page 4 you'll

1    see there's another heading here.  It says "Use your

2    report to get what is coming to you."  Do you see that?

3         A.    Right.

4         Q.    It says "Faxing your Rip-Off Report to the

5    company or individual you have just reported can serve

6    as a very valuable negotiating tool.  Include in your

7    negotiation that you have the ability to update your

8    report and reflect their good business practices by

9    explaining that their eagerness to satisfy the complaint

10   and make things right will be seen by the entire world.

11   Also explain that failure to respond, slash, rectify the

12   situation will also be seen."  Do you see that?

13        A.    Correct.

14        Q.    Okay.  And this is, again, another reason why

15   you're explaining to the consuming public why they ought

16   to post their complaints on the Rip-Off Report as to

17   somewhere else, right?

18             MS. SPETH:  Object to form.

19             THE WITNESS:  No.  I would say it's an

20   alternative.  More so it's an alternative to going to

21   some attorney and spending money to try and negotiate

22   something and slap them with a lawsuit because you were

23   -- because you got ripped off.  Consumers, since Al Gore

24   invented the internet, have -- that's a joke.  But since

25   the internet came around, before Rip-Off Report was

1  created, consumers were already doing this.

2  Q.    BY MR. LIPPMAN:  Okay.  Now, Xcentric does not

3  confirm the truth or not of anything that's contained in

4  a Rip-Off Report, right?

5  A.    I think that's obvious.  By the internet in

6  general, anyone knows don't believe everything maybe you

7  even read on the news, on the TV, or you -- in the

8  newspaper or even on the internet.

9  Q.    Okay.

10  MS. SPETH:  That sounded like a yes or no

11  question to me.

12  THE WITNESS:  Does it?

13  MS. SPETH:  Yeah, it did.

14  Q.    BY MR. LIPPMAN:  Xcentric doesn't confirm the

15  accuracy, the truth of --

16  A.    No, we don't.

17  Q.    -- of whatever's posted on it, right?

18  A.    No, we don't.

19  Q.    Okay.  Would you agree with me that somebody

20  could post on the Rip-Off Report a derogatory comment

21  about a person or an entity that's totally false?

22  A.    Correct.

23  Q.    Somebody could do it either because their

24  perception or their view of something was perhaps not

25  very clear, or they may do it for spiteful purposes as

1    well, right?

2        A.    I guess it's possible.

3        Q.    I mean, somebody out there could say, I don't

4    know, you know, "I hate McDonald's for some reason" and

5    write these -- "I went in and had a hamburger and it had

6    a rat in it."  And you don't know whether it's true or

7    not, right?

8        A.    We can't play judge and jury.

9        Q.    Okay.  You agree with me?

10       A.    Correct.

11       Q.    You don't know whether it is --

12       A.    Okay.  Go ahead.

13       Q.    Okay.  Aren't you, in this portion where

14   you're saying use your reports to get what's coming to

15   you, aren't you encouraging people to blackmail others?

16       A.    What's the difference between that and going

17   to a lawyer and spending a lot of money and saying,

18   "Listen, we're going to file a lawsuit against you, you

19   know, if you don't take care of my client and cost you a

20   lot of money, publicity, and everything else that goes

21   along with it, possibly."

22       Q.    So, the answer to my question --

23       A.    I don't know what the difference is.

24       Q.    The answer to my question is yes, you --

25       A.    You're using the word blackmail.  I don't

1    think it's blackmail.

2        Q.    So -- but you don't see it any different than

3    hiring a lawyer to assert your claims?

4        A.    Absolutely right, I don't see any difference.

5        Q.    Even if the report is blatantly false?

6              MS. SPETH:  Form.

7        Q.    BY MR. LIPPMAN:  In other words, even if --

8    let's -- let's go back to the example of the person who

9    hates McDonald's for some illogical reasons and posts

10   something on there that says "I went to McDonald's,

11   ordered a quarter pounder and there was a rat in it,"

12   and then sends it to McDonald's and says, "If you don't

13   pay me a million dollars because of what happened to me,

14   I'm not going to" -- "I'm going to tell people what you

15   did."  Do you think that's inappropriate?

16       A.    Well, who knows if that happened --

17             MS. SPETH:  Form.

18             THE WITNESS:  -- or it didn't happen.

19       Q.    BY MR. LIPPMAN:  But you're encouraging people

20   to do it.

21       A.    I don't see how.

22       Q.    You don't read this as an encouragement to do

23   that?

24       A.    No.

25       Q.    Okay.

1    A.    I -- I assume most people are honest and --

2    and -- and are not going to -- you know, they're not

3    going to lie.

4    Q.    And if I can have you flip to -- flip over to

5    the next page, Page 6 of 8 of Exhibit 1.  In the first

6    full paragraph there it states, "We are anxious and

7    willing to join forces with victims and attorneys to

8    stand up for the rights of consumers and help them get

9    justice."  Do you see that?

10    A.    You know, I don't think a lot of this stuff

11    that you're pointing out is even on the website.  This

12    is old.

13    Q.    This was on the website at some -- at one

14    point in time?

15    A.    It's a long time ago.

16    Q.    Do you know when?

17    A.    Maybe more than three years ago.  I'm not

18    sure.  I don't know.

19    Q.    You don't know?

20    A.    I don't know the answer to that.  I take that

21    back.  Three years ago.  It could be five, it could be

22    two years ago, it could be a year ago.  I don't

23    remember.

24    Q.    Okay.  And then it says, "E-mail us.  Both

25    victims and attorneys should send their e-mails to

1    **ClassAction@ripoffreport.com."**

2    A.    I don't think that's even on there anymore,

3    but --

4    **Q.    I didn't ask you whether it's on there**

5    **anymore.  That's what it says right here, right?**

6    A.    Yes, it does.

7    **Q.    Okay.  And ClassAction@ripoffreport.com is an**

8    **e-mail address that goes to the Rip-Off -- to Xcentric's**

9    **office?**

10    A.    Correct.

11    **Q.    And I assume Xcentric employees would receive**

12    **those e-mails?**

13    A.    Well, actually the e-mail address didn't work.

14    **Q.    It didn't work?**

15    A.    It didn't work.

16    **Q.    So, if I at this point in time wanted to send**

17    **something and I sent it to ClassAction@ripoffreport.com**

18    **it never worked?**

19    A.    Umm, I don't know if -- I don't think it would

20    work because I don't get anything in ClassAction.

21    **Q.    Did somebody set up that --**

22    A.    This is a long time ago.

23    **Q.    -- that title, though?**

24    **My question --**

25    A.    And it never worked.

1    Q.    My question is:  Did anybody at some -- did

2    somebody at some point in time set up this website for

3    Xcentric?

4        A.    Did somebody?

5        Q.    Yeah.  I mean, was there ever a website --

6    excuse me, not a website, but an e-mail address

7    ClassAction@ripoffreport.com ever set up that somebody

8    could send an e-mail there?

9        A.    Yeah, obviously.

10       Q.    Okay.

11       A.    Yes.

12       Q.    Okay.  And if somebody sent an e-mail at that

13   point in time to ClassAction@ripoffreport.com, it would

14   go to somebody at Xcentric Ventures?

15       A.    It was supposed to but, like I said, it never

16   worked.

17       Q.    Well, maybe nobody even sent an e-mail?

18       A.    Right, maybe.

19       Q.    Maybe it worked but nobody ever sent one?

20       A.    I don't think it worked, and the section was

21   removed.

22       Q.    Okay.  Well, what -- what did Xcentric do

23   under the category of being willing to join forces with

24   victims and attorneys to stand up for rights of

25   consumers and help them get justice?

1    A.    When plaintiff's attorneys would contact us.

2    **Q.    Yeah?  You would give them the names of the**

3 **people on the posted reports?**

4    A.    Only -- oh, not plaintiffs, consumer

5 attorneys.  I got that backwards probably.

6    When consumer rights attorneys, you know,

7 attorneys that protect consumers versus attorneys that

8 might protect corporations that are -- that are bad.  So

9 those attorneys who protect consumers would contact us.

10 Hopefully, I answered your question.

11    **Q.    And all you would do is provide them with the**

12 **names of the people?**

13    A.    Correct.

14    **Q.    And that's how you were anxious and willing to**

15 **join forces with victims and attorneys to stand up for**

16 **the rights of consumers and help them get justice?**

17    A.    Well, a -- no.  Originally, I was trying to

18 formulate a way to -- this is years ago.  I was going to

19 do something in California, but I can't remember

20 exactly.  We were going to set up some sort of a

21 consumer organization to try and help victims.

22    **Q.    You were going to be like the next Ralph**

23 **Nader?**

24    A.    I've already been billed by certain news

25 agencies as -- as a Ralph Nader.

1      Q.     See, I'm always behind the times, you see?

2             MS. SPETH:  Steven, can we take a short break?

3      I'm sorry.

4             MR. LIPPMAN:  Yeah.

5             VIDEOGRAPHER:  Off the record.  The time is

6      2:28 p.m.

7             (Recess taken from 2:28 p.m. until 2:34 p.m.)

8             VIDEOGRAPHER:  On the record.  The time is

9      2:34 p.m.

10     Q.     BY MR. LIPPMAN:  Mr. Magedson, if you could

11     direct your attention to Page 7 of what we have

12     previously marked as Exhibit 1, the home page to the

13     Rip-Off Report.

14     A.     Okay.

15     Q.     And in this last full paragraph, about midway

16     down it says, "Reporting your experiences on Rip-Off

17     Report is the next best thing to getting your story on

18     TV or in a newspaper."  Do you see that?

19     A.     I -- I don't see it but I know it was there.

20     Q.     Okay.  And that, again, is alluding to what we

21     talked about earlier, the process where you provide

22     information to the media upon request about areas that

23     they ask you about?

24            MS. SPETH:  Form.

25            THE WITNESS:  I didn't -- I'm not hearing you

1    correctly.

2        Q.    BY MR. LIPPMAN:  Okay.  Maybe I -- maybe I

3    didn't ask it very well then.

4            But this comment that you have on Rip-Off

5    Report's home page that reporting experiences on a

6    Rip-Off Report is the next best thing to getting your

7    story on TV or in the newspaper, doesn't that allude to

8    the process you told me earlier where Rip-Off Report

9    would get calls from the media and you would provide

10   information to the media about a company or individual

11   or industry based upon information provided in the

12   Rip-Off Reports?

13       A.    Correct.

14       Q.    And then if you would turn, please, to the

15   last -- Page 8 of Exhibit 1.  In the last paragraph you

16   see where it says, "Additionally, by filing a Rip-Off

17   Report, you might be contacted by one of us to notify

18   you to make contact with a law firm that has shown

19   interest in your case.  We get requests every week for

20   class action lawsuits bringing victims together with

21   lawyers willing to sue the company after reading your

22   filed Rip-Off Report," do you see that?

23       A.    Yes, I do.

24       Q.    Okay.  Again, this is the process you were

25   talking about earlier where you told me that you get

1    calls from lawyers who read Rip-Off Reports and that it

2    piques their interest in potentially bringing a lawsuit

3    against that person or entity or industry?

4        A.    Correct.

5        Q.    Okay.  And the process of where you put the

6    people who make the complaints, post things on the

7    Rip-Off Report, together with these lawyers by providing

8    their contact information?

9        A.    Correct.

10        Q.    Okay.

11            (Deposition Exhibit No. 2 was marked for

12    identification.)

13        Q.    BY MR. LIPPMAN:  I'm handing you now what I'm

14    marking as Exhibit 2.

15            MS. SPETH:  Doesn't that already have an

16    exhibit tab on it?

17            MR. LIPPMAN:  It's from the --

18            MS. SPETH:  Oh, okay, some previous --

19            MR. LIPPMAN:  Yes.  I'll tell you exactly what

20    it is.  And I only have one of these.  I apologize, so

21    we'll just use the one.

22            MS. SPETH:  Isn't it the same thing?

23            THE WITNESS:  It's the same.

24            MR. LIPPMAN:  It is the same thing, it's just

25    -- and, actually, you'll see where I --

THE WITNESS:  This is more readable.

Q.    BY MR. LIPPMAN:  Yes.  And you'll see where I did not cover up, as your counsel pointed out, on the bottom it has "Composite Exhibit" -- "Exhibit Composite C."  This was what's marked as Exhibit 1 to this deposition.  It's a document which was Composite Exhibit C, or part of Composite Exhibit C to our complaint.  So I didn't cover up that exhibit so you'll see where it was from.

And what I've marked as Exhibit 2 is the exact thing as Exhibit 1, it's just, as you saw, Mr. Magedson, it's a clearer copy, because I just wanted to ask you a couple questions about this.

And, remember, we talked earlier on the first page or two of Exhibit 1 about the items that are on the right-hand side.  And you'll see in the upper right-hand side there's a series there.  It says "Newest Rip-Off Reports."  Do you see that?

A.    Correct, I see it.

Q.    Okay.  And who decides -- or, I guess, Rip-Off Report decides which items get listed under this section "Newest Rip-Off Reports," right?

A.    No.

Q.    Who decides who gets in there?

A.    Nobody does.

1    Q.    It's just automatically done in chronological

2  order?

3    A.    It's -- yes, um-hum.

4    Q.    So, if I was the -- theoretically, if this was

5  what the website home page looked like today and I was

6  the next person to post a Rip-Off Report, I would go up

7  as the next item?

8    A.    Correct.

9    Q.    Okay.  And underneath that we see there's a

10  heading "Top Rip-Off Reports," right?

11    A.    Right.

12    Q.    Okay.  And the ones underneath "Top Rip-Off

13  Reports," the pictures and the little descriptions

14  underneath that, those are the ones you told me earlier

15  that consumers submit to Rip-Off Report and Rip-Off

16  Report decides which ones it's going to put under this

17  category of top Rip-Off Reports?

18    A.    Correct.

19    Q.    I think you alluded to -- I think the front

20  page?

21    A.    Right.

22    Q.    Is that what you were talking about earlier?

23        And then on the second page of Exhibit 2

24  you'll see in the right-hand side there's a category

25  there, "Top Rip-Off Links."  Do you see that?

1    A.    Correct, um-hum.

2    Q.    And I guess we're talking about links here.

3    If you go on one of these and click on it, it's going to

4    take you to another website?

5    A.    No.

6    Q.    Isn't that what the link means?

7    A.    No.  It just -- it's linking you to other

8    reports about the company.

9    Q.    Oh, okay.  So, in other words, if I clicked on

10    the first one --

11    Is it Alyon Technologies?

12    A.    Correct.

13    Q.    -- it would -- that would take me to other

14    reports about Alyon Technologies?

15    A.    Correct.

16    Q.    And who decides which links get put in this

17    section, "Top Rip-Off Links"?

18    A.    We get a request from the consumer.

19    Q.    Same thing like the top Rip-Off Reports,

20    consumers say to Rip-Off Report, "We think this ought to

21    be in the top Rip-Off links"?

22    A.    Correct.

23    Q.    And then somebody at Rip-Off Report decides

24    which one goes in the top Rip-Off links?

25    A.    Correct.

1    Q.    And then underneath there is another heading,

2    "Featured Rip-Off Reports."  Do you see that?

3    A.    Yes.

4    Q.    Excuse me.  And, again, kind of like with the

5    top Rip-Off Reports, there's a picture and a little

6    blurb underneath it?

7    A.    Right.

8    Q.    And who decides which items get put in the

9    section "Featured Rip-Off Reports"?

10    A.    The same thing.

11    Q.    So a consumer says, "I'd like you to consider

12    Rip-Off Report putting this in the Featured Rip-Off

13    Report section," and somebody at Rip-Off Report decides

14    which ones go in and which ones don't go in?

15    A.    Correct.

16    Q.    And what's the difference between Top Rip-Off

17    Reports and Featured Rip-Off Reports?

18    A.    Umm, like I said, the website has changed over

19    the years.  That's old and it's -- there is no

20    difference.

21    Q.    Okay.  But even though it's old, there was not

22    really a big difference between Top Rip-Off Reports or

23    Featured Rip-Off Reports, they're pretty much

24    synonymous?

25    A.    Umm, probably.

1    Q.    Okay.  Now, the -- like, for instance, I'm

2  looking at the featured Rip-Off Reports and in the

3  middle category on the left-hand side there's a picture

4  of a gentleman and it says, "Dead Beat Dad, Donald Reed

5  Powers."  Do you see that?

6    A.    Um-hum.

7    Q.    And if I clicked on the thing that says "Dead

8  Beat Dad, Donald Reed Powers," is that a link that takes

9  me somewhere?

10    A.    You know, it takes you to the report that the

11  consumer submitted.

12    Q.    Okay.  So, in other words, if I click on any

13  of the descriptions underneath the pictures and any of

14  the featured Rip-Off Reports or top Rip-Off Reports it

15  will take me to the actual Rip-Off Report?

16    A.    Correct.

17    Q.    Okay.  Now, if you wouldn't mind, on

18  Exhibit 1, just turn to the first page and you'll see on

19  the -- I'm going to say on the upper left-hand column

20  there was a number of different sections here, like

21  "File Report, Update Report, Search Reports."  Do you

22  see that --

23    A.    Um-hum.

24    Q.    -- on the left-hand side?

25        Those are the various sections of the Rip-Off

1    Report web page, right?

2        A.    Yes.

3        Q.    Kind of like -- we talked about this, kind of

4    like the table of contents where you can click and go to

5    different portions of the --

6        A.    I don't know if I'd call it that, but it's the

7    different featured areas, yes.

8        Q.    Okay.  Now, you see one of these featured

9    areas -- it's one, two, three -- four up from the

10   bottom.  It says "Revenge Guide."  Do you see that?

11       A.    Um-hum.

12       Q.    And let me hand you what I've marked as

13   Exhibit 3.

14           (Deposition Exhibit No. 3 was marked for

15   identification.)

16           MR. LIPPMAN:  And I do have an extra copy of

17   this.

18           MS. SPETH:  Thank you.

19       Q.    BY MR. LIPPMAN:  This is the -- if I was to

20   click on "Revenge Guide," what I've marked as Exhibit 3,

21   that's what it would take me to, right?

22       A.    Correct.

23       Q.    And if you'll look on the first page of

24   Exhibit 3, on the left-hand side see where it says

25   "Helping victims collect in a few days or hours"?

1    A.    Correct.

2    Q.    Do you see that?

3    A.    Correct.

4    Q.    And one of the things on the bottom there it

5    says -- there's a quote, "Go ahead, sue me," close

6    quote.  Sound familiar?  With the question mark.  Do you

7    see that?  Do you see that, sir?

8    A.    I know -- I know it.  I'm familiar with that.

9    I don't have to see it.

10    Q.    I just need to get an audible response.

11    A.    Oh, no problem.  Okay.  Yes, I do.

12    Q.    That's alluding to a comment that a consumer

13    who feels that he may have been aggrieved might hear

14    from somebody saying "Go ahead, sue me"?

15    A.    Right.

16    Q.    Okay.  And is that something that Xcentric and

17    Rip-Off Report believes is an inappropriate response by

18    a service provider to a consumer?

19         MS. SPETH:  Form.

20         THE WITNESS:  I don't understand the question.

21    Q.    BY MR. LIPPMAN:  Well, does Xcentric believe

22    that a service provider responding to a consumer who

23    feels he was aggrieved "Go ahead, sue me" is an

24    inappropriate response?

25    A.    I still don't know -- understand what you

1   mean, service provider or -- you mean like somebody

2   who's performing a service?

3        Q.    **Well, a consumer -- a consumer is complaining**

4   **about somebody, right?**

5        A.    Okay.

6        Q.    **What do you call the person the consumer's**

7   **complaining about?**

8        A.    A company that ripped them off.

9        Q.    **Okay.  So if the company that ripped them off**

10  **responds "Go ahead and sue me," Rip-Off Report believes**

11  **that's an inappropriate response, right?**

12            MS. SPETH:  Form.

13            THE WITNESS:  Correct.

14       Q.    **BY MR. LIPPMAN:  But people who believe that**

15  **postings are in -- that are in the Rip-Off Report that**

16  **are inappropriate, Xcentric's response to those people**

17  **on occasions has been "Go ahead and sue us, we're**

18  **protected," right?**

19       A.    I don't understand that at all.  You lost me.

20       Q.    **Have you ever said -- have you personally ever**

21  **responded to somebody who complained about a posting on**

22  **the Rip-Off Report to go ahead and sue Xcentric or go**

23  **ahead and sue Rip-Off Report?**

24       A.    Umm, I might have said that to somebody.

25       Q.    **And have you ever told people "You're wasting**

1    your time because we're protected whatever we do"?

2         A.    I think you're twisting it around.

3         Q.    Okay.  In substance --

4         A.    So I'm going to say no to that question.

5         Q.    Okay.  But, in substance, is that what you

6    told people?

7         A.    I don't know what you mean by substance of

8    that.

9         Q.    Have you told people "Go ahead and sue me.  Go

10   ahead and sue Xcentric.  Go ahead and sue Rip-Off

11   Report.  You won't prevail because we're protected"?

12        A.    Protected from what?  We --

13        Q.    Legally protected in how we conduct our

14   business.

15        A.    We are protected by the law.

16        Q.    Okay.  And you've told people that, right?

17        A.    Yes.

18        Q.    You've told people go ahead and sue you

19   because you're protected by the law, right?

20        A.    I don't know if we encourage it like that,

21   like you're saying.

22        Q.    You say it flippantly, you could care less

23   whether they do it or not?

24        A.    I would -- that's not a true statement, we

25   don't care what -- how can we not care?