UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

CASE NO.: 2:04-cv-47-FtM-34-SPC

**ORIGINAL**

WHITNEY INFORMATION NETWORK, Inc., )
a Colorado corporation, )
                              )
                              )
                 Plaintiff, )
                              )
vs.                            )
                              )
XCENTRIC VENTURES, LLC, an )   Phoenix, Arizona
Arizona limited liability company; )   August 1, 2007
BADBUSINESSBUREAU.ORG, an, )      10:00 a.m.
Arizona limited liability company; )
and, ED MAGEDSON, an individual, )
                              )
                              )
                Defendants. )
_____ )

THE VIDEOTAPED DEPOSITION OF EDWARD MAGEDSON

VOLUME 2

Pages 127 - 271

DEBORAH L. TUCKER
Certified Reporter
Certificate No. 50464

```
                        I N D E X
```

EXAMINATION:                                      PAGE

By Mr. Lippman                                    131

By Ms. Speth                                      257

By Mr. Lippman                                    265

EXHIBITS                                          PAGE

No.  1   8-page Rip-Off Report internet printout   27

No.  2   2-page Rip-Off Report internet printout;
         Pages 1 and 2 of 8                         90

No.  3   4-page Rip-Off Report internet printout;
         Helping Victims Collect                    96

No.  4   4-page Rip-Off Report internet printout;
         advertising information                   109

No.  5   3-page Rip-Off Report internet printout;
         "We need your help"                       112

No.  6   8-page Rip-Off Report internet printout;
         Frequently Asked Questions                131

No.  7   7-page Rip-Off Report internet printout;
         File a report                             138

No.  8   3-page Rip-Off Report internet printout;
         Russ Whitney entries                      144

No.  9   5-page Rip-Off Report internet printout;
         Do-It-Yourself Guide                      153

No. 10   5-pgae Rip-Off Report internet printout;
         Rebuttal Rules have changed               181

No. 11   1-page Rip-Off Report internet printout;
         Some Rebuttal Notes from the EDitor       184

No. 12   Two pages of e-mail series May and June
         2003 between EDitor and Jeff LeJune       189

No. 13   11-page e-mail series; May 2006 re:
         Energy Automation Systems                 193

EXHIBITS    (continued)

No. 14    1-page e-mail series, October 2005
          between Russ Whitney and EDitor
          Bates No. XCN WHT-00044                    197

No. 15    11-page document; "class Action Lawsuit
          Framework in Process"
          Bates Nos. XCN WHT-0053 through 00064     200

No. 16    3-page e-mail series, June 2006 between
          EDitor and Robert Paisola
          Bates Nos. XCN WHT-00278 through 020      210

No. 17    1-page e-mail from EDitor to Robert
          Paisola
          Bates No. XCN WHT-000321                  213

No. 18    1-page e-mail from XD700@aol.com to
          info@RipOffReport.com, October 2006
          Bates No. XCN WHT-00328                   214

No. 19    7-page e-mail series, January, February
          and May 2007 between M.A. Yates and EDitor
          Bates Nos. XCN WHT-00331 through 00337    217

No. 20    3-page e-mail series, February  2006
          between cream bar and EDitor
          Bates Nos. XCN WHT-00325 through 00327    225

1       THE VIDEOTAPED DEPOSITION OF EDWARD MAGEDSON

2   continued on August 1, 2007, at 3:21 p.m., in the

3   offices of Jaburg & Wilk, PC, 3200 North Central Avenue,

4   Suite 2000, Phoenix, Arizona, before Deborah L. Tucker,

5   a certified reporter, Certificate No. 50464, for the

6   State of Arizona, pursuant to the Rules of Civil

7   Procedure.

8       The Plaintiff, Whitney Information Network,

9   was represented by its attorneys, Rothstein, Rosenfeldt,

10  Adler, by Mr. Steven L. Lippman and Mr. Shawn L. Birken.

11      The Defendants, Xcentric Ventures,

12  Badbusinessbureau.org, and Mr. Magedson, were

13  represented by their attorneys, Jaburg & Wilk, by

14  Ms. Maria Crimi Speth and Mr. Adam S. Kunz.

15

16

17

18

19

20

21

22

23

24

25

1
                             Phoenix, Arizona

                             August 1, 2007

2
                             3:21 o'clock p.m.

3

4
        (The proceedings commenced at 3:21 p.m.)

5

6
            EDWARD MAGEDSON,

7
having been previously duly sworn, was further examined

8
and testified as follows:

9

10
        (Deposition Exhibit No. 6 was marked for

11
identification.)

12
        VIDEOGRAPHER:  This is the beginning of

13
Tape No. 2 of the continuing videotaped deposition of

14
Ed Magedson.

15
        On the record.  The time is 3:21 p.m.

16

17
           E X A M I N A T I O N

18
BY MR. LIPPMAN:

19
    **Q.    Mr. Magedson, I'm handing you what I've marked**

20
**as Exhibit 6.  And this is another portion of the**

21
**Rip-Off Report website, right?**

22
    A.    Um-hum, I guess.  I can't verify that this is

23
exactly what's there, but...

24
    **Q.    You don't know whether it is or it isn't?**

25
    A.    No, I wouldn't.

1    Q.    See on the bottom where it says

2    http://www.ripoffreport.com?

3    A.    People have spoofed my website in the past.

4    So, I mean, it looks like something that's relatively --

5    it could be it.  I'm not -- I can't check every word and

6    couldn't verify every word, so...

7    Q.    You can't tell one way or the other?

8    A.    I can't tell one way or another.

9    Q.    Okay.  There is a frequently asked questions

10   portion of the Rip-Off Report, right?

11   A.    Yes.

12   Q.    Would you mind turning to Page 6 of 8 of

13   Exhibit 6.  Do you have that in front of you?

14   A.    Okay.

15   Q.    And do you see there's a section about midway

16   down the page, "How do I file a Rip-Off Report?"  Do you

17   see that, sir?

18   A.    Okay.

19   Q.    And there's a Section A, "Select the, quote,

20   File your Rip-Off Report, close quote, button."  Do you

21   see that?

22   A.    Okay.

23   Q.    And then, "B, File your report which consists

24   of six easy steps."  Do you see that?

25   A.    Correct, yes.

1    Q.    Do you see Step 4, it says, "Categorize your

2    report by selecting from our list of categories."

3    A.    Um-hum.

4    Q.    Okay.  And this is when you're preparing a

5    report there's a -- I think the term they call it is a

6    drop-down.  You kind of click on it and it drops downs a

7    number of selections that you can choose and you have to

8    click one of those?

9    A.    Yes.

10    Q.    And the choices in that drop-down, those

11    choices were created by someone in Xcentric, right?

12        MS. SPETH:  Object to form.

13        THE WITNESS:  Hum?

14    Q.    BY MR. LIPPMAN:  I'm sorry?

15    A.    What did you say?

16        MS. SPETH:  I said "Object to form."

17        THE WITNESS:  Oh.  Ask the question.  What's

18    the question?

19    Q.    BY MR. LIPPMAN:  When you hit that portion of

20    the categories --

21    A.    Um-hum.

22    Q.    -- and you click it and it drops down, the

23    alternatives, all of the alternatives that are in there,

24    those were options that were created by somebody at

25    Xcentric?

134

1     A.     Created -- what created -- what was created?

2     Q.     **Who came up with those options for the**

3     **categories?**

4     A.     The consumers.

5     Q.     **I'll show it to you afterwards.**

6     **And would you turn to the next page, Page 7 of**

7     **8 of Exhibit 6?**

8     A.     Can you repeat that question, what you're

9     asking?  Maybe I'm misunderstanding what you're saying.

10    Q.     **Sure.**

11    A.     I'm not happy with what your --

12    Q.     **When you fill out the form to do a -- to file**

13    **a Rip-Off Report --**

14    A.     Okay.

15    Q.     **-- and you hit the category portion and**

16    **there's the drop-down that we talked about earlier, the**

17    **various items that are in the drop-down, the various**

18    **categories that are in the drop-down --**

19    A.     Okay.

20    Q.     **-- those categories were created by somebody**

21    **at Xcentric?**

22    A.     Oh, created --

23    Q.     **Right.**

24    A.     -- the categories?

25    Q.     **Yeah.  Somebody at Xcentric came up with those**

1   categories, right, and then the consumer chooses among

2   one of those categories?

3        A.    The answer is yes and no.

4        Q.    Okay.

5        A.    There was -- at the very beginning there was

6   some basic benign categories that were made.   Before,

7   what I thought you were asking is who created -- creates

8   the report when you select the category.

9        Q.    Okay.

10       A.    All right.   There -- back years ago there were

11  basic categories that were placed.   And then there

12  really wasn't categories to really accommodate a lot of

13  people, so they would suggest a category, and it was on

14  the basis of their category of their suggestion that we

15  would create new categories.

16       Q.    Okay.   So consumer --

17       A.    So the only way a category gets created --

18       Q.    Um-hum.

19       A.    -- is if somebody sends an e-mail and says,

20  "Oh, I'm trying to file a report on dog watchers," you

21  know, you know, "could you create a category for dog

22  watchers?"

23       Q.    Okay.

24       A.    You know, we may say, well, there is already

25  some -- a category there for animal services, okay, in

general, so we may say just go ahead and do that or we would go ahead and create, on their request, create a new category.

Q.    Okay.  So consumers suggest new categories to Xcentric?

A.    Correct.

Q.    And Xcentric decides whether the consumer's suggestion is something worthy --

A.    Right.

Q.    -- of putting a new category in and adding it or whether it's already covered and not adding it?

A.    Right.

Q.    And if you -- and if Xcentric thinks it's worthy in adding it, it adds it to the drop-down list, includes it in there so the next consumer filing a report can choose that category if he wants to or she wants to?

A.    Right.

Q.    Okay.  Now let's turn to Page 7 of Exhibit -- what am I on, 6?  Yeah, Exhibit 6.  Do you have that, sir?

A.    You want me to go to 7?

Q.    Yeah, Page 7.

A.    We're already on 7.  Oh, we were on 6.  Okay. All right.

1    Q.    Got it?

2    A.    Yes.

3    Q.    And you see there's a category, the second one

4    down, "What makes a good Rip-Off Report?"  Do you see

5    that?

6    A.    Um-hum.

7    Q.    Okay.  And this is trying to give the

8    consumers some guidance on what they should think about

9    in preparing their Rip-Off Reports?

10    A.    Right.  And being honest and factual.  Okay.

11    I see it.

12    Q.    And then you go down next, "How can my story

13    be featured on the home page?"  Do you see that?

14    A.    Okay.

15    Q.    And the home page or the front page, this is

16    what we talked about earlier in, for instance, Exhibit

17    2, that were under the top Rip-Off Reports --

18    A.    Um-hum.

19    Q.    -- and featured Rip-Off Reports, right?

20    A.    Go ahead.

21    Q.    Correct?  That's what we were talking about,

22    right?

23    A.    Um-hum.

24    Q.    So this section here, "How can my story be

25    featured on the home page?" this is guidance to a person

1    who wants to place a Rip-Off Report as to how his might

2    be deemed worthy of being in the top Rip-Off Reports or

3    featured Rip-Off Reports as we saw on Exhibit 2, right?

4        A.    Um-hum.

5        Q.    Correct?

6        A.    Okay.

7        Q.    Yes, sir?

8        A.    Yes, sir.

9        Q.    Okay.

10            (Deposition Exhibit No. 7 was marked for

11    identification.)

12        Q.    BY MR. LIPPMAN:  Why don't you give these back

13    to me so we can keep these organized here.

14            I'm handing you now what I've marked as

15    Exhibit 7.  And you've seen this document before, right,

16    or you've seen this portion of the --

17        A.    Okay.

18        Q.    This is another portion of the Rip-Off Report

19    website, right?

20        A.    Okay.

21        Q.    Is that correct, sir?

22        A.    Correct.

23        Q.    Okay.  This is where you would click to file a

24    report, what you would get, right?  Sir?

25        A.    I'm just not recognizing this for some reason.

Oh, okay, I understand.  Okay.

Q.    **Right, sir?**

A.    Yeah, okay.

Q.    **If somebody clicks on "File a report," they would have -- they would get to a place where they would have to provide certain information about themselves, right?**

A.    Yes, um-hum.

Q.    **Who they are, where they are, things of that nature?**

A.    Yes.

Q.    **Okay.  And then once they went through that, they would get to this part to prepare the Rip-Off Report they want to file, right?**

A.    Yes.

Q.    **And, as we see, it goes through step by step the information that somebody has to provide in order to file a Rip-Off Report, right?**

A.    Yes.

Q.    **And we see, for instance, in step -- on Page 2 of 7, "Step 2, General Report Information."  This is where it takes people through the steps of preparing the title for their report, right?**

A.    Hold on.

Q.    **Right, it says "Step 2"?**

1    A.    I don't see that.  Where are you talking

2    about?

3    Q.    "Step 2, General Report Information," do you

4    see that?

5    A.    Okay.

6    Q.    First thing, "Title your Rip-Off Report"?

7    A.    Um-hum.

8    Q.    Right?  It says four things.  "A, The name of

9    the company for the individual you are reporting,"

10   right?

11   A.    Okay.

12   Q.    Correct?

13   A.    Correct.

14   Q.    Okay.  "B, Descriptive words explaining what

15   they did to you," right?

16   A.    Correct.

17   Q.    "C, The city the company or individual is

18   located in"?

19   A.    Yes.

20   Q.    And, "D, The state the company or individual

21   is located in," right?

22   A.    Yes.

23   Q.    That's the guidance provided to somebody

24   wishing to post a Rip-Off Report and preparing the title

25   for the Rip-Off Report, right?

141

A.    Correct.

Q.    And then -- so you go down -- it goes in further detail.  For instance, Item B, "Enter descriptive words to your title to describe what the company or individual did to you," right?

A.    Yeah, where -- what number are you on?

Q.    Letter B, Capital B.

A.    Okay.

Q.    Do you see that?

A.    Okay.  Yes.

Q.    And the person is instructed "Be creative when using the example words.  It will make your report more interesting."  You see, "Search other reports to see what others are writing."

A.    Okay.

Q.    That's the guidance that Xcentric is providing to people who want to post a Rip-Off Report as to how to prepare a title, right?

A.    Okay.

Q.    Correct?

A.    Yes.

Q.    And if you would turn to Page 5 of 7, please. Do you have that, sir?

A.    Yes.

Q.    Okay.  And you see here, "Step 4, categorize

1    report"?

2        A.    Correct, yes.

3        Q.    It says "Categorize your Rip-Off Report"?

4        A.    Um-hum.

5        Q.    And then you see down there where it says

6    first choose a topic, then locate the best category that

7    suits your report, right?

8        A.    Okay, yes.

9        Q.    And then these are the drop-downs that we

10    talked about earlier?  These are the --

11        A.    Well, it's like a ----

12        Q.    -- the topics somebody chooses and then the

13    category they choose, right?

14        A.    Right.

15        Q.    And the selection among the topics and the

16    categories, what's in those two areas, topic and

17    category -- well, I'm not -- let me start all over

18    again.  I'm totally butchering that.  And if you

19    followed me I'd be surprised.

20            But, in the first item, first choose a topic,

21    do you see that?

22        A.    Yes.

23        Q.    And the alternatives under "Topic," for

24    instance, do you see the first one there, "Outrageous

25    and popular Rip-Off," or the second one, "Unusual

1    Rip-Off," those options were selected by Xcentric,

2    correct?

3          The available options were selected by

4    Xcentric.  The person chooses which of those available

5    options they want to choose.  Right?

6        A.    Right.

7        Q.    Okay.  Same thing under the second item,

8    "Choose a category."  "Attorneys" -- "Attorney generals,

9    auto dealers, BBB, Better Business Bureau," et cetera,

10   those alternatives were selected by Xcentric Ventures,

11   and then the individual chooses among those

12   alternatives, correct?

13       A.    Correct.

14       Q.    And as we see in the next step, Step 5, "Add

15   Report Link" -- but you have to put the entity that

16   you're reporting on at the end of your report because

17   that will link it to all of the other reports on the

18   Rip-Off Report about that entity?

19       A.    You don't have to.

20       Q.    Oh, you don't have to?  That's an option

21   somebody has?

22       A.    That's right.  You don't have to do that.

23       Q.    Okay.  And, again, somebody would fill all

24   this out, get to the end and hit, like we see on Page 6

25   of 7, "Submit your report," and that's how -- the

1    process somebody goes through in submitting a Rip-Off

2    Report, right?

3        A.    Right.

4              (Deposition Exhibit No. 8 was marked for

5    identification.)

6        Q.    BY MR. LIPPMAN:  I'll trade with you.

7        A.    No.

8        Q.    I'm now handing you what I've marked as

9    Exhibit 8.  Do you know, have you seen this document

10   before?

11       A.    I don't know what you -- oh, I mean --

12       Q.    Well, let me tell you.  See, in the lower

13   right-hand corner where it says XCN WHT-00011?

14       A.    Oh, okay.  Yes, I have actually, yeah.

15       Q.    You've seen this document before, right?

16       A.    Yes, I do remember this.

17       Q.    And I will represent to you, this document was

18   produced to us in this litigation.  That's where you see

19   the --

20       A.    Okay.  I remember it.  That's why -- okay.  I

21   do remember it.  Okay.  Okay.

22       Q.    Now, when I say this document shows, I'm going

23   to say for lack of a better term, a little blurb of

24   information with regard to the various Rip-Off Reports

25   that were posted on the Rip-Off Report website, that

1    pertained to Whitney or Russ Whitney, right?

2        A.    It looks like that, yes.

3        Q.    Okay.  And we see, for instance, like on the

4    first page of Exhibit 7 -- I was going to look at the

5    first -- excuse me, the first page of Exhibit 8.  I'm

6    just going to look at the first item where it says "Date

7    4-5-2007, 5:21:21 p.m.," that means that this particular

8    Rip-Off Report posting was posted on April 5th, 2007 at

9    5:21 and 21 seconds p.m., right?

10       A.    Yeah.

11       Q.    Okay.  And the title of it is "Russ Whitney,

12   Building Wealth, comma, Whitney Education Group SCAM,"

13   et cetera.  That's -- that would be -- in other words,

14   if I went to that Rip-Off Report that's what the title

15   of it would be, right?

16       A.    Correct.

17       Q.    Okay.  And then underneath it where it says

18   "Seminar Programs," do you see that?

19       A.    Right.

20       Q.    Seminar programs, that's one of the topic

21   categories that would come in the drop-down that

22   somebody has to select, right?

23       A.    Right.

24       Q.    So, again, we'd see on their Rip-Off Report

25   under the category, it would say -- it would say

1      "Semester Programs," correct?

2          A.    Correct.

3          Q.    That's contained in the report that gets

4      posted and published, right?

5          A.    Um-hum.

6          Q.    Sir?

7          A.    Yes.

8          Q.    Okay.  And then we see on the right-hand side

9      where it says "Author," in this instance, "Moon

10     Township, Pennsylvania," right?  That tells me who

11     posted that particular Rip-Off Report?

12         A.    It just tells you the city and state.

13         Q.    And where they're located?

14         A.    Right.

15         Q.    But Moon, that's supposed to designate who the

16     person is, right, and then the township?

17         A.    No, it's not the name.  That's the town.  Moon

18     Township.

19         Q.    Oh, okay.  I understand.  So it says "Author,

20     Moon Township, Pennsylvania."  That just means where the

21     person is?

22         A.    Right.

23         Q.    Like in the one below that we see "Author," it

24     says "Los Angeles, California" --

25         A.    Right.

1  Q.    -- that tells me where that person is located?

2  A.    Right.

3  Q.    Okay, I gotcha.  Now, if you could go down

4  just a little bit further on the same first page of

5  Exhibit 8, the third -- for instance, the third posting

6  there, you see the one on March 17th, 2007 at 8:56 p.m.?

7  A.    Right.

8  Q.    "Russ Whitney Education Group Scam," right?

9  And it continues on.  Do you see that?

10  A.    Right.

11  Q.    And the category that this was put under is

12  "Con artist," right?

13  A.    Okay.

14  Q.    Correct?

15  A.    I see it, yes.

16  Q.    Okay.  And, again, that con artist category,

17  that's one of the categories that Xcentric Ventures

18  offers that somebody has to choose among?

19  A.    Yes, the consumer chooses that.

20  Q.    Okay.  And the same thing on the one below

21  that, the fourth one on May -- excuse me, March 8th,

22  2007 at 4:52 p.m., the category there is "Corrupt

23  Companies," right?

24  A.    I see that, yes.

25  Q.    And, again, that's one of the topics that

1    Xcentric Ventures offers as one of the alternatives for

2    a consumer to select in posting his Rip-Off Report,

3    right?

4        A.    Yes, correct.

5        Q.    And then if you would turn to the fourth page

6    -- and, I'm sorry, they're not -- just so you know, the

7    fourth page of Exhibit 8, it says on the bottom -- it's

8    00014.

9        A.    Okay.

10       Q.    Do you have that?

11       A.    Yes.

12       Q.    And, again, the seventeenth report,

13   October 28, 2006, do you see that?

14       A.    All right.

15       Q.    "Russ Writ" -- "Russ Whitney ripped off

16   another hard worker."  Do you see that?

17       A.    Correct, yes.

18       Q.    And the category for this Rip-Off Report was

19   again "Corrupt Companies," right?

20       A.    Okay, I see that.

21       Q.    Correct?

22       A.    Correct.

23       Q.    Okay.  Again, "Corrupt Companies" is one of

24   the topic categories that Xcentric Ventures makes

25   available to people to utilize in posting a Rip-Off

1    Report, right?

2        A.    My answer hasn't changed.

3        Q.    "Yes"?

4        A.    Correct, yes.

5        Q.    And if you would flip over to the next page of

6    Exhibit 8 you'll see there's an entry 28, September 7th,

7    2006.  Do you see that?

8        A.    No. 28, okay.

9        Q.    "Russ Whitney, aka, Whitney Education

10   Services," do you see that one?

11       A.    "Aka Wealth Intelligence" --

12       Q.    Yes.

13       A.    -- "Academy."

14       Q.    Yes.  And the category that this one, this

15   Rip-Off Report, was posted under was "False TV

16   Advertisements," right?

17       A.    Okay, yes, I see that.

18       Q.    Okay.  And false TV advertisements is a number

19   -- another one of the categories that Xcentric offers as

20   one of the choices that a consumer has to use to post a

21   Rip-Off Report, correct?

22       A.    I see that.

23       Q.    Is that correct?

24       A.    Correct.

25       Q.    If you wouldn't mind, turn over two more pages

1    to the page that ends at 00017.  Do you have that?

2        A.    I see it.

3        Q.    Do you see -- again, Report 31, March 16th,

4    2006, "Russ Whitney Scam Alert."  Do you see that one?

5        A.    Um-hum.

6        Q.    Again, the category there was "False TV

7    Advertisements," right?

8        A.    I see that.

9        Q.    As well as No. 34 on October 11th, 2005, also

10   the category for that one was "False TV Advertisements,"

11   right?

12       A.    I see that.

13       Q.    And "False TV Advertisements" is one of the

14   other topics that Xcentric Ventures offered as an

15   alternative for a consumer to use for posting a Rip-Off

16   Report?

17       A.    Correct.

18       Q.    Would you flip to the next page?  It's 00018.

19   Do you have that?

20       A.    Okay.  I'm at 00018.

21       Q.    Okay.  Do you see Exhibit -- excuse me -- Item

22   36, the category for that one was "False TV

23   Advertisements," right?

24       A.    Correct.

25       Q.    And for 37, "Corrupt Companies"?

1    A.    Correct.

2    Q.    38, "Corrupt Companies"?

3    A.    Correct.

4    Q.    For 39, "Corrupt Companies"?

5    A.    Correct.

6    Q.    For 40, "False TV Advertisements"?

7    A.    Correct.

8    Q.    For 42, "Corrupt Companies"?

9    A.    "Home based business" -- oh.  No, corrupt

10   business.

11   Q.    Correct?

12   A.    Correct.

13   Q.    And for 45, again, the category was "Corrupt

14   Companies," correct?

15   A.    Financial services?

16   Q.    No, the one below it.  Four -- it's Aug- --

17   four -- No. 45, August 31, 2003.

18   A.    Okay.

19   Q.    Do you see that?  The category was "Corrupt

20   Companies"?

21   A.    Yes.

22   Q.    And, again, these two categories, "False T's"

23   -- "False TV Advertisements" and "Corrupt Companies" are

24   two of the alternatives that Xcentric Ventures offers to

25   a consumer to use as a category under which they need to

1    post a Rip-Off Report, right?

2    A.    Correct.

3    Q.    And if I can have you flip two more pages to

4    the page ending in 00020, do you have that?

5    A.    Okay.

6    Q.    And again we see for posting No. 46 the

7    category was "Corrupt Companies," right?

8    A.    Multi level marketing?

9    Q.    No.  "No. 46, Russ Whitney Rip-Off, dishonest,

10   fraudulent, no service."

11   A.    I'm having a hard time seeing.  Okay.

12   Q.    Do you see that?

13   A.    Is that the top one?

14   Q.    Yes, sir.

15   A.    Yes, I see it.

16   Q.    "Corrupt Companies" is the topic for this one,

17   right?

18   A.    Correct, yes, I see.

19   Q.    And the next one below it, 47, the topic is

20   "False TV Advertisements," right?

21   A.    I see "Multi Level Marketing."

22   Q.    No, the one above it.  That's 48.

23   A.    Okay.

24   Q.    The one above it, 47, on January 31st, 2003.

25   A.    Okay.

Q.    Do you see where the topic is "False TV Advertisements"?

A.    Yes.

Q.    Again, as we talked about before, corrupt companies and false TV advertisements are two of the various topics that Xcentric Ventures makes available to a consumer to choose among in posting a Rip-Off Report, right?

A.    Yes.

MS. SPETH:  You're doing fine now?  Sorry.

THE WITNESS:  I'm tired.

Q.    BY MR. LIPPMAN:  I'll switch with you again.

(Deposition Exhibit No. 9 was marked for identification.)

Q.    BY MR. LIPPMAN:  I'm handing you now what I've marked as Exhibit No. 9.  And this is another part of the Rip-Off Report website, right?

A.    Yes.

Q.    And this portion of the Rip-Off Report website deals with the corporate advocacy business program?

A.    Corporate advocacy business remediation and customer satisfaction program, yes.

Q.    Okay.  I've seen that referred from time to time as the CAP.

A.    Correct.

154

Q.    Can we refer to that as CAP?  Otherwise, I'll run out of breath if I have to keep saying it.

A.    All right.  I'll let you do that.

Q.    You're going to be nice to me?

A.    Yes.

Q.    Okay.  So if I refer to CAP, we're talking about the Rip-Off Report corporate advocacy business remediation and consumer satisfaction program, right?

A.    Right.

Q.    And in order to participate in the CAP, an entity or person against whom a Rip-Off Report has been posted pays a fee for that, right?

A.    Ask the question -- ask -- ask me the question again.

Q.    Sure.  In order to participate in the CAP, the entity or person against whom a Rip-Off Report has been posted pays a fee?

A.    I'm going to say no to that question --

Q.    Okay.

A.    -- because the way you're asking it is -- is, you're twisting around in a way, and I'm not --

Q.    I'll ask it differently.

A.    All right.  Go ahead.  All right.

Q.    The CAP is -- the people who participate in the CAP are individuals or entities to whom Rip-Off

1    Reports have been posted about, the subject of a Rip-Off

2    Report?

3        A.    Yes.

4        Q.    Okay.  And in order for that individual or

5    entity to participate in the CAP, they pay Rip-Off

6    Report a fee, correct?

7        A.    Well, they have to do other things before they

8    pay the fee, so...

9        Q.    But one of the -- one of the prerequisites of

10   participating in the CAP program is paying a fee?

11       A.    Yeah, but we just don't take the fee.  They

12   have to do certain things in order to pay the fee.

13       Q.    Okay.  But --

14       A.    So --

15       Q.    -- they have to do certain things and pay a

16   fee?  It's one of the things they need to do is pay a

17   fee?

18       A.    Okay, yes.

19       Q.    Right?

20       A.    It's one of the things.

21       Q.    Okay.  I mean, you can do the other things --

22   I understand if you pay the fee but don't do the other

23   things you don't get in the CAP program, right?  In

24   other words, you can't just pay and not do the other --

25   do the other things?

156

A.    Right.  You have to -- I'll let you ask me the questions and I'll just --

Q.    Okay.  In order to participate in the CAP, the person can't just pay the fee and not do the other things it needs to do?

A.    Correct.

Q.    Just as well, it can't just do the other things and not pay the fee, correct?

A.    Right.

Q.    You have to fulfill all the requirements, do the other things and pay the fee to participate in the CAP?

A.    The fee is for our services.

Q.    Okay.  Now, if you look along the right-hand side of Exhibit 9, in particular on the second page of Exhibit 9, it says on the right-hand side, there's a box there that says "Prescription Drug," or, like the second one down, www.ZoomTalent.com, do you see that?

A.    Correct, I see that.

Q.    That's -- this is an advertisement that somebody places on the Rip-Off Report?

A.    Right.

Q.    But this is like what we talked about earlier where we saw the -- the rates for the advertising?

A.    No.  No.

Q.     "No"?

A.     Ask me the question again.  I want to make sure I'm understanding it correctly.

Q.     **Sure.  Remember we saw earlier on Exhibit 4 the rates for the advertising on the Rip-Off Report?**

A.     Right.

Q.     **And we talked about people placing ads on the Rip-Off Report?  This is one of those ads, right?**

A.     No.

Q.     **This is not one of those ads?**

A.     No.

Q.     **Okay.  Why is this any different than the ads on --**

A.     Because I told you before --

Q.     **Yeah.**

A.     -- that's very old.

Q.     **Yeah.**

A.     This is a little bit more recent, but that's way old.  And it never lasted but maybe a few months.

Q.     **Okay.**

A.     And it was pulled.  And that's going back five years ago maybe.  And this is -- these are different ads.  This is under a different test or --

Q.     **Okay.  These folks would pay to have their ads on the Rip-Off Report website, right?**

1    A.    No.   These ads weren't -- these ads -- these

2  ads were not paid for.

3    **Q.    These were ads put on for free?**

4    A.    Yeah, they weren't paid for.  I didn't receive

5  cash for them.

6    **Q.    Were you supposed to receive cash and they**

7  **just didn't pay you?**

8    A.    No, no.

9    **Q.    You did it for free?**

10    A.    I did it for free.

11    **Q.    Why did you do that?**

12    A.    I'm just a nice guy.

13    **Q.    Now --**

14    A.    Is there a question there?  You asked me why I

15  did it?

16    **Q.    Yeah.**

17    A.    I'm a nice guy.  I mean, just -- I did it.  I

18  placed the ads.

19    **Q.    Okay.  All of these ads you placed for free?**

20    A.    Right, all of those ads I placed for free.

21    **Q.    Now, if I'm an entity and I participate in the**

22  **CAP, that means that when a Rip-Off Report is posted**

23  **about me, Xcentric will investigate the truth of that**

24  **Rip-Off Report, right?**

25    A.    When new reports come in.

1     Q.     When a new report comes in.  In other words,

2     not before I became a member of -- participated in the

3     CAP, but after the time I partic- -- I become a member

4     of the CAP?

5     A.     Right, correct.

6     Q.     Okay.  And so let's assume on January 1, 2007

7     my company, ABC, Inc., becomes a member of the CAP.

8     Okay?

9     A.     Okay.

10    Q.     And on January 10th, 2007 somebody posts a

11    Rip-Off Report about my company, ABC, Inc.?

12    A.     Right.

13    Q.     Then, as a member of CAP, Xcentric, operator

14    of the Rip-Off Report, would investigate whether or not

15    what is contained in that Rip-Off Report is true or not,

16    correct?

17    A.     No.

18    Q.     Okay.  What would you do?

19    A.     Well, we sent -- because part of the CAP, the

20    company agrees --

21    Q.     Um-hum?

22    A.     -- first off, the company agrees, anyone who's

23    filed an existing report, they're going to make them a

24    hundred percent satisfied.  And even if that means a

25    refund.  That's everyone that filed a Rip-Off Report.

We -- they agree to an e-mailing.  We e-mail them out.
That's number one.

    **Q.**    **Um-hum?**

    A.    So then we send them out the e-mail.  And we
do a mass e-mail out to all the consumers that filed a
Rip-Off Report on the particular company.  And we send
them an e-mail, look, the company -- whatever the
company's giving us in writing that they are committing
to that we can put in a report about them, they're
giving us in writing their commitment to good customer
service, how they've changed, maybe they fired people,
maybe they made more hours for their customer service,
and everything else like that.  But they have to give us
a stated commitment in what they're doing --

    **Q.**    **Okay.**

    A.    -- to make -- for the program, in order to do
the program.

    Then, after that, the -- and then after that,
then anything new that comes in, the company agrees that
anyone running across a Rip-Off Report or filing in a
report because they're upset, whether it be from the
past or just in the present, they were wronged by the
company, the company agrees that they're going to take
care of the problem.

    Not ten percent, not five percent, no

arbitration, they're going to make them figure out

what's -- and they're going to get it resolved quickly.

No dragging it out.  No lawyers, no arbitration, none of

that garbage.  They're going to make things right and

move on.

          And the program really works.  And everybody

that's on it likes it.  I know I'm telling you more than

you need to know.

          But the business has to -- we -- so what we

end up doing with that report is, we e-mail that person

as soon as they filed the report, we e-mail them and

tell them, look, I don't know if you read what --

basically, I'm just giving you the roundabouts, like if

you read what was written, what we've posted about the

company, or why you're trying to file a new report, but,

look, the company is willing to make things right with

you and somebody will contact you within three to five

business days.  We try to give them some statistics

about the company, some changes that they made.  This is

slipping through the cracks, probably.  Company

executives are going to want to take care of this with

you, and somebody will get to you within three to five

business days.  If it's a holiday time, we even give

them, you know, 10 to 14 days, depending upon if there's

a, you know, a holiday period.  So we give the company

time to get back to them within a reasonably soon time.
And so the company -- so the consumer is satisfied and,
hopefully, the consumer doesn't want the report to still
be posted.

So, hopefully, taking care of the problem is
avoiding new problems, consumers get to see how a
business took care of the problems, their commitment.
And most of the companies that go on the program, the
more they admit to doing wrong, meaning, you know, like
when your child does something wrong and they try to
tell you, "Dad, I just didn't do that," and you know
damn well they lied and you want to punish them, well,
it doesn't work any different even when you're a
politician.  Look, I take responsibility and, you know,
for that, I did that wrong and I should have never voted
for the war.

Okay.  Well, your trust level maybe goes up a
little bit at least.  Now we're talking politicians now.
But in a regular business, it's always better when a
consumer can read and see the history.  I don't care if
it's 10,000 reports on the company.

And even like a company like Russ Whitney
who's got how many reports, and they're all over the
country.  I mean, how many reports do they have?  A
couple of dozen?  Three dozen?  Four dozen?  It's really

not that bad.

So a -- consumers need to understand that --
we explain to the consumer, look, this is a small
fraction of their business.  You know, you might have
gotten a bad representative, a salesman that's rotten.
You know, there's good, there's bad people all over the
place.  The company executives are going to want to take
care of this.  And the company takes care of it, even if
they're -- they shouldn't be, they take care of it in
the name of good customer service.  Because, in all
honesty, most of these -- a lot of times consumers, they
think they were wronged.  You're a consumer, too.  You
go to a place of business and you walk out the door, you
think you were wronged.  And maybe you weren't, you were
just being a jerk that day.

Is that possible?  You know him better than I
do.

But, you know, you walk into a business and
you think -- well, who knows whatever -- whatever reason
you think they did wrong, but they didn't.

The program really shows a business how to
make -- how to change their image.  With or without
Rip-Off Report, with or without it, Russ Whitney, and
every other company around that does things wrong, or
consumers think they do wrong, are going to get

1    complaints.  I don't care who you are.  You can't

2    satisfy everybody all the time.

3              So, with or without Rip-Off Report, people are

4    going to get complaints.  Whether they put them on

5    whatever they're going to put them on, and they're free

6    to put whatever they want, you can call them all kinds

7    of corrupt this or dirty that, or they'll call them, you

8    know, seminar programs, to whatever.  Consumers are

9    going to do it.  And today, with the internet, consumers

10   want to hear a third-party opinion.  They want to see

11   how a business took care of business.

12             So, it's -- most everybody who's on the

13   program -- everybody that's on the program, they're glad

14   the Rip-Off Report's there because it shows how they

15   took care of business and it completely turns around

16   their business.  That's why the program does so well.

17   But businesses -- some businesses, like your company

18   that you're representing, wants to think that Rip-Off

19   Report is this bad thing, we extort.  There's no

20   extortion.  You know, we make up the reports like I'm

21   sitting around making up the reports.  It's ridiculous.

22   The program really works.

23             All right.  I'm finished.

24             MS. SPETH:  I bet you you don't know what the

25   question was anymore.

1    THE WITNESS:  Did I answer?  I answered the
2    question.
3    MS. SPETH:  I don't know if you did or didn't.
4    I don't remember.
5    THE WITNESS:  No, he asked -- the question he
6    asked was --
7    Q.    BY MR. LIPPMAN:  Let me -- let me move on.
8    MS. SPETH:  That's all right.  You don't have
9    -- you don't have to remember.
10   Q.    BY MR. LIPPMAN:  The -- I just want to
11   understand the process, though.
12       If I'm a CAP member and somebody posts a
13   report about me, I understand they're going to get an
14   e-mail from you saying, "Hey, these guys are pretty
15   good.  They'll address your thing.  Somebody will
16   contact you in X numbers of days."  I know -- I know
17   we're -- I'm making this --
18   A.    Right.  We -- right.
19   Q.    That's up to them --
20   A.    And we try to calm them down.
21   Q.    Okay.
22   A.    Because we know -- Rip-Off Report knows.
23   They've -- they've already agreed to it in writing.
24   Q.    Okay.
25   A.    They're going to take care of the problem.  A

1   consumer cannot come back and tell us that, "You know

2   what, they didn't take care of us."

3           MS. SPETH:  Ed, let him finish his question.

4           THE WITNESS:  I'm sorry.  Okay.

5           MS. SPETH:  Just answer the question.

6       Q.    BY MR. LIPPMAN:  Now, I understand that's step

7   one.  The consumer gets that e-mail.  I assume -- I, as

8   the -- as the CAP member, I get a copy of the Rip-Off

9   Report, as well, so I know what I need to address and

10  who I need to speak to, right?

11      A.    Yes, you get a copy of exactly what we're

12  sending them.

13      Q.    Okay.  And if I satisfy the consumer, does the

14  -- the report doesn't get posted?

15      A.    It's up to the consumer.

16      Q.    Okay.

17      A.    It's a date --

18      Q.    Okay.  So, in other words, I can --

19      A.    To date, no one's ever said, "Oh, I" -- you

20  know, after -- why would they want it?  I mean, the

21  company took care of them.  They realized it --

22          MS. SPETH:  Ed.

23          THE WITNESS:  -- and apologized.  Okay.

24          MS. SPETH:  Ed, please answer the question.

25      Q.    BY MR. LIPPMAN:  So, generally, the way it

1    works is the CAP member gets a copy of the Rip-Off

2    Report.   It's not yet posted.   It's filed but not yet

3    posted.   They get a copy of it.   If they satisfy the

4    consumer, it doesn't get posted, right?

5        A.    Right.   If they don't --

6        Q.    If they don't --

7        A.    Even if they do --

8        Q.    -- it does get posted?

9        A.    -- when the consumer wants it posted --

10       Q.    The consumer can still post it?

11       A.    And -- yeah.   And then -- and then, of course,

12   the company's asking us to please explain --

13       Q.    Right.

14       A.    -- well, the company did give them back a

15   refund and they did apologize, they realized they made a

16   mistake.

17       Q.    Okay.

18       A.    And -- and, you know, that kind of thing would

19   take place.

20       Q.    And Rip-Off Report posts that?

21       A.    Right -- well, yeah, because they're

22   instructing -- you know, they're instructing us to

23   please tell the truth.

24       Q.    Okay.   And I think you alluded to earlier that

25   most of the time when a consumer posts his Rip-Off

1  **Report it's a CAP member, and the CAP member takes care**

2  **of it, the consumer usually decides not to go ahead and**

3  **post the report?**

4      A.    Right.  We've never been asked.  Never been

5  asked.

6      Q.    **To post a report after it's been taken care**

7  **of?**

8      A.    Never been asked.  Because then --

9      Q.    **Okay.  I just want to clarify a couple of**

10  **things.**

11      A.    Okay.

12      Q.    **I want to make sure I understand.  If I'm a**

13  **CAP member, in order to be a CAP member, I'm saying that**

14  **regardless of what the consumer complains about, whether**

15  **he's right or wrong, I'm going to make him happy?  I'm**

16  **going to do what he wants me to do?**

17      A.    You know, it sounds kind of crazy and like you

18  think that's just totally ludicrous.

19      Q.    **It does.**

20      A.    You know what?

21      Q.    **But that's what they're committing to do?**

22      A.    You know what?  You know, one -- every company

23  would think -- every company would think --

24          MS. SPETH:  Ed, it's a yes or no question.

25          THE WITNESS:  It's a -- well -- so what's the

1      question?  Well, I really to explain.

2                MS. SPETH:  I know you want to explain.

3          Q.    BY MR. LIPPMAN:  The question is, in order --

4      if I'm a CAP member --

5          A.    Um-hum.

6          Q.    -- in order to remain in the CAP program, I'm

7      committing that regardless of what the complaint is,

8      whether the complaint is legitimate or illegitimate,

9      whether the customer's right or wrong, or whether what

10     he wants is -- a normal person would look at as a

11     ridiculous request, I'm going to do it to make that

12     customer happy?

13         A.    You -- so, you said -- well, yeah.  Yes, the

14     business -- that's what the business ends up doing.

15         Q.    That's -- but that's what they're committed to

16     do to be a member of the CAP, right?

17         A.    No -- well, within reason.  What we've -- we

18     don't have an issue with --

19         Q.    And who decides the within reason part?

20         A.    We haven't had an issue.

21         Q.    Okay.  But Rip-Off Report would decide that?

22         A.    You know what, the business -- you know what,

23     if they're not satisfied on Rip-Off Report --

24         Q.    Yeah.

25         A.    -- they're going to go somewhere else and just

1    file.

2         Q.    Okay.  But -- I understand.  But I'm talking

3    about -- I'm trying to understand this.

4              If I'm a member of the CAP program, part of

5    being a member of CAP program means I give my

6    commitment, among other things, among other things I

7    have to do and among paying the fee, but I give my

8    commitment that when somebody files a Rip-Off Report,

9    you are going to send this notice that we agree upon

10   the language of, and you are going to send to me the

11   actual Rip-Off Report, and I'm going to make that

12   customer happy regardless of whether his complaint is

13   legitimate --

14        A.    What they want --

15        Q.    -- illegitimate, whatever, whatever it takes,

16   I'm going to make this person happy?

17        A.    Yes.

18        Q.    And if I don't do that, I can't participate in

19   the CAP program?

20        A.    No, you could still participate.  The report

21   gets posted.

22        Q.    Okay.

23        A.    And the report will get posted and --

24        Q.    And you're going to make a determination,

25   "you" meaning the Rip-Off Report, essentially is going

1    to make a determination when this person posts it,

2    whether you're going to post something that says, "Hey,

3    wait a minute.  This business tried to make amends and

4    the customer wasn't willing to do it," or "This business

5    didn't try to make amends," right?

6        A.    Well, haven't had the problem.

7        Q.    It's never occurred?

8        A.    No, I haven't had --

9              (Court reporter clarification.)

10       Q.    BY MR. LIPPMAN:  That never occurred?

11       A.    It has -- it has not occurred.

12       Q.    Okay.  I mean, you will -- and I think you

13   alluded to this earlier.  Sometimes consumers make

14   complaints and they're just wrong, right?  What they're

15   complaining about it is not an appropriate complaint.

16   Maybe they were having -- they were having a bad day or

17   -- or --

18       A.    No, I don't agree with that.

19       Q.    You think every complaint a consumer makes --

20       A.    I believe -- I believe -- I believe that most

21   consumers -- I believe that most consumers feel in their

22   heart that they're wrong, even if they're not wrong.

23   That's what I try to say to you before.  You're a

24   consumer.  How many times have you gone and walked out

25   of a store and you might have said -- you know, you went

```
 1    to Circuit -- I don't want to say which store.  Any
 2    store.
 3        Q.    Right.
 4        A.    You go to, you know, some -- some retail store
 5    and you said, you know, "Those dirty bastards, they
 6    should have given me my money back."  Or, you know,
 7    "They sold me a warranty," da, da, da, da, you know, and
 8    -- you know, maybe you didn't read -- you're a lawyer
 9    and you didn't even read the writing on it.  And you
10    know the way they have some other lawyer worded it,
11    you're really screwed because -- and it's really a rip
12    off because that's not the way the employees presented
13    it to you.  And that happens a lot.
14        Q.    That's --
15        A.    So the consumer, he don't care what it says.
16    "This is not what they told me."  You know, I would get
17    a replacement computer if I brought it in, versus, you
18    know, yeah, well, it has to -- you know, with all these
19    other different things.
20        Q.    Okay.  But -- and I appreciate that people
21    could disagree, but you've got to agree with me, as
22    well, just as I said there are consumers out there who
23    try and take advantage of opportunities like that and
24    maybe go in and ask for things that they know they're
25    not entitled to?
```

1    A.    Here's the analogy.

2    Q.    Correct?  Would you agree with me that people

3    do that?

4    A.    Yes.

5    Q.    It's -- it's not unheard that people --

6    A.    Oh, of course.

7    Q.    -- come in and ask for things that they know

8    they're not entitled to?

9    A.    And there's people that file phony lawsuits

10   also.

11   Q.    People do that, too.

12   A.    Every day they file frivolous lawsuits.

13   Q.    And people -- and people could file Rip-Off

14   Reports that they know are inaccurate --

15   A.    Right.

16   Q.    -- right?

17         And yet if I'm a CAP member under this

18   program, no matter how -- a consumer may file a Rip-Off

19   Report that that person knows is wrong and they're

20   asking for something that's totally ridiculous, and yet

21   in order for me to remain a CAP member I've got to make

22   that person happy?

23   A.    Umm, and I'm -- I'm going to say within --

24   within reason.  It is --

25   Q.    Okay.  Okay.  But now --

174

1          MS. SPETH:  Wait, wait.  Before you ask the

2     next question, are you done with your answer?

3          THE WITNESS:  I'm not sure.

4          MS. SPETH:  Okay.  Both of you, I'm just

5     telling you right now you are killing this court

6     reporter.  Slow down.

7          THE WITNESS:  She told us to give her us -- a

8     run for her money.

9          MS. SPETH:  You read that.

10         THE WITNESS:  Okay.

11         MR. LIPPMAN:  No, no, no, no.  Wait a second.

12    Read it.

13         MS. SPETH:  He read it.

14         MR. LIPPMAN:  No, read it out loud.  What's on

15    there?

16         MS. SPETH:  Excuse me.  Since when is there no

17    longer attorney/client privilege?

18         MR. LIPPMAN:  There's not a privilege when

19    somebody's on the witness stand, ma'am.  You're going to

20    read that right now.  You're going to read that into the

21    record.

22         MS. SPETH:  Can I just tell you something,

23    Steven?

24         MR. LIPPMAN:  You're going to read that into

25    the record.

```
1        MS. SPETH:  Can I just tell you something?

2        MR. LIPPMAN:  You can tell me anything.

3        MS. SPETH:  You do not tell me what to do.

4        MR. LIPPMAN:  Okay.

5        MS. SPETH:  There is certainly a privilege.

6   There was no question pending.

7        MR. LIPPMAN:  Read that -- read that on the

8   record.

9        MS. SPETH:  It's not going to happen.

10       MR. LIPPMAN:  Fine.  Then I would like that --

11  then put it in an envelope and seal it and I want it

12  part of the transcript.

13       MS. SPETH:  It's attorney/client privilege.

14  It's not going to happen.

15       MR. LIPPMAN:  Put it in --

16       MS. SPETH:  It's not going to happen.

17       MR. LIPPMAN:  You have no right to speak to a

18  witness while he's sitting there.

19       MS. SPETH:  Show me a rule that says that.

20       MR. LIPPMAN:  This is just like he's sitting

21  on a witness stand.

22       MS. SPETH:  Show me a rule that says that.

23       MR. LIPPMAN:  Okay.  Well, then you're going

24  to -- you're going to explain to a federal judge that

25  you're entitled to walk up to a witness in the middle of
```