1    his testimony and talk to him.

2            MS. SPETH:  There was no question pending.

3            MR. BIRKEN:  Once he's sworn in you lose that.

4            MS. SPETH:  Show me a rule that says that.

5            MR. LIPPMAN:  That's fine.

6            MS. SPETH:  Once he's sworn in, you show me a

7    rule that says that.

8            MR. LIPPMAN:  Doesn't matter.  That's fine.

9            MS. SPETH:  Are you saying during the breaks I

10   was not allowed to talk to my client?

11           MR. LIPPMAN:  Absolutely not.

12           MS. SPETH:  Okay.  So, during the breaks when

13   I depose your client you will not be talking to them

14   during the breaks?

15           MR. LIPPMAN:  Of course not.

16           MS. SPETH:  You show me a rule that says that,

17   because I've never heard of such a thing.

18           MR. LIPPMAN:  You spoke to Mr. Magedson during

19   the breaks about his testimony?

20           THE WITNESS:  I made phone calls.

21           MR. LIPPMAN:  You're telling me that you spoke

22   to --

23           MS. SPETH:  I am not going to speak to you

24   about attorney/client privilege.  It is outrageous for

25   you to ask me to.

1        MR. LIPPMAN:  You're telling me that you spoke

2   to the witness --

3        MS. SPETH:  I'm telling you --

4        MR. LIPPMAN:  -- during the breaks about --

5   about his testimony?  I don't care what you -- you don't

6   have to tell me what you said.

7        MS. SPETH:  I'm telling you I'm not answering

8   your questions --

9        MR. LIPPMAN:  Okay.

10       MS. SPETH:  -- because you're asking about

11  attorney/client privilege.

12       MR. LIPPMAN:  Fine.

13       MS. SPETH:  I will not speak to a witness when

14  there is a question pending, and I will not coach a

15  witness on how to answer your question, of course.

16       MR. LIPPMAN:  And you think it's appropriate

17  to talk to a witness during the breaks even though

18  there's no question pending?

19       MS. SPETH:  My client?

20       MR. LIPPMAN:  Yes, your client.

21       MS. SPETH:  Do I think that's appropriate?

22       MR. LIPPMAN:  Yes.

23       MS. SPETH:  Of course.

24       MR. LIPPMAN:  And have you done that in this

25  instance?

1       MS. SPETH:  Attorney/client privilege.  I have

2   no intent of --

3       MR. LIPPMAN:  Don't tell me -- no, I don't

4   want to know what the substance -- what you talked to

5   him -- I just want to know --

6       MS. SPETH:  I have no intention of answering

7   your question.

8       MR. LIPPMAN:  -- did you talk to him?

9       MS. SPETH:  I have no intention of answering

10  your question.

11      MR. LIPPMAN:  Fine.  We'll raise it with the

12  judge.

13      I'm asking you for the third time now, I would

14  like you to put what's on that piece of paper that you

15  handed to Mr. Magedson and asked him to read just a few

16  minutes ago while this deposition was going in an

17  envelope, seal it so that I can't see it, so that it can

18  be presented to the judge.

19      MS. SPETH:  It's attorney/client privilege.

20      MR. LIPPMAN:  You're refusing to do that?

21      MS. SPETH:  I don't know if I'm refusing to do

22  that.  I have to think about it.

23      MR. LIPPMAN:  Okay.

24      MS. SPETH:  I'm certainly not reading it to

25  you.  It's attorney/client privilege.

1           MR. LIPPMAN:  Okay.

2     Q.    BY MR. LIPPMAN:  Mr. Magedson, if -- if --

3 if --

4           MS. SPETH:  "Magedson."

5     Q.    BY MR. LIPPMAN:  -- if my company is of the

6 belief that we review consumer complaints, if we think

7 the consumer is proper, we give them what -- we give

8 them what they ask for.  If we think what the consumer

9 is asking for is inappropriate, we don't do that.  I

10 then couldn't be a member of the CAP, right, because I'm

11 not making the unconditional commitment to make the

12 consumer happy whether his request is legitimate or

13 illegitimate, correct?

14     A.    I don't understand the question.

15     Q.    Sure.

16           If my corporate policy is that we don't do

17 what a consumer wants when they make a -- render a

18 complaint with us, whether -- regardless of whether we

19 believe it's a legitimate complaint or an illegitimate

20 complaint, but we investigate each complaint.  If we

21 think it's legitimate, we do what the consumer wants.

22 If we don't -- think it's illegitimate, we don't do what

23 the consumer wants.

24           If that's my company's philosophy in dealing

25 with consumer complaints, I could not be a member of the

1    CAP because I couldn't make the commitment to you that I

2    will make the consumer happy regardless of what their

3    complaint is, right?

4        A.    Depends on the type of business and what --

5    each case is different.

6        Q.    But I thought you told me that in order to be

7    a member of CAP you have to make a commitment to make

8    the consumer happy no matter what their complaint is,

9    even if we would look at it and think it's --

10       A.    Sometimes it depends on the extent of -- some

11   things might be more involved than others, so -- but,

12   umm -- give me the question again.

13       Q.    Well, let me ask you this:  Let me ask you a

14   different question.  In deciding whether a CAP member's

15   response to a consumer complaint in a Rip-Off --

16   proposed Rip-Off Report is acceptable or unacceptable,

17   Xcentric makes that determination, right?

18       A.    Yes.

19       Q.    Okay.  Let me direct your attention back to

20   Exhibit 9 again.  You'll see on the bottom of the

21   page --

22       A.    Which page?

23       Q.    The bottom of the first page, I apologize.

24       A.    Um-hum.

25       Q.    Just above the first paragraph, you see where

1  it -- the last paragraph.  You see it says "By Ed

2  Magedson, founder Rip-Off Report"?

3      A.    Um-hum.

4      Q.    You see that?

5      A.    Yes.

6      Q.    And I'm just trying to understand.  Is it the

7  portion above that that you wrote or the portion below

8  that that is by you?

9      A.    Both was by me.

10      Q.    Both, okay.  And so you say there in the

11  bottom paragraph, "As a matter of policy, when Rip-Off

12  Report is retained by a company to investigate

13  independently and to publish our findings, we use every

14  bit of information at our disposal to determine the

15  truthfulness of the complaints against the company or

16  individual."  Do you see that?

17      A.    Yes.

18      Q.    That's part of the CAP program?

19      A.    Yes.

20          (Deposition Exhibit No. 10 was marked for

21  identification.)

22      Q.    BY MR. LIPPMAN:  I'll trade you again.  I'm

23  going to hand you Exhibit 10, if you'll give me back

24  Exhibit 9.  Thanks.  Here you go.

25          What I've marked as Exhibit 10, this is

1   another portion of the Rip-Off Report website, right?

2       A.    Okay.

3       Q.    Is that correct?

4       A.    Correct.

5       Q.    Okay.  And this portion of the Rip-Off Report

6   website that's marked as Exhibit 10 sets forth the

7   parameters for posting rebuttals, right?

8       A.    Okay.

9       Q.    Correct?

10      A.    Correct.

11      Q.    Okay.  And a rebuttal is response by the

12  person who is being complained about in the Rip-Off

13  Report?

14      A.    It can be.

15      Q.    Okay.  Or it could be somebody else out there

16  who sees a Rip-Off Report and says, "Hey, wait, you're

17  crazy.  I had a good experience with these guys.  What

18  you're saying is not right"?

19      A.    Correct.

20      Q.    Okay.  But, generally, do rebuttals come from

21  the people who were complained about?

22      A.    I don't know.  We -- I can't -- I don't know

23  what percentage, but there's a lot.  I mean, owners --

24  owners come in all the time, or an employee and...

25      Q.    If you can't say so, that's fine, but -- I

1  mean, do you find that most of the rebuttals come from

2  the people who have complained or you just can't tell

3  one way or the other?

4      A.    I -- you know, it's maybe 50/50.

5      Q.    Okay.  Fair enough.  Now, when I post a

6  Rip-Off Report -- I'm somebody posting a Rip-Off Report.

7  With the qualifiers you told us earlier about, putting

8  social security numbers or bank accounts or profanity or

9  pornography on it, things of that nature, but I can put

10 whatever I want in my Rip-Off Report, right?  I mean, I

11 can say whatever I want and say it the way I want to say

12 it?

13     A.    Correct.

14     Q.    Okay.

15     A.    That's the internet.

16     Q.    That's the internet.

17           Now, in this Exhibit 10 on the guidelines for

18 rebuttals, it says, "No trivial comments will be

19 accepted."  What does that mean?

20     A.    Well, we're just trying to stay a room --

21 around -- away from chat room type conversation.  But

22 sometimes it just -- it gets out of control, and you --

23 it's -- it happens.  It leads on.  People start back and

24 forth and we can't stop the flow.

25           It happens with newspapers, as well.  But they

1    have a blog after the -- an article that's written.  And

2    you see the constant blogs that come afterwards.

3          And sometimes, you know, the -- sometimes you

4    get -- well, once it's posted, we don't take it away.

5    But things will be posted on blogs, and they end up just

6    taking them away because they're so trivial.

7    **Q.    Well -- but if I put a trivial comment in my**

8    **rebuttal, whatever that means, does that mean it won't**

9    **get posted?**

10   A.    Umm --

11   **Q.    Or somebody's going to look at it and make**

12   **that determination?**

13   A.    Somebody will look at it and make that

14   determination.  It's just --

15   **Q.    And that somebody is somebody at Xcentric?**

16   A.    That's somebody who monitors the website.

17   **Q.    Somebody who works for Xcentric?**

18   A.    Right.

19         (Deposition Exhibit No. 11 was marked for

20   identification.)

21   **Q.    BY MR. LIPPMAN:  I'm going to hand you now**

22   **what I've marked as Exhibit 11.  Again, this is another**

23   **portion of the Rip-Off Report website, right?**

24   A.    What about it?

25   **Q.    This is another portion of the Rip-Off Report?**

185

1       A.      Correct, yes.

2       Q.      And this, again, talks about what is and is

3   not acceptable in a rebuttal?

4       A.      Yes.

5       Q.      Okay.  We even see the title of some rebuttal

6   notes from the editor, right?

7       A.      Okay.

8       Q.      Correct?

9       A.      Yes.

10      Q.      And you're the editor, right?

11      A.      Yeah.

12      Q.      Okay.  And you see -- and the top portion

13  there's an example of a rebuttal submitted by Ocwen Bank

14  with over 200 Rip-Off Reports, right --

15      A.      Okay.

16      Q.      -- where the, in essence, say, if you have a

17  concern about this, call us at this number, right?

18  Correct?

19      A.      What's the question?

20      Q.      You see there's an example here where you show

21  a rebuttal?

22      A.      I see the example, yes.

23      Q.      Okay.  All right.  And you make the statement

24  that the above is not a rebuttal, right?

25      A.      I make that statement.

1    Q.    Okay.  And you say, as well, "Because these

2    types of rebuttals are so time consuming, and are a form

3    of spamming because they provide no substantive

4    information.  Therefore, we have initiated the following

5    procedure" -- excuse me, "policy, slash, procedures and

6    fees to submitting (sic) multiple rebuttals."  Do you

7    see that?

8    A.    Fees?

9    Q.    Yes, sir, fees.

10   A.    There's no fees.

11   Q.    Well, let's look at the -- it's the last --

12   you know what, I'll point it out to you.  I think that's

13   probably the easiest way to do it.  I'm reading from

14   right -- right here.  Do you see that, "Because of these

15   types of," all caps, "rebuttals."  Do you see that?

16   A.    When is this from, 2006?  There's never been a

17   fee ever collected on a rebuttal, so I don't know where

18   that came from.

19   Q.    Okay.  So even though this says there's fees

20   to submit multiple rebuttals, there never was such a

21   fee?

22   A.    There was never such a fee.

23   Q.    That was a mistake?

24   A.    Not only that but, in actuality -- I think

25   this copy -- this copy here does exist, but we allow

1  companies to put, all the time, their customer service

2  information.

3      Q.    Okay.

4      A.    So, I -- this is from 2006, but there was

5  never ever a fee that was ever, ever collected.

6      Q.    Okay.

7      A.    Never once for a rebuttal.

8      Q.    Not a problem.

9            And you see where it says further down, it

10  says, "Rebuttals not acceptable" in all caps?  Do you

11  see that?

12      A.    Oh, yeah, down towards the bottom, yes.

13      Q.    Do you see that, sir?

14      A.    Yes.

15      Q.    "We will not allow companies or individuals to

16  simply state what a wonderful company they are," and it

17  keeps on going on.  Do you see that?

18      A.    Yes.

19      Q.    Says "This is not a rebuttal," right?

20      A.    Right.

21      Q.    And, again, somebody at Xcentric is going to

22  review the proposed rebuttal, decide whether or not it

23  fits within this category of rebuttals not acceptable,

24  and if it does fit in that category, not allow it to be

25  posted, correct?

A.    Again, the policy basically -- even when this policy was written, we actually did allow it.  We just wanted companies to address when they have a number of complaints, not like one, two, even five, or something.

But when the company has pages of complaints, we want 'em really to -- it's okay to give your customer service information, but we want them really to address it, just don't use the space to advertise, oh, you know, our customer service number is.

Well, obviously, the consumers have already tried to call the customer service.  What are you offering or saying that's going to change?  You know, what's -- you know, we're not going to do this anymore, or that, you know, this problem doesn't exist.  You know, we're going to answer our phone.  We're going to respond to your e-mails.  We're going to not say you -- you know, we shipped you something when we didn't.  You know, we're going to check -- we've checked with our shipping department and fixed things.

I don't know.  They need to respond to some degree and just not get on there and say, oh, we're great and....

**Q.    My question to you is a little bit different. I apologize if I didn't ask it well.**

A.    Okay.

1       Q.      My question to you is:  When somebody submits

2    a proposed rebuttal, someone at Xcentric is reviewing it

3    to find out whether it fits within the acceptable or the

4    unexceptable category, and if it's unacceptable they

5    won't allow it to be posted, correct?

6       A.      Right.

7               (Deposition Exhibit No. 12 was marked for

8    identification.)

9       Q.      BY MR. LIPPMAN:  I'm handing you now what I've

10   marked as Exhibit 12, which is a string of e-mails

11   between Jeff LeJune, L-e, capital J-u-n-e, and

12   EDitor@ripoffreport.com.

13              You -- the e-mail address EDitor, E-d in

14   capitals, i-t-o-r, small case, at ripoffreport.com,

15   that's your e-mail address, right?

16      A.      Yes.

17      Q.      I like the way you did that.  The "EDitor."

18      A.      Okay.

19      Q.      Very cute.  Do you recall these e-mails?

20      A.      From 2003, no.

21      Q.      Okay.  Do you know who Jeff LeJune is?

22      A.      No clue.

23      Q.      Okay.  And you see here in -- if you go on

24   Page 2 of Exhibit 12, you will see the first e-mail on

25   May 29th, 2003 at 11:41 a.m.  Mr. LeJune e-mails to you

1  and reports about this employee of Energy Automation

2  Systems, Inc., and how his employer bans him from

3  posting things on the Rip-Off Report, right?

4          MS. SPETH:  Objection, misstates the e-mail.

5          THE WITNESS:  I don't understand.  What's the

6  question?

7      Q.    BY MR. LIPPMAN:  Mr. LeJune in May sends you

8  an e-mail where he tells you about Energy Automation

9  Systems, Inc., banning its employees from reading

10  Rip-Off Report, right?

11     A.    Okay.

12     Q.    All right.  And then you respond to

13  Mr. LeJune, "This is great.  Can you post something or

14  part of this e-mail below.  This would be great and

15  would definitely piss them off."  Do you see that?

16     A.    I see it, but I don't think I wrote that.

17     Q.    Well, that's your e-mail address, right?

18     A.    Well, I get spoofed e-mail all the time.

19  People send out e-mails as editor of Rip-Off Report all

20  the time.

21     Q.    You think somebody else is using your e-mail

22  address?

23     A.    Do I think?  I know people are using my e-mail

24  address and sending it out spoof.

25     Q.    You're saying even though that's your e-mail

1    address you didn't send this e-mail?

2        A.    People --

3        Q.    That's all I'm asking you, sir.  Does your --

4        A.    I didn't write this e-mail.

5        Q.    You didn't write this e-mail?

6        A.    No, I didn't write that e-mail.

7        Q.    How do you know you didn't write this?  You

8    don't -- you recall this from May --

9        A.    I wouldn't write something like that.

10       MS. SPETH:  Ed --

11       Q.    BY MR. LIPPMAN:  Okay.

12       MS. SPETH:  -- let him finish the question,

13   please.

14       THE WITNESS:  Okay.  So your question was?

15       Q.    BY MR. LIPPMAN:  Well, you see the top one

16   where it says, "Can you file your own detailed Rip-Off

17   Report?  Your info will not be revealed.  Your source of

18   info" -- "You are a source of info for you."  Do you see

19   that?  You didn't write that?

20       A.    Well, it's from 2003.  It's not something that

21   I would write.

22       Q.    Well, I'm just trying to understand.  Are you

23   telling me you don't know whether or not you wrote this

24   or are you telling me that absolutely you did not write

25   this?

1      A.    I wouldn't write something like that.  And I'm

2  telling you that my -- more than likely, this is spoofed

3  e-mail.

4      **Q.    And "spoofed e-mail" means it's something that**

5  **didn't come from you --**

6      A.    Correct.

7      **Q.    -- it came from somebody else --**

8      A.    Yes.

9      **Q.    -- using your e-mail address?**

10     A.    Yes.  People can send out e-mail look --

11  making it look like it's your e-mail.

12     **Q.    I confess --**

13     A.    You said you weren't --

14     **Q.    I confessed earlier I'm not a computer genius.**

15     A.    -- you said you weren't --

16     **Q.    So I've never --**

17     A.    Ask anybody about spoofing e-mails.

18     **Q.    Okay.**

19     A.    And that -- that's not something I would write

20  to somebody.

21     **Q.    Okay.  By the way, just so you know, do you**

22  **see on the bottom of Exhibit 12 where it says "Case" --**

23     A.    Can I get a copy of this?  I want to

24  investigate this.  Can I get a copy?

25          MS. SPETH:  I have a copy.

1    Q.    BY MR. LIPPMAN:  Do you see the bottom of that

2  where it says "Case 3:06"?

3    A.    Where are you?

4    Q.    On the bottom.

5    MS. SPETH:  Bottom of the page.

6    Q.    BY MR. LIPPMAN:  Bottom of the page, see where

7  it says, "Case 3:06-cv-010079"?

8    A.    Yeah, um-hum.

9    Q.    All right.  I don't know whether this helps

10  you or not, but this document was filed in a federal

11  court proceeding.

12    MS. SPETH:  Is that a question?

13    Q.    BY MR. LIPPMAN:  No, no, I'm just telling you.

14  Does that help you know --

15    MS. SPETH:  Is that a question?

16    Q.    BY MR. LIPPMAN:  -- whether you sent this or

17  not?

18    A.    I'm -- I wouldn't send something like that.

19    Q.    Okay.

20    A.    Could I be wrong?  I don't think so.

21    Q.    Okay.

22    A.    And I think -- I don't think so.

23    (Deposition Exhibit No. 13 was marked for

24  identification.)

25    Q.    BY MR. LIPPMAN:  Let me hand you what I've

1  marked as Exhibit 13.  This is another series of e-mails

2  between EDitor@ripoffreport.com and a Joseph Merlo,

3  M-e-r-l-o.  Have you seen these e-mails before?

4      A.    Yeah, I can almost vaguely remember this lying

5  lawyer.

6      Q.    I'm sorry?

7      A.    I --

8          MS. SPETH:  Ed, the question was have you seen

9  the e-mail before.

10          THE WITNESS:  I -- I -- no, I don't remember

11  the -- I sort of remember the situation, but --

12          MS. SPETH:  No, the question is if you've seen

13  it before.

14      Q.    BY MR. LIPPMAN:  Your comment to me earlier

15  was you almost remember this lying lawyer?

16      A.    Yes, I said that.

17      Q.    The document marked as Exhibit 13, this is a

18  true and correct copy of your e-mails back and forth

19  with Mr. Merlo?

20      A.    Okay.

21      Q.    Correct?

22          MS. SPETH:  Is that a question?

23          THE WITNESS:  I don't know.  Ask me questions.

24  I don't know.  I don't know.

25      Q.    BY MR. LIPPMAN:  Okay.  Do you believe so?  Do

1    **you have any reason to believe this is not --**

2    A.    I'm not sure.  I don't know.

3    **Q.    -- a true and correct copy of the e-mails?**

4    A.    I don't know.  I don't know.

5    **Q.    Well, what causes you -- what gives you any**

6    **doubts to believe that this is not a true and correct**

7    **copy of your e-mails with Mr. Merlo?**

8    A.    Umm --

9    MS. SPETH:  I'm sorry, could you repeat the

10    question because I missed it?

11    MR. LIPPMAN:  Sure.

12    **Q.    BY MR. LIPPMAN:  What, if anything, causes you**

13    **to believe that this is not a true and correct copy of**

14    **your e-mails with Mr. Merlo?**

15    A.    Because, umm -- I have to read it, verify it.

16    **Q.    Go ahead and read it.**

17    A.    You going to ask me questions to it?

18    **Q.    I am.  Then I want to know --**

19    A.    I'm too tired to read this whole document, so

20    just -- if you want to point out different things to me,

21    I suggest you do it.

22    **Q.    No, I want to know --**

23    A.    I don't know.

24    **Q.    -- whether this is true and correct or not.**

25    A.    I don't know.

196

Q.    **Wait a second.**

A.    My eyes are hurting me too bad, and I have a headache, that if I start reading this I will be unable to sit here in this room with the lights on pounding at my head right now.

So, you want me to sit here and read this, it's going to take a long time.  But I don't want to read it because then I'm going to be in pain.  So, if you have a specific question you have to for me, ask it.

Q.    **Take as long as you want, sir.  I just want to know if this is a true and correct copy of your e-mails with Mr. Merlo.**

A.    I wouldn't even know even if I read it.

MS. SPETH:  Ed, please wait until the question is finished before you begin your answer.

THE WITNESS:  Okay.

Q.    **BY MR. LIPPMAN:  You're telling me if you read this, you couldn't -- you wouldn't even know?**

A.    I wouldn't even know.

Q.    **But that is your e-mail address, right, EDitor@ripoffreport.com?**

A.    It's my e-mail address.

Q.    **Okay.**

A.    But that doesn't mean it's -- it came from me and they were corresponding with me.

1    Q.    Okay.  You don't know one way or the other,

2    yes or no?

3    A.    No, I don't.

4    Q.    Okay.

5    A.    It's getting hot in here.

6    MS. SPETH:  I'll see what I can do.

7    (Recess taken from 4:34 p.m. until 4:35 p.m.)

8    THE WITNESS:  Actually, look, what I'm telling

9    you --

10    MS. SPETH:  There's no question pending, Ed.

11    Just wait for the question.

12    MR. LIPPMAN:  You guys ready?

13    (Deposition Exhibit No. 14 was marked for

14    identification.)

15    THE WITNESS:  I need you to bring this to my

16    attention later.

17    MS. SPETH:  Okay.

18    Q.    BY MR. LIPPMAN:  Can I have that back?  Thank

19    you.

20    I'm handing you now what I've marked as

21    Exhibit 14, which is an e-mail between yourself and Russ

22    Whitney.  Have you ever seen this document before?

23    And just so you know, if you can see again in

24    the lower right-hand corner the Bates No. XCN WHT-00044,

25    I can represent to you that this document came to us

1  **from your counsel in its production in this case.**

2      A.    This document looks like it's been doctored or

3  something.

4      **Q.    Okay.**

5      A.    Why is it -- there's this line here.  I don't

6  understand what this -- why this is like that.

7      **Q.    I don't know.  Is this --**

8          MS. SPETH:  Was that a question?

9      **Q.    BY MR. LIPPMAN:  -- a true and correct copy of**

10 **your e-mail between yourself and Mr. Whitney?**

11         MS. SPETH:  Object to the form.

12         MR. LIPPMAN:  Humor me with the basis of that

13 form objection.

14         MS. SPETH:  What was the basis?

15         MR. LIPPMAN:  Yes.

16         MS. SPETH:  Yeah, because this -- it doesn't

17 purport to be from Mr. Whitney at all.  You said from

18 you and Mr. Whitney.  You assumed that it was, when it

19 actually says it isn't.

20         MR. LIPPMAN:  Well, it says from Russ Whitney.

21 That's --

22         MS. SPETH:  Yeah, but look --

23         MR. LIPPMAN:  -- seems like a dead giveaway to

24 me.

25         MS. SPETH:  Look at the address.  Talk about

1   spoofing e-mails, Steve.  Look at the address.  That's

2   not your Russ Whitney.

3              THE WITNESS:  Oh, I see why I'm questioning

4   it.

5       Q.     BY MR. LIPPMAN:  Um-hum.

6       A.     Because why wouldn't Russ Whitney -- you're

7   saying it's from Russ Whitney?

8       Q.     I don't know.  It says --

9              MS. SPETH:  That's what he says.

10      Q.     BY MR. LIPPMAN:  That's what -- I'm just

11  reading what it says on the e-mail.  From Russ Whitney

12  to Russ Whitney.

13      A.     Right.  And, apparently, because we cannot

14  place it, Steve, it's -- it shows from a different

15  e-mail address or something.  Plus, it's a Yahoo

16  address.  If this is Russ Whitney, they'd be using,

17  like, Russ Whitney at Russ Whitney, dot, com or

18  something, some official e-mail address.

19             So I don't know I understand what you're

20  asking here.  I don't under- --

21      Q.     All I know is --

22      A.     I'm not comprehending the e-mail even.

23      Q.     Okay.  All I'm asking you is, this was

24  produced to us by your counsel in this lawsuit.  I

25  just want to know, is this a true and correct copy of

1   the e-mail between EDitor@ripoffreport.com and what

2   it says is Russ Whitney mail to

3   russwhitneylawsuit@yahoo.com.

4       A.    I can't say.

5       Q.    Okay.  And you don't know whether this was

6   actually --

7       A.    If I handed this to my attorneys --

8       Q.    Yeah.

9       A.    -- then it must have -- must be.

10      Q.    Okay.  And when it says from -- on the bottom,

11  from Russ Whitney, you don't know whether this is

12  actually coming from the Russell Whitney who's the

13  chairman of Whitney Education Group or not, right?

14      A.    Right.  I think that's reflected in his

15  e-mail.

16      Q.    Okay.

17            (Deposition Exhibit No. 15 was marked for

18  identification.)

19            MR. LIPPMAN:  Can I have that one back?  I'll

20  keep all the originals together.

21            MS. SPETH:  I think he's worried you're going

22  to take his exhibits.

23            MR. LIPPMAN:  What's that?

24            MS. SPETH:  I said, "I think he's worried

25  you're going to take his exhibits."

1          MR. LIPPMAN:  He is?

2          MS. SPETH:  No, you're worried he's going to

3     take your exhibits.

4          MR. LIPPMAN:  Oh, no.  You know what, I just

5     find that if I keep them together, I don't -- they dont'

6     get lost that way.

7          MS. SPETH:  I know.  I know.

8          MR. LIPPMAN:  It's those depositions where

9     they're all over the table that they end up walking

10    away.

11         MS. SPETH:  Been there.  Been there.  You

12    guys use white exhibit tabs.  We use yellow for that

13    reason --

14         MR. LIPPMAN:  Yellow's good.

15         MS. SPETH:  -- because it's --

16         MR. LIPPMAN:  Yep.  We have some pink ones or

17    -- pink ones or --

18         MS. SPETH:  We use bright yellow.

19         MR. LIPPMAN:  I had a guy a couple weeks ago

20    chase somebody out to his car.

21         MS. SPETH:  I've seen that happen.

22         MR. LIPPMAN:  Saying the whole way, "I don't

23    have it.  I don't have it."

24         I'm just, "Please, just open your bag."  It

25    was in the middle of things.  I mean, he honestly didn't

1      take it, but he just --

2              MS. SPETH:  He didn't think he had it.

3              THE WITNESS:  Okay.

4          Q.     **BY MR. LIPPMAN:  You ready, sir?**

5          A.     Go ahead.

6          Q.     **This document marked as Exhibit 15, have you**

7      **seen this before?**

8          A.     I think this -- if I remember correctly, this

9      was something, I think, that was faxed to me, if I'm not

10     mistaken.  It's -- let me just read here closely.  Hang

11     on one second.

12         Q.     **Okay.**

13         A.     I -- I forget if -- I don't know if -- if this

14     off a Rip-Off Report or -- I think I remember getting

15     something that was some long document that looked like

16     some kind of case that was going on that was filed with,

17     I want to say with some agency, but I could be wrong.

18             MS. SPETH:  The question was have you seen

19     ever seen it before.

20             THE WITNESS:  I think so.

21         Q.     **BY MR. LIPPMAN:  Okay.**

22         A.     I think so.  I must have.

23             Did I give this to you?

24             MS. SPETH:  It indicates at the bottom,

25     according to the Bates number, that you did.

1          THE WITNESS:  So, yeah, that's why.  I mean,

2   it looks familiar but I can't remember that -- yes, I've

3   seen it before.

4       **Q.    BY MR. LIPPMAN:  You didn't prepare this,**

5   **right?  You personally did not prepare this?**

6       A.    No.

7       **Q.    Okay.  Did anybody at Xcentric prepare this?**

8       A.    No.

9       **Q.    Okay.  You don't know who prepared it?**

10      A.    No.  I'm really not even sure what it is, so

11  -- but we don't prepare documents.

12          MR. LIPPMAN:  Why don't we just take a break,

13  like five minutes.

14          MS. SPETH:  Sure.

15          VIDEOGRAPHER:  Off the record.  The time is

16  4:42 p.m.

17          (Recess taken from 4:42 p.m. until 4:54 p.m.)

18          VIDEOGRAPHER:  On the record.  The time is

19  4:54 p.m.

20      **Q.    BY MR. LIPPMAN:  I want to go back for a**

21  **second.  There's a couple of things I thought about with**

22  **regard to the CAP program.**

23          **If I'm a CAP member, somebody files a -- makes**

24  **a Rip-Off Report and submits it, it hasn't been posted**

25  **yet on the website, but submits it.  You send them the**

204

e-mail that it's going to be investigated.  You send it to me.  And I look at it and I determine that the person's just wrong.

Is the consumer, the person who posted the Rip-Off Report, then free to say, you know, "I still want to post my Rip-Off Report," or would you, under those circumstances, say, "Hey, look, I see you investigated it.  I see you checked it out.  What the person is asking for is wrong.  You acted appropriately, you don't need to do anymore"?

A.    It won't get posted if -- and we tell the consumer to fly a kite if there's no account, if they had no e-mails to prove -- because I had to think about this.  I'm glad you're asking me again.

Like -- let's say a consumer -- we post, you know, this depositive report with the commitment from the business.  Remember, the business gives us that commitment, we post it.

And two weeks later a consumer, you know, sends us an e-mail and sends it to the business and said, "Hey, listen a year ago, you know, I did your program or something and I never made any money and you guys lied and you misrepresented," all the usual kinds of things like that.

So, if it was that long ago, especially, you

1    know, some time back, we would request -- the first

2    question we ask is, "Well, do you have any e-mails to

3    show that you had a problem back then?" so we know that

4    they really did have a problem with them and they did

5    try to have some sort of an issue, or they did have some

6    sort of an issue.

7         But -- so -- so -- and if somebody was filing

8    -- nobody's going to contact us and say something that's

9    an ex-employee.  That ain't happening anymore.  Because

10    if somebody just tries to say, oh, you know, they

11    weren't ripped off, but they're saying, "Oh, I just know

12    they're a bunch of dirty bastards and, you know, they're

13    this and that," if they're not a customer, the report's

14    not getting posted.  And there's nothing to refund or to

15    take care of.

16         So I -- I knew you were asking, but I had

17    other things on my mind.  And I am getting extremely

18    tired.  I didn't -- I didn't get much sleep.  I -- you

19    know, I work 20 hours a day.

20         So, there are many reasons why, A, the report

21    wouldn't even be -- there may be some reasons why the

22    report wouldn't be addressed.  And, the way we write

23    what we write it really deters anybody from any

24    erroneous stuff coming in.

25         Like, if there was erroneous stuff coming in,

1  somebody's not going to contact us and say, "Hey, I was

2  a customer and I got ripped off."

3       "Okay.  What's your phone number so we can

4  send it to the company and they can verify who you are?"

5  Because most companies go by, like, you know, seven --

6  whatever -- you know, the phone number.

7       I don't think I answered your question, did I?

8  Q.    **BY MR. LIPPMAN:  Let me -- let me -- let me go**

9  **off on a tangent for one second.**

10 A.     I do that.

11        MS. SPETH:  That seems to be the theme.

12        THE WITNESS:  That's my job.

13 Q.    **BY MR. LIPPMAN:  I know we've been going for a**

14 **while today.**

15 A.     That's all right.  Okay.

16 Q.    **Okay.  We started a little bit late today, in**

17 **part dealing with the issue --**

18 A.     It's not your fault.  I'm not saying --

19 Q.     **-- of your arriving a little bit late.**

20        **I'm trying to get this done today.  And, you**

21 **know, obviously, we're going to go beyond 5:00 o'clock.**

22 **I don't think we have much longer to go, but we do have**

23 **a little bit longer to go.**

24        **So, on the one hand, I would like to get this**

25 **done today because I've made that commitment to get it**

1    done today.  And, quite frankly, we changed our flights

2    to go home tonight to get it done today.

3         A.    I want to take a break, like, for an hour.

4               MS. SPETH:  Stop.

5         Q.    BY MR. LIPPMAN:  But on the -- but on the flip

6    side, I don't want to take your deposition and have a

7    problem later with you telling me, you know, "I'm unable

8    to concentrate and I can't answer your questions."

9         A.    I'm trying the best I can.

10        Q.    I appreciate that.  And so I'm willing to take

11   a two-minute break if you wish to speak to your counsel,

12   or not, that's fine.  But if we're at a point where

13   somebody's going to complain about his ability to answer

14   questions because of the time that we've gone, I don't

15   want to waste my time taking this deposition and have

16   somebody complain about that.

17        A.    I'll let you know when there's a problem.

18        Q.    Okay.  I appreciate that.

19        A.    I'll just ask you the question again --

20        Q.    That's fine.

21        A.    -- until I understand.

22        Q.    If we hit a point where you can't go anymore

23   and we have to stop --

24        A.    Okay.

25        Q.    -- I'm not saying I'd be happy, but we'll deal

1    with it.

2         A.    Okay.

3         Q.    Now, actually during the break I think your

4    counsel pointed out to me -- I'm going to hand you back

5    Exhibit 14.  And your counsel's suggested to me that she

6    believes Exhibit 15 is the --

7         A.    This is 14.

8         Q.    Yes.  That Exhibit 15 is the posting that the

9    person who identifies himself as Russ Whitney in Exhibit

10   14 wanted to have posted on the Rip-Off Report.

11              MS. SPETH:  Or at least part of it.

12              THE WITNESS:  I -- I don't know.

13        Q.    BY MR. LIPPMAN:  You don't know whether that's

14   true or not?

15        A.    No, I wouldn't.  It could be.

16        Q.    Okay.  And you'll see, as your counsel pointed

17   out on Exhibit 14, where it says on the top "Page 1 of

18   192," do you see that?

19        A.    Say that again.

20              MS. SPETH:  At the top.

21        Q.    BY MR. LIPPMAN:  At the top of Exhibit 14

22   where it says "Page 1 of 192."

23        A.    Yes.

24        Q.    And on the bottom it shows a date of July 2nd,

25   2007?

209

1    A.    Yes.

2    Q.    And then you see on Exhibit 15 on the top it

3 says Page -- it starts with Page 10 of 192?  Upper

4 right-hand corner.

5    A.    Okay.

6    Q.    You see the same date in the lower left-hand

7 corner?

8    A.    I see that.

9    Q.    And that's why your counsel was suggesting

10 that perhaps what is marked as Exhibit 15 was the

11 posting that was asked to be placed on the Rip-Off

12 Report in the e-mail marked as Exhibit 14.  Does that

13 perhaps refresh your recollection as to what this is?

14    A.    Yes, um-hum, right.  I -- I -- I -- no, I

15 don't -- well, I wouldn't know.  It's a good theory, but

16 I also do want to say for the record --

17    Q.    If you don't recall, you don't recall.

18    A.    -- something looks funny here.  I'm not saying

19 that this is not my e-mail or it is my e-mail, because I

20 can't -- there's no way I could remember.

21    Q.    Um-hum.

22    A.    But something looks kind of weird.

23    Q.    Okay.

24    A.    Did we send this to --

25        MS. SPETH:  You said that earlier, Ed.

1          THE WITNESS:  Okay.  All right.

2          MR. LIPPMAN:  I'll take them back.  Good try.

3   I bought it.

4          THE WITNESS:  I'm gonna -- that -- that

5   document -- I want to say that that document, I'm almost

6   positive, because I remember all the -- whatever you

7   call those side V things, that's just -- I remember that

8   sticks in my mind.  I'm almost positive I got that as a

9   fax.

10         (Deposition Exhibit No. 16 was marked for

11   identification.)

12      **Q.    BY MR. LIPPMAN:  I'm handing you what I've**

13   **marked as Exhibit 16.  It's e-mails between yourself and**

14   **a gentleman named Robert Paisola.**

15      A.    Okay.

16      **Q.    Have you seen this document before?**

17      A.    I submitted it.

18      **Q.    It did come from your counsel, yes, as you can**

19   **see in the lower right-hand corner from the Bates stamp.**

20   **Do you recall this e-mail between yourself and**

21   **Mr. Paisola?**

22      A.    The truthful answer is, I don't remember it

23   but I'm sure that it's a document that I sent.

24      **Q.    Okay.**

25      A.    So, if I gave it to my attorney, this is part

1    of what I was ordered to do to come up with stuff that

2    -- everything that was related to you guys.  So...

3         Q.    Okay.  If you will look on the first page of

4    Exhibit 16, the last paragraph, that starts with the big

5    font, see where it says "But"?  Do you see that, the

6    last paragraph there?

7         A.    Okay, um-hum.

8         Q.    Okay.  And if you go four lines down, all the

9    way to the right-hand side, it starts a sentence, "I

10   have not shared this."  Do you see that?  Sir, do you

11   see that?

12        A.    I see that.  I'm reading that sentence.

13        Q.    Okay.  I'm going to read it out loud.  "I have

14   not shared this yet" -- excuse me.  "I have not shared

15   this with anyone yet, not even my attorney, but I am

16   looking over all this and looking for my notes of more

17   than a dozen employees and serious clients that want to

18   join forces to show what they are doing wrong to both

19   consumers and employees like yourself."  Do you see

20   that?

21        A.    Okay.

22        Q.    Do you see that, sir?

23        A.    Yeah, I see that.

24        Q.    And this is referring to notes that you have

25   of employees or clients of a Whitney business?

1          MS. SPETH:  Objection.

2      Q.    BY MR. LIPPMAN:  Is that what you're referring

3  to here?

4          MS. SPETH:  Misstates the --

5          THE WITNESS:  Yeah, I'm not sure I know what

6  you mean.

7      Q.    BY MR. LIPPMAN:  Well, I'm asking you, when

8  you talk about your -- looking for your notes of more

9  than a dozen employees and serious clients that want to

10  join forces to show what they're doing wrong to both

11  consumers and employees like yourself, the -- the one

12  that you're talking that's doing wrong is Whitney

13  Information, correct?

14     A.    Well, it's what I'm being told that they're

15  doing wrong.  I wouldn't have -- I wouldn't know.  I've

16  never -- I don't even know what Whitney does.

17     Q.    Okay.

18     A.    So, now I see what --

19          MS. SPETH:  Is there a question pending?

20          THE WITNESS:  No.  That's all right.  Okay.

21          Aren't you glad you brought him along?

22     Q.    BY MR. LIPPMAN:  Turn to the second page of

23  Exhibit 16.

24     A.    Okay.

25     Q.    And the first full sentence on this page, it

1  says, "I told lawyers you will not be able to help with

2  that, three question marks, but can I give your contact

3  information to a TV news magazine that did contact us

4  about doing a story on Whitney and several other

5  companies like them.  If they were to keep your identity

6  confidential, slash, disguise you, would you be willing

7  to cooperate."  Do you see that?

8      A.    Yes.

9      Q.    Okay.  So you're attempting here to put

10  Mr. Paisola together with members of the media who are

11  looking on doing a story?

12      A.    Probably an investigative reporter called.

13      Q.    Okay.  And Mr. Paisola has not posted any

14  Rip-Off reports, right?

15      A.    I wouldn't know that he did or he didn't.

16      Q.    You're not aware of him posting any Rip-Off

17  reports?

18      A.    No.

19          (Deposition Exhibit No. 17 was marked for

20  identification.)

21      Q.    BY MR. LIPPMAN:  I hand you what I've marked

22  as Exhibit 17.  I presume you've seen this document

23  before, right?

24      A.    I had to have.

25      Q.    Exhibit 17 is another e-mail between yourself

1    and Mr. Paisola?

2        A.    Yes.  My memory is documented, too.

3        Q.    I'm sorry?

4        A.    My bad memory is being documented.

5        Q.    Why is that?

6        A.    Nothing.

7        Q.    Oh, oh, your memory.

8              And, again, here you're trying to put

9    Mr. Paisola together with members of the media who are

10   at least telling you they're doing some investigation or

11   potentially a story about Whitney?

12       A.    Right.

13             (Deposition Exhibit No. 18 was marked for

14   identification.)

15       Q.    BY MR. LIPPMAN:  I'm going to hand you what

16   I've marked as Exhibit 18.

17             MS. SPETH:  Is that you there?

18       Q.    BY MR. LIPPMAN:  This is an e-mail to

19   info@ripoffreport.com.  I guess that's somebody else at

20   Xcentric Ventures?

21       A.    No.

22       Q.    This is just a general e-mail?

23       A.    Yeah, um-hum.

24       Q.    Okay.  In other words, that's not directed

25   personally to you, right?

1      A.     No.

2      Q.     Like when we saw EDitor@ripoffreport.com,

3   that's directly to you, right?

4      A.     Yes -- no, this all -- it all goes to the same

5   box.

6      Q.     Okay.  But this is like a general e-mail box?

7      A.     Yes.

8      Q.     Okay.  And if somebody sends an e-mail like

9   this saying -- like they say, "I saw reports about Russ

10  Whitney, I want to get in touch with some of the people

11  who wrote the reports," do you provide the contact

12  information?

13     A.     Not unless a bona fide lawyer is really doing

14  a lawsuit.

15     Q.     How do you know if they're a bona fide lawyer

16  doing a lawsuit?

17     A.     Do a Martin Dale Hubbell, or whatever you call

18  it -- no, they would contact us, send information.  We'd

19  ask them some questions.  And if they were a bona fine

20  lawyer doing a lawsuit --

21     Q.     I don't mean to be facetious, but --

22     A.     That's all right.

23     Q.     -- what does a bona fide lawyer mean?

24     A.     Maybe I'm using the wrong word.  If they're a

25  lawyer that's really doing an action.

1     Q.     **Okay.**

2     A.     And we might even check into -- which we have.

3 I'll try and get somebody to, like, check on the lawyer

4 and see if, you know, if they've won cases before.  If

5 they just settle for -- you know, when they do a class

6 action, if they settle for coupons, or whatever you call

7 it, and then just -- it really just never goes anywhere,

8 if they have, like, a bad reputation or not.

9     Q.     **And if you think they're, for lack of a better**

10 **term, a good lawyer, you would provide them with the**

11 **information?**

12     A.     Yes.

13     Q.     **And if you think they're a bad lawyer, you**

14 **won't provide them with the information?**

15     A.     Yeah.  I haven't run into any bad lawyers.  Is

16 that find -- hard to find?

17     Q.     **I'm not saying anything.**

18     A.     I never had the case where it's -- you know,

19 it had to really be a lawyer really looking, because

20 there's always people that always say, "Oh, you know, I

21 want to just get people together," but --

22     Q.     **Okay.**

23     A.     -- that's not a good thing.

24     Q.     **But you do some checking to decide whether**

25 **this is somebody you want to release the information to**

1    or not?

2        A.    Right.

3        Q.    I mean, "you" being -- "you" meaning, not

4    necessarily you personally, but Xcentric Ventures does

5    that?

6        A.    Right.

7        Q.    Okay.

8        A.    I can't handle those long documents.

9            (Deposition Exhibit No. 19 was marked for

10   identification.)

11       Q.    BY MR. LIPPMAN:  Let me hand you what I've

12   marked as Exhibit 19, which is, again, another

13   document that was produced to us by your counsel.

14   And this is a series of e-mails between yourself,

15   EDitor@ripoffreport.com and a -- I believe her -- it

16   says M.A. Yates, but she keeps referring to herself as

17   Madeline, so I refer -- assume that's Madeline Yates.

18       A.    Okay.

19       Q.    Do you recall this document?

20       A.    I don't rem- -- I -- let me start here from

21   the beginning.

22       Q.    Okay.  If you don't recall it, that's fine.

23       A.    I just -- I mean, it's -- it's a document that

24   went through my -- that went through my hands.  So, I

25   mean --

1  Q. All right.

2  A. -- I just -- I can't -- there's no way I can

3 remember these things.  I mean --

4  Q. That's fine.

5  A. It's just -- yeah, I just don't --

6  Q. But this is a copy of your e-mails with

7 Ms. Yates?

8  A. Right.

9  Q. Okay.  And I don't know if you see the

10 beginning, Ms. Yates asked you some questions about her

11 initial e-mail on January 18, 2007.

12  A. Are you on Page 1?

13  Q. On Page 6, actually.

14  MS. SPETH:  Page 6.

15  Q. BY MR. LIPPMAN:  It kind of goes -- these go

16 backwards in reverse chronological order.

17  A. Oh, okay.  All right.

18  Q. So the first e-mail is at the end.

19  A. All right.  Okay.

20  Q. And she asks some questions about --

21  I apologize.  My wife.

22  He asks some -- she asks some questions about

23 Whitney Education, right?

24  A. Um-hum.  Okay.  What's your question?

25  Q. All right.  You see that -- that's the first

**U.S. Legal Support**
**(305) 373-8404**

1  -- she asked you some questions about it, and then you

2  respond to her on January 19th, 2007.

3      A.    Right, which my response starts on --

4      Q.    Looks like Page -- Page 4.

5      A.    No -- okay.  Yeah, two pages back.

6      Q.    Yes.

7      A.    And I -- okay.  No, we don't give...

8      Q.    You tell her, "No, we do not give access to

9  that info.  We do not give out your info.  We heard most

10  of their key people are in jail.  Is that true?  Thank

11  you for your info.  Please send me anything else you

12  find out.  You know, they have been suing us for a long,

13  long time."  Right?

14      A.    Okay.

15      Q.    That's your response to Ms. Yates' --

16      A.    Yes.

17      Q.    -- initial inquiry, right?

18      A.    Um-hum.

19      Q.    And then she sends you back, later that day,

20  an e-mail, "Thanks for the quick response."  And she

21  asks some more questions about the folks at Whitney,

22  right?  Do you see that in the middle of Page 4?

23      A.    Of Page 4?

24      Q.    Yeah.

25      A.    Okay.  Yeah, I see that, um-hum.

1    Q.    Okay.  And then you respond back to her on the

2    top of Page 4?

3    A.    Wait, wait, wait.  Can I just -- I want to

4    read this for a second.

5    Q.    Sure, go ahead.  Take your time.

6    A.    I'm reading her response.  Okay.  Now, you

7    want me to look --

8    Q.    On the top of Page 4 as you respond back to

9    her again.  "Class" -- you see where it says "Class" --

10   A.    On page -- top of Page 4?

11   Q.    Yeah.  See, it starts on the bottom of Page 3.

12   A.    Oh, okay.  Yeah.

13   Q.    You responded --

14   A.    Okay.  "Class actions are not the best."

15   Q.    "Better off with a mass action.  We always

16   have lawyers looking at cases.  It would be great if you

17   can send back this entire e-mail along with any links to

18   newspaper articles, et cetera."  Do you see that?

19   A.    Right.

20   Q.    And then Ms. Yates responds again on

21   February 4th, 2007.  "Hello again."  Found the link to

22   the newspaper article.

23   A.    Okay.

24   Q.    And she provides you with a link, right?

25   A.    Um-hum.

221

1      Q.    And then you write back to her, "Thanks,"

2  right?

3      A.    I don't see the "Thanks."  Where are you?

4      Q.    Page 3, middle of the page.

5  EDitor@ripoffreport.

6      A.    Oh, "Thanks."  Yeah, okay.

7      Q.    And then she writes back again later in the

8  day on February 4th, "Any suggestions from me since I

9  can't hire attorney?"  Do you see that?

10     A.    Okay.

11     Q.    Right?

12           And then if you go back to Page 2, on the

13  bottom, a little later that day on February 4th, you

14  write back to her, "There was an attorney that had

15  contacted us about three weeks ago that wanted Whitney

16  Information victims info.  They called by phone."

17     A.    What -- what page are you on?  I'm sorry.

18     Q.    The bottom of Page 2.

19     A.    Okay.  Okay.  I see.

20     Q.    Right?  It says, "They called by phone.  I

21  will look to see if they e-mailed us.  I remember it was

22  a woman and she was contacting me back in about two or

23  three weeks.  If you filed a Rip-Off Report you would be

24  included, as you would be contacted."  Do you see that?

25     A.    Um-hum.

1    Q.    That was your response to Mrs. Yates saying,

2   "Any suggestions for me since I can't hire an attorney?"

3   right?

4    A.    Um-hum.

5    Q.    And then a couple of months later, Mrs. Yates

6   replies back to you on May 21st, 2007, right?

7    A.    Um-hum.

8    Q.    Says, "Hello.  Perhaps you recall me from a

9   few months ago"?  You see that --

10    A.    I see it, um-hum.

11    Q.    -- on Page 2?

12    A.    Okay.

13    Q.    And then if we flip over to Page 1 --

14    A.    Wait, wait.  Okay.

15    Q.    And you see Ms. Yates follows -- sends you

16   again on May 30th another -- another follow-up.  "Hello,

17   Ed.  Just a follow up to my e-mail below.  As stated I

18   will be happy to join forces legally if there's any type

19   of suit that may be developing."

20    A.    Right.

21    Q.    She's talking about a lawsuit against one or

22   more of the Whitney entities, right?

23    A.    I assume, yep.

24    Q.    And then further on -- and then you reply back

25   to her.  Among other things, you ask her, "Do you have a

223

1    phone number I can call you at?"  Do you see that?

2    A.    What page are you on?

3    Q.    **First page.**

4    A.    And where is "Do you have a phone number I can

5    call you?"

6    Q.    **In the middle.  See "EDitor"?**

7    A.    Does she write that or I'm writing that?

8    Q.    **I think this is you writing it, right?**

9    EDitor@ripoffreport.com wrote "Madeline," da, da, da,

10   da, da, da.  Do you have phone number I can call you at,

11   da, da, da, da, da, Ed.

12   A.    Oh, okay.  Okay.  Yeah, I see.

13   Q.    **Right?  And then you see she responds back and**

14   **gives you her phone number, her cell number?**

15   A.    Um-hum.

16   Q.    **Did you talk to her?  You don't recall?**

17   A.    I don't remember.  I can't -- can't remember.

18   Q.    **It's not that long ago.  It's only May of this**

19   **year.**

20         MS. SPETH:  Ask him what he did yesterday.

21   Q.    **BY MR. LIPPMAN:  You don't recall whether you**

22   **talked to her or not?**

23   A.    No.  I -- it -- probably did.

24   Q.    **Okay.**

25   A.    I just don't remember it.  I would assume if

1    we went all this way and she gave me the number.

2        **Q.    Do you know if you talked to her about**

3    **potential legal action against Whitney that she wanted**

4    **to pursue?**

5        A.    I wouldn't know.  I know as much then as I

6    know now.

7        **Q.    Okay.**

8        A.    And nothing -- there's nothing -- nothing.

9        **Q.    Well, you did know something.  I mean, you --**

10       A.    I --

11       **Q.    You did tell her back in January of '07, "We**

12   **heard most of their key people are in jail.  Is that**

13   **true?"**

14       A.    Well, I don't know.

15       **Q.    "Send me anything you find out."**

16       A.    Is it true?

17       **Q.    You heard something?**

18       A.    I did hear something.  She sent me an article.

19       **Q.    All right.**

20       A.    People call with all kinds of information.  I

21   don't know what to believe or not believe.

22           MR. LIPPMAN:  You need to change the tape?

23           VIDEOGRAPHER:  This is the conclusion of Tape

24   No. 2 of the continuing videotaped deposition of Ed

25   Magedson.

1          Off the record.  The time is 5:20 p.m.

2          (Recess taken from 5:20 p.m. until 5:27 p.m.)

3          VIDEOGRAPHER:  This is the beginning of Tape

4  No. 3 of the continuing videotaped deposition of Ed

5  Magedson.

6          On the record.  The time is 5:27 p.m.

7          (Deposition Exhibit No. 20 was marked for

8  identification.)

9    **Q.**    **BY MR. LIPPMAN:  Mr. Magedson, I've handed you**

10  **what I've marked as Exhibit 20.  Have you seen this**

11  **document before?**

12    A.    I had to have.  I must have.

13    **Q.**    **Okay.  And Exhibit 20 is a copy of a series of**

14  **e-mails between yourself and somebody whose e-mail**

15  **address is cream, underscore, bar@hotmail.com?**

16    A.    I guess, yeah, um-hum.

17    **Q.**    **Okay.  Now, this person, that cream bar, it**

18  **says at the end of it, it's a John in Atlanta, Georgia.**

19  **I don't know if his name is John or not, but we'll refer**

20  **to him as John.  Okay?  John, it looks like --**

21    A.    Wait.  Okay.  You're going to the last page

22  first?

23    **Q.**    **Yeah.**

24    A.    Okay.

25    **Q.**    **See at the end where it says "John, Atlanta,**