1   Georgia"?

2      A.   Right, okay.

3      Q.   **Okay.  So let's assume his name really is**

4   **John.**

5      MS. SPETH:  Where -- now I'm lost.  What page

6   is that on?

7      MR. LIPPMAN:  The last page.

8      MS. SPETH:  Oh, good.  Oh, oh, just the

9   signature.  I'm sorry.

10      MR. LIPPMAN:  Yeah.  He signs off as John.

11      MS. SPETH:  I understand.  I'm sorry.

12      Q.   **BY MR. LIPPMAN:  Okay.  And assuming that**

13   **cream_bar@hotmail.com, his real name really is John, it**

14   **looks like he submits what he believes should be a**

15   **rebuttal to a Rip-Off Report, right?**

16      A.   Um-hum.

17      MS. SPETH:  I think that misstates the e-mail.

18   Looks like he submits it as a report and Ed's should

19   have been --

20      THE WITNESS:  Oh, okay.  Right.  Okay.  What I

21   sent to him originally is at the top of 326.

22      Q.   **BY MR. LIPPMAN:  I got -- I understand.**

23      A.   See, that's the first thing -- I said that's a

24   standard --

25      Q.   **I gotcha.  It starts on the bottom of the**

1    first page and it goes through the second and third

2    page, and you're telling him what you submitted is not a

3    -- is not a Rip-Off Report, it's a rebuttal?

4        A.    Right.  It's not going to do the company he's

5    reporting about --

6        Q.    Okay.

7        A.    -- to file a new report because nobody's going

8    to know what the hell he's talking about.

9        Q.    And I presume that, from seeing this, that

10   when somebody submits the Rip-Off Reports that, as you

11   alluded to earlier, somebody's looking at them to remove

12   whatever the offensive materials are that we talked

13   about earlier, right?  Make sure there's no social

14   security numbers or bank account numbers or pornography,

15   or things of that nature?

16       A.    And if they're reporting a rip-off.

17       Q.    Okay.  If they're not reporting a rip-off, it

18   doesn't get posted?

19       A.    Sorry, what you posted is not a rebuttal, it's

20   -- I mean, it's a rebuttal and not a new report.

21       Q.    Okay.

22       A.    Umm -- umm -- umm -- umm, "It is not

23   beneficial for you to file a new report.  Certainly, no

24   benefit to the reported business or individual."

25   There's is no benefit to that because it's just creating

another report and nobody knows what he's really rebutting because he's really rebutting, and he needs to pick out a report to put his argument to.

    Q.    **Okay.**

    A.    Because it doesn't make any sense.

    Q.    **Okay.  So somebody looks at the report, the proposed Rip-Off Report?**

    A.    Right.

    Q.    **And, as you alluded to earlier, one of the things they look at is for the inappropriate material, the social security numbers or bank account numbers or --**

    A.    And if it's a report.

    Q.    **-- profanity?  And somebody's looking to see whether it's really a report or not?**

    A.    Yes.

    Q.    **And if it's not a report, it doesn't get posted?**

    A.    Right.  We take the time to tell them, this --

    Q.    **It's not a report?**

    A.    -- is not beneficial to the business that you're trying to report.

    Q.    **Okay.  So --**

    A.    If we were trying to create more pages, we would certainly just accept it.  But it makes no sense

1    because --

2        Q.    Okay.

3        A.    -- it could end up getting categorized even

4    somewhere on a search engine that's not really going to

5    benefit the company.  And I guess -- this is about who?

6        Q.    Okay.  And that's part of the process that the

7    folks who work at Xcentric who are -- I don't know what

8    -- what are the term -- what's the term you use for the

9    people who do that?  Were they content reviewers or --

10        A.    They're monitors.

11        Q.    Monitors, okay.  So the people who are

12    monitors at Xcentric, that's what they do, is they get a

13    peak at a report when it's submitted before it gets

14    posted to check all of these things we talked about,

15    both the offensive materials and whether it's actually a

16    report or not?

17        A.    Correct.

18        Q.    Okay.  And if it -- if it has offensive

19    material, they black it out?

20        A.    Or if it's -- yes.  Or if it's too much

21    offensive material, it just doesn't get --

22        Q.    It just doesn't get posted?

23        A.    It just doesn't even -- we don't bother.

24        Q.    Okay.  And if it's not a report, it doesn't

25    get posted either?

1    A.    Right.  And they're sent an e-mail just like

2    this.

3    **Q.    Telling you, sorry, this is not a report?**

4    A.    We're really trying to help them.

5    **Q.    Okay.**

6    A.    All right.

7          MS. SPETH:  Ed --

8          THE WITNESS:  This isn't something that we're

9    trying to do to hurt them.

10    **Q.    BY MR. LIPPMAN:  Okay.**

11          MS. SPETH:  -- just answer the question.

12    **Q.    BY MR. LIPPMAN:  And that's -- but that's what**

13    **the monitor's job is?  That's what the monitor does?**

14    A.    Yes.

15    **Q.    And how many monitors work at Xcentric now?**

16    A.    It's either six or seven.

17    **Q.    Okay.**

18    A.    Maybe eight.  I don't think it's -- I don't

19    know if it's eight.  I'm not sure.

20    **Q.    How does Xcentric get the money to pay these**

21    **people?**

22    A.    Attorneys like you donate.  No, I'm kidding.

23    I shouldn't joke.

24          The corporate advocacy program.

25    **Q.    So, the fees from the CAP program pay for all**

231

1    the expenses for Xcentric?

2        A.    Pay for the expenses.

3        Q.    Including --

4        A.    I don't know about all.

5        Q.    Where does the rest come from?  You?

6            MS. SPETH:  I'm going to object and say that's

7    not relevant.

8            MR. LIPPMAN:  Okay.  He still needs to answer.

9            MS. SPETH:  No, I think -- I think it's not

10   relevant, and it's a financial question.  And I don't

11   believe he needs to answer irrelevant stuff, so he

12   doesn't need to answer that.

13           MR. LIPPMAN:  You're instructing him not to

14   answer that?

15           MS. SPETH:  I'm not instructing him.  I'm

16   saying it's not relevant.  I'm saying --

17           MR. LIPPMAN:  Okay.

18           MS. SPETH:  -- your question does not ask --

19   I'm objecting to your question and saying it's not

20   relevant.

21       Q.    BY MR. LIPPMAN:  You still need to answer the

22   question.

23           MS. SPETH:  Oh, no, no, no.  You don't get to

24   instruct my client to do anything.  He gets to decide.

25           MR. LIPPMAN:  Unless you're going to instruct

1    him not to answer the question, you still need to answer

2    the question.

3         MS. SPETH:  Oh, no.  He gets to decide.  It's

4    not relevant.

5         MR. LIPPMAN:  A judge gets to decide that

6    ultimately, but --

7         MS. SPETH:  That is right.  Exactly true.  I

8    agree with you there.

9    **Q.    BY MR. LIPPMAN:  Sir, certain monies come from**

10   **the CAP program to pay for the expenses of Xcentric,**

11   **right?**

12        A.    To help pay for the expense, yes.

13   **Q.    Okay.  And I assume the expenses are keeping**

14   **this website up and running and paying for the**

15   **employees?**

16        A.    Right.

17   **Q.    Is that generally what the expense are?**

18        A.    Legal bills.

19   **Q.    Legal bills and office?**

20        A.    More legal bills.

21   **Q.    Okay.  More legal bills than office?**

22        A.    And more legal bills.

23   **Q.    Okay.  Your counsel's entitled to earn a**

24   **living.**

25        A.    Oh, there's more -- there's more legal bills.

1    Actually, outside counsel cost a lot more than inside

2    counsel.

3        Q.    I'm sure they do.

4              So, some of the money comes from the CAP

5    program, right?

6        A.    Yes.

7        Q.    Where does the rest of the money come from?

8              MS. SPETH:  And I'm going to again say that

9    that is not a relevant question, and pursuant to Rule 26

10   it's not discoverable and he doesn't have to answer it.

11       Q.    BY MR. LIPPMAN:  Sir, I'd like you to answer

12   the question, unless your counsel's instructing you not

13   to answer it.

14       A.    The question was -- what is your question?

15       Q.    Where does the balance of the money come from

16   to pay for Xcentric Ventures to operate the Rip-Off

17   Report?

18       A.    It's really simple.  There is none.

19       Q.    What do you mean "there is none"?

20       A.    There is no other money.  There's a little bit

21   of money from advertising revenue.

22       Q.    But -- I mean, Xcentric does incur expenses,

23   right?

24       A.    Yes.

25       Q.    It has to pay the lawyers 12 times that you

1    told me, and to -- have the website up and running and

2    the people who work for it, right?

3        A.    Correct.

4        Q.    And you told me that some of the money to pay

5    all of those expenses comes from the CAP program?

6        A.    Right.

7        Q.    And by saying some of the money comes from it,

8    I assume that means not enough money to cover all of the

9    expenses?

10       A.    Right, okay.

11       Q.    **Right?**

12       A.    Right.

13       Q.    **Is that accurate?**

14       A.    Yes.

15       Q.    Okay.  Where does the balance of the money

16   come from to pay for these expenses?  I can't assume

17   that your counsel works for free, or your employees work

18   for free, or your --

19            MS. SPETH:  Don't get any ideas.

20       Q.    BY MR. LIPPMAN:  -- website hosts work for

21   free.  Where does the rest of the money come from to pay

22   those expenses?

23       A.    There's some advertising revenue.

24       Q.    Okay.  And is the advertising revenue and the

25   CAP revenue sufficient to pay all Xcentric's expenses?

235

1      A.    Not all the time.

2      Q.    **And then where does the balance of that money**

3 **come from?**

4           MS. SPETH:   Once again, I'm going to say

5 that's not relevant.

6      Q.    **BY MR. LIPPMAN:   Does it come from your**

7 **pocket?**

8      A.    It comes from -- I hold off on the bills,

9 so...

10     Q.    **I don't understand what you mean by --**

11     A.    I hold off.  I don't pay all -- I don't just

12 -- you know, just the bills don't get paid.

13     Q.    **Okay.  But at some point in time does -- the**

14 **revenue from the CAP program and advertising is**

15 **sufficient to cover all of Xcentric's expenses?**

16     A.    No.

17     Q.    **Well, you can't keep holding off bills**

18 **forever, right, because people will start complaining**

19 **about you on Rip-Off Report?**

20     A.    Well, they -- no, before they're getting -- I

21 don't owe anybody that's mad at me.

22     Q.    **Okay.**

23     A.    So, I mean, I -- I have outstanding legal

24 bills.

25     Q.    **So you're just accruing those expenses and the**

236

1   **people, for the grace of God, are letting you not pay**

2   **it?**

3      A.   I don't know if you need to bring God into

4   this.

5      **Q.   Well, whatever.  In their good graces are not**

6   **let -- are not complaining about the fact that their**

7   **bills are not gating paid?**

8      A.   Yeah, I guess, yes.

9      **Q.   Okay.  Do you personally contribute any money**

10  **towards the expense of Xcentric?**

11      MS. SPETH:  I'm going to object.  That's not

12  relevant and he does not have to answer a question

13  that's not relevant.  Unless you can --

14      MR. LIPPMAN:  If you're going to instruct him

15  not to answer --

16      MS. SPETH:  You know --

17      MR. LIPPMAN:  -- instruct him not to answer.

18      MS. SPETH:  Steve, let me -- let me say

19  something.

20      THE WITNESS:  Why don't you get a decision on

21  that?

22      MS. SPETH:  Hang on.  Hang on.

23      Steven, if you can tell me what the relevance

24  of that is as to any claim of defense in this case, I

25  might reconsider.

237

1    MR. LIPPMAN:  It goes to his bias.  I just

2  want to know what his personal interest is in this.  If

3  he's putting in $10 a year, maybe not.  If he's putting

4  in $10 million a year for this venture, it may go to his

5  bias.  I don't know.  I just want to know the answer.

6    MS. SPETH:  All right.  I don't still don't

7  think it's relevant.

8    **Q.    BY MR. LIPPMAN:  Do you put any money of your**

9  **own personal money in to keep Xcentric Ventures running?**

10    MS. SPETH:  Once again, you are not re- -- you

11  are not required to answer irrelevant questions about

12  your own personal finances.

13    **Q.    BY MR. LIPPMAN:  Well, I disagree with that.**

14  **You are required to answer --**

15    MS. SPETH:  You can get a ruling from the

16  judge.

17    MR. LIPPMAN:  -- any question unless it's

18  privileged.  You can certainly raise a relevance

19  objection, but that's not the basis to instruct somebody

20  not to answer a question.  And it's not a basis not to

21  answer a question.

22    MS. SPETH:  Of course, it is.  It's a basis

23  that you have no right to answer (sic) the question.

24  It's called an objection.

25    MR. LIPPMAN:  Okay.

1          THE WITNESS:  I guess you guys went to

2   different law schools.

3      **Q.    BY MR. LIPPMAN:  Yeah.**

4          MS. SPETH:  Apparently we read different rule

5   books because the rule book I read says you don't have

6   to answer it if it's not relevant.

7          MR. LIPPMAN:  Well, when it says subject to

8   objections, that's what it means by subject to

9   objections.

10          MS. SPETH:  If you can show me that --

11          THE WITNESS:  Calm down.  Let's get to --

12   let's keep questioning.

13      **Q.    BY MR. LIPPMAN:  The answer is?**

14      A.    I'm going to hold off on that question.

15      **Q.    You're going to refuse to answer that**

16   **question?**

17      A.    At this time, yes.

18      **Q.    Okay.  How much money in 2007 have you**

19   **contributed to keep Xcentric Ventures running?**

20          MS. SPETH:   You're going to play this game,

21   huh?

22          MR. LIPPMAN:  Well, I got to ask the question.

23          MS. SPETH:  Objection, relevance.

24          MR. LIPPMAN:  If you're going to instruct him

25   not to answer, just instruct him not to answer.

1          MS. SPETH:  I don't think I can instruct him

2     not to answer.  I'm telling you your question isn't

3     relevant.  And I'm also telling you that at some point a

4     court can rule on this.  But until a court rules on it,

5     I don't believe a witness has to answer personal

6     questions about their own personal finances that are not

7     relevant to the case.

8          By the way, why don't you ask him the last

9     time he went to the doctor and what his, you know, urine

10    test said, because you think you can ask him anything.

11         MR. LIPPMAN:  I could care less about that.

12         MS. SPETH:  Right.  And you shouldn't care

13    less about personal finances.

14         MR. LIPPMAN:  Let's move on.  If he's not

15    going to answer, just don't answer.

16         THE WITNESS:  You can't take a urine test in

17    place of that?

18    **Q.    BY MR. LIPPMAN:  Sir, I'm just asking you the**

19    **question.  How much did you contribute to keep Xcentric**

20    **Ventures running in 2007?**

21         MS. SPETH:  And I'm going to object.

22         THE WITNESS:  I don't see what --

23    **Q.    BY MR. LIPPMAN:  And if you're not going to**

24    **answer, just tell me you're not going to answer.**

25         A.   I don't see what it's relevant to, like,

truthfulness of the reports or who posted the reports.

Q.    **Sir, if you're not going to answer, just tell me you're not going to answer.**

A.    Okay.

Q.    **I just want to move it along.**

A.    Yeah, just not -- no.

Q.    **Okay.  What about in 2006, how much money did you contribute to Xcentric?**

A.    Why would that change?

MS. SPETH:  Objection, relevance.

Q.    **BY MR. LIPPMAN:  Just tell me you're not going to answer it.  I just have to put it on the record.**

A.    I'm not going to answer that right now.

Q.    **What about 2005, would you tell me how much --**

A.    I don't want to answer anything regarding my personal finances.

Q.    **One second.**

**I'm just asking you in 2005 how much money you personally contributed to keep Xcentric Ventures running.**

MS. SPETH:  Objection, relevance.

Q.    **BY MR. LIPPMAN:  Just tell me you're not going to answer.  I just have to have it on the record.**

A.    Nothing.  I'm not going to answer.

Q.    **Okay.  And what about 2004?**

1          MS. SPETH:  Objection, relevance.

2          THE WITNESS:  I'm not going to answer that.

3    **Q.**    **BY MR. LIPPMAN:  Okay.  Do you know a**

4    **gentleman by the name of Dickson Earl Woodard?**

5          MS. SPETH:  It's too late to talk about

6    Dickson.

7    **Q.**    **BY MR. LIPPMAN:  I'm glad I made you laugh.**

8    A.    If you only knew.  I know him -- I know of

9    him.

10    **Q.**    **What's the -- what is or was the relationship**

11    **between yourself or Rip-Off Report with Mr. Woodard?**

12    A.    Mr. Woodard tried to act like somebody.  He

13    wanted to be my friend, would call at 1:00, 2:00 o'clock

14    in the morning,

15    **Q.**    **That's not one of my friends.**

16    A.    Okay.  No, no.  He tried to be -- he was just

17    trying to be friendly.  You'd be surprised when I get

18    calls.  And I just put it on speaker phone and let him

19    speak his piece.

20          And then about four weeks later, three weeks

21    later, the same voice calls me.  I knew I recognized the

22    voice.  And I may -- I got disconnected and went back

23    and got my tape recorder.  I may not -- maybe I'm

24    explaining too much more, but I ended up -- because I

25    knew I was getting threatened.

242

1      And the guy basically threatened me with

2 bodily harm.  And, you know, he threatened me for a long

3 time, for about  three- or four-week period until I

4 figured out who he was.  Because he called from an

5 unblocked phone number by mistake.  He was obviously

6 high on some sort of drug and -- when he called, and so

7 he did probably didn't dial correctly to block his

8 number.

9      So -- but then he apologized  He totally --

10 when I realized who he was and hung up on him, I told

11 him -- I gave him 20 minutes to call me back and tell me

12 everything, because I gave him where he had a tattoo,

13 and everything like that.  And he kind of freaked out, I

14 guess.  I got that all from his phone number.

15      Q.    **Why was he -- he was threatening you --**

16      A.    He called me --

17      Q.    **-- bodily harm?**

18      A.    -- threatening me allegedly for another

19 company.

20      Q.    **Okay.  But he was -- he was threatening you, I**

21 **would harm you if what, if you didn't do what?**

22      A.    Oh, if I didn't remove reports.

23      Q.    **Okay.  So, in other words, he was threatening**

24 **you with bodily harm if you did not remove things from**

25 **the Rip-Off Report?**

1    A.    Yeah.  He knew where I lived, knew where I

2    was, and knew where I banked, and knew this and that

3    about me.

4    **Q.    Whose reports was he threatening you to --**

5    **with bodily harm if you did not remove?**

6    A.    I really didn't know at first, and I wasn't

7    sure.  I mean, he mentioned -- I forget which company.

8    There was a couple of different company names, because

9    he floats around to different businesses and he seems

10    like somebody who's just --

11    **Q.    But I assume at the time he was threatening**

12    **you, he'd tell you whose reports he wanted removed?**

13    A.    I forget which -- I forget at the moment which

14    one that it was.

15    **Q.    You just don't recall right now?**

16    A.    I just don't recall now.

17    **Q.    Okay.**

18    A.    And then -- but I recall just a recent --

19    there was a recent thing.  I don't even remember that

20    company --

21    **Q.    Okay.**

22    A.    -- actually.

23    **Q.    Was there ever litigation between yourself or**

24    **Xcentric or anybody else who operates or operated**

25    **Rip-Off Report and Mr. Dickson (sic)?**

244

1    A.    Say that question again.

2    Q.    I'm sorry.

3         **Was there ever any litigation between yourself**

4   **or Xcentric or anybody else who operated a Rip-Off**

5   **Report website and Mr. Woodard?**

6    A.    Somebody else, yeah, but not me.

7    Q.    **In other words, he sued somebody else, not**

8   **you?  He was involved --**

9    A.    He sued somebody else.

10        (Court reporter clarification.)

11   Q.    **BY MR. LIPPMAN:  Somebody else sued you, not**

12  **him?**

13        MS. SPETH:  He said I don't think he sued

14  someone else.

15   Q.    **BY MR. LIPPMAN:  I'm trying to understand your**

16  **answer.  Somebody else sued?**

17   A.    Well, what's your question?  What do you want

18  to know?

19   Q.    **Was there ever any litigation between**

20  **yourself, Xcentric, or anybody else who operated the**

21  **Rip-Off Report website on one side and Mr. Woodard on**

22  **the other side?**

23   A.    There was never any litigation between myself

24  and Woodard, but there was litigation, and I can't

25  remember -- uh, uh, uh, uh, umm -- I could probably ask

245

1    my counsel.  She'd remember who it is.

2           You know who I'm talking about.  There's some

3    company in Texas.  I forget the name of them.

4        Q.    **G.W. Equity?**

5        A.    Yeah, there go.  Thank you.  G.W. Equity.  And

6    I think he was blackmailing them for money, and stuff

7    like that.  I don't know.  He's -- the guy is --

8        Q.    **The lawsuit was between G.W. Equity and**

9    **Woodard?**

10       A.    Yeah.  Oh, yeah, right.  I don't think -- did

11   they sue me?

12          MS. SPETH:  I can't answer the questions.  You

13   have to answer.

14       Q.    **BY MR. LIPPMAN:  You don't -- you don't know?**

15          MS. SPETH:  Say you don't know if you don't

16   know.

17          THE WITNESS:  I don't remember.  I don't know.

18   I don't know if he sued me or how they the got me

19   involved or -- there was something they wanted from -- I

20   think they wanted us to remove reports, or something.

21   And he made some claims and stuff like that to guys.

22       Q.    **BY MR. LIPPMAN:  Okay.  Now, the monitors, the**

23   **content monitors that we talked about earlier --**

24       A.    Um-hum.

25       Q.    **-- the process that they go through, those --**

1    the people -- you guys -- you know, you filed -- "you"

2    meaning Xcentric and yourself have filed a motion for

3    summary judgment in this case.  Are you aware of that

4    fact?

5        A.    Yes, yeah.

6        Q.    Okay.  You -- you signed an affidavit in

7    support of that?  And a number of other people did, as

8    well --

9        A.    Okay, yeah.

10       Q.    -- who are content monitors, right?

11       A.    Correct.

12       Q.    Those are the content monitors that we were

13   talking about earlier, the monitors who review the

14   reports before they get posted, right?  The reports that

15   get submitted --

16       A.    Right, um-hum.

17       Q.    -- before they actually go on the website,

18   right?

19       A.    Right, um-hum.

20       Q.    Okay.  Those are the actual people who do it,

21   right?

22       A.    Yes.

23       Q.    Okay.  Do you have any recordings, either tape

24   recordings or video recordings, of any conversations or

25   communications you've had with anybody at Whitney

1  **Information Network or Whitney Education Group or any of**

2  **the other Whitney entities?**

3      A.    At one point I moved, and I -- umm, I want to

4  say I -- I mean, I -- I -- I know that I had some tape,

5  and I don't know if it's with this case or another case.

6  I can't remember.  I don't know.

7      Q.    **You had a tape of a conversation?**

8      A.    Yeah.  I can't remember if it had to do with

9  -- I don't -- was there any tape for Whitney?  I don't

10  know.

11          MS. SPETH:  Just say you don't know.

12          THE WITNESS:  I mean, there's so many cases

13  I'm doing, so I can't remember.

14      Q.    **BY MR. LIPPMAN:  You don't remember?**

15      A.    No, I don't remember.  No, I can't remember.

16      Q.    **If you had a tape that pertained to the**

17  **Whitney folks would you have turned it over to your**

18  **counsel?**

19      A.    Oh, yeah.  That's what I'm saying, did I turn

20  anything over when you asked for it.

21      Q.    **If you had it, you would have given it to your**

22  **counsel?**

23      A.    Absolutely.

24      Q.    **Okay.**

25          MR. LIPPMAN:  And I presume you would have

1    given that to us.

2            MS. SPETH:  Absolutely.

3            MR. BIRKEN:  Actually, you responded in one of

4    your discovery things that you did have a tape, but I

5    haven't seen a transcript of it.

6            MS. SPETH:  I don't remember.

7            MR. BIRKEN:  Okay.

8            MR. LIPPMAN:  Well, let's follow up on it.

9            THE WITNESS:  Did you hear what I was just

10   saying a second ago?

11           MR. BIRKEN:  Yeah.

12           THE WITNESS:  I started to say that I remember

13   there was -- and I didn't know if it was Whitney case or

14   some other case where I was looking, because, in

15   actuality, I thought -- I thought that I had taped phone

16   conversations -- I would have no reason to not turn it

17   over to you -- between myself and Paisola.

18           MS. SPETH:  That was this case.

19           MR. LIPPMAN:  Huh?

20           MS. SPETH:  That was this case.

21           THE WITNESS:  Okay.  I -- and if I'm not

22   mistaken, and I could be speaking wrong, but I'm -- I'm

23   80 percent sure --

24       Q.    BY MR. LIPPMAN:  All right.

25       A.     -- you know, that I had, when I -- and I

1  couldn't find -- you know, because I moved and, you

2  know.  And I still have it.  And it's a thing.  And I

3  know in my head that I'm looking for it because I have a

4  reminder.

5      **Q.    You believe you have a tape --**

6      A.    I believe --

7      **Q.    -- of a conversation --**

8      A.    -- I had a tape.

9      **Q.    -- with Robert Paisola --**

10      A.    Right.

11      **Q.    -- and you just have not been able to find it?**

12      A.    Right.  And it -- and it consisted of several

13  conversations --

14      **Q.    Okay.**

15      A.    -- I think.

16      **Q.    Okay.**

17      A.    And I'm pretty sure.  But I know that I had

18  one.  I'm almost positive I had one.

19      **Q.    Okay.**

20      A.    And it was -- because he also, I would group

21  in the same -- well, I shouldn't say anything.  Just...

22      **Q.    Okay.  And I presume from your comment that**

23  **you haven't located it yet, then, that you have not**

24  **given it to counsel?**

25      A.    Yeah, I know, but I'd love to hand it to you.

250

1    Q.    No, no.

2    A.    I don't -- there's nothing to argue.

3    Q.    You've not given it to your counsel?

4    A.    Right, I haven't given it to my counsel.

5    Q.    Okay.  Has anybody at Whitney Information

6    Network or Whitney Education Group, or any of the other

7    Whitney entities ever threatened you?

8    A.    It doesn't come to mind.  And -- and I would

9    have turned it over to you when I was searching the

10    Whitney stuff.  If I didn't turn it over to you, then

11    there was none, no.

12    Q.    And nothing that comes to your mind?

13    A.    No.

14    Q.    In other words, I understand you have some

15    fear of threats of physical harm to yourself?

16    A.    Right.

17    Q.    But it's not coming from Whitney people?

18    A.    No, I don't know.  I can't definitively say,

19    you know --

20    Q.    Okay.

21    A.    -- absolutely not.  And you -- you know, who

22    -- you know, you don't know your clients.

23    Q.    I understand you can't say no because you

24    don't know who's threatening you?

25    A.    Right, exactly.

**U.S. Legal Support**
**(305) 373-8404**

1    Q.    But you can't say, yes, that it's Whitney?

2    A.    Right, I cannot say yes because I have no

3    evidence of such.

4    Q.    Okay.  And how -- how far back have these

5    threats been going?  Are we talking about from 10 years

6    ago?

7    A.    No, about -- I want to say about 2000.

8    Q.    About 2000?

9    A.    Yeah.

10    Q.    Okay.  Before anything ever arose between

11    Xcentric and Whitney?

12    A.    Yeah, but there's -- that -- you know, right.

13    It's not one person, it's...

14    Q.    Okay.  And I just show you again in Exhibit 8,

15    it appears as if the first posting on the Rip-Off Report

16    regarding Russ Whitney or any of the Whitney entities

17    was on April 21st, 2002, right?

18    A.    I don't --

19    Q.    I mean, that's what it shows?

20    A.    If that's what it shows, that's what it shows.

21    Q.    And that's about two years after you first

22    started receiving these threats?

23    A.    Umm, let me -- yes, but let me -- I do want to

24    explain one thing to you.  The order in which these

25    reports are --

1    Q.    **Um-hum.**

2    A.    -- because of the way the search works, may

3 not -- these reports -- did you look at these?  Are they

4 like in order?  Did you look at the dates?

5    Q.    **You know --**

6    A.    Is there an earlier date?  Because all I can

7 tell you is the way the search is working --

8    Q.    **Um-hum.**

9    A.    -- right now, it may not be showing the oldest

10 report first.  So, just to keep note of that.  You know,

11 just look to see if there's anything that's older.

12 Because there have been issues with the search feature

13 on and off, so -- okay.

14    Q.    **This appears that it's in reverse**

15 **chronological order.**

16    A.    I knew I didn't need to bring that to your

17 attention, but I'm just saying just look at that because

18 there could be something that's earlier.  But if that's

19 what it says, that's what it is.

20    Q.    **And what did that cause you to believe since**

21 **the first report about Whitney was two years after you**

22 **started getting these threats of bodily harm?  Wouldn't**

23 **that also --**

24    A.    No, no, no.  I started getting -- oh, you mean

25 two years before --

1    Q.    **Two years before, right.**

2    A.    Yeah.

3    Q.    **The Whitney folks wouldn't be threatening you**

4    **in 2000.  They didn't even have a thing posted on them**

5    **until 2002.**

6    A.    Right, but I know who the threats were coming

7    from in 2000.

8    Q.    **Oh, you don't know who the present threats are**

9    **coming from?**

10    A.    No.

11    Q.    **Okay.**

12    A.    Not all; some, yes.

13    Q.    **Okay.**

14    A.    So, did you take that as a "yes" or "no"?

15    Q.    **I'm sorry?**

16    A.    Did you take that as a "yes" or "no"?

17          MS. SPETH:  Ed, it's getting late.  Stop.

18    Q.    **BY MR. LIPPMAN:  You know who some of the**

19    **threats are being made by?**

20    A.    Yes.

21    Q.    **And there are others you don't know who they**

22    **are made by?**

23    A.    Right, exactly.

24    Q.    **Have you ever used a different name?**

25          MS. SPETH:  Different than what?

254

1    Q.    **BY MR. LIPPMAN:  Different than Ed Magedson.**

2    A.    Ed Magedson with an "I," which is the original

3    way or our name was spelled before our family,

4    relatives, came over to the United States.

5    Q.    **Okay.**

6    A.    So, like --

7    Q.    **You may have spelled Magedson differently?**

8    A.    Right.  It was just spelled differently.  And

9    I've used -- I've used that sometimes.

10    Q.    **Okay.  But you've always gone by Ed Magedson?**

11    A.    Yeah, 99 percent of the time, absolutely.

12    Q.    **What do you go by the other one percent of the**

13    **time?**

14    A.    That M-a-g-i-d-s-o-n.

15    Q.    **Oh, oh, I'm sorry.  You spell it the opposite**

16    **way.**

17    A.    Not opposite, just with an "I" instead of an

18    "E."

19    Q.    **Okay.  But either with an "I" or "E," you**

20    **always, a hundred percent of the time, you go by Ed,**

21    **Ed Magedson?**

22    A.    Absolutely.

23    Q.    **And you have throughout your entire life?**

24    A.    Absolutely.

25    Q.    **Okay.  You've never, like changed your name or**

1    used a nickname, or something like that?

2        A.    No.

3        Q.    You never were Buffy Magedson?

4        A.    I don't know.  I was never buff, so I don't

5    recall.  Buffy Magedson.

6        Q.    Did you get paid for the work you do for

7    Xcentric?

8              MS. SPETH:  I'm going to object.  First of

9    all, let's define the question better.  I'm going to

10   first object to form and maybe ask you who the "you" is.

11       Q.    BY MR. LIPPMAN:  "You," Ed Magedson.  Do you

12   get paid for the work you do at Xcentric?

13             MS. SPETH:  I -- I -- I think I've got a

14   relevance objection, but let me think about this.  Let

15   me just think about this.  No, I'm not going to object.

16             THE WITNESS:  No, I haven't.

17       Q.    BY MR. LIPPMAN:  At any point in time, you've

18   never gotten paid for the work?

19       A.    I have not gotten paid a dime.

20       Q.    You work for free?

21       A.    I work for food.  No, I haven't been able to

22   get paid.  I haven't been able to pay any -- you know,

23   to be able to pay myself anything, no.

24       Q.    You work for free?

25       A.    I work for free.

1   Q.    Have you ever been paid by Xcentric for work

2   did you for it?

3   A.    No.

4   Q.    From day one?

5   A.    No.  Can I file a report about them?  Would

6   you handle my case?

7   Q.    Not unless I know where the rest of the

8   money's coming from after the CAP program.

9   A.    A la CAP.

10  Q.    Do you receive any benefits as a result of the

11  work you perform for Xcentric?  Like do they provide

12  health insurance for you or a car?

13  A.    Perks?

14  Q.    Perks.

15  A.    No.

16  Q.    No expense account?

17  A.    (No audible response.)

18  Q.    Run any personal expenses through Xcentric?

19  A.    Umm, no.  No, it's all -- no, I -- no, huh-uh.

20        MR. LIPPMAN:  Unless you want to ask me some

21  questions, we're all done.

22        THE WITNESS:  You sure you don't want to --

23        MS. SPETH:  Actually, I have some questions

24  for you.

25        MR. LIPPMAN:  Really?

1          MS. SPETH:  I do.

2          MR. LIPPMAN:  Wow.

3          MS. SPETH:  I don't mean to shock you too

4    much.  Is that against the rules in Florida?

5          MR. LIPPMAN:  No.  It's most -- it's totally

6    in jive with the rules.

7          THE WITNESS:  Don't you have to act mean and

8    get real nasty in order to get paid for today?

9          MR. LIPPMAN:  Who, me?  No, I just have to do

10   a good job.  You don't need to be mean and nasty to do a

11   good job.  That's a bad lawyer.

12         MS. SPETH:  Can you put the exhibits back in

13   front of him, in front of the witness, please?

14         MR. LIPPMAN:  Yes.

15         MS. SPETH:  Thank you.

16         MR. LIPPMAN:  And there are -- is that No. 20?

17         MS. SPETH:  Put it right on top of that.  And

18   we'll go back in order.  Oh, they're in reverse order.

19         MR. LIPPMAN:  Reverse order.

20         THE WITNESS:  That's okay.  I'll find it.

21

22                    EXAMINATION

23   BY MS. SPETH:

24       Q.    Go to 6.  And just flip them over so they're

25   not all out of order.

1          MR. LIPPMAN:  You wanted me to hand them to

2     him?  Will that make it easier for you.

3          MS. SPETH:  I think he'll be okay.

4          THE WITNESS:  Okay, 6.

5     Q.    BY MS. SPETH:  And go to Page 6 of 6.

6     A.    Hang on one second.

7          Do you have a second copy there?  I don't have

8     to give you a copy, right?

9          MR. LIPPMAN:  No.  Wait one second. I just

10    want to catch up with you.

11    Q.    BY MS. SPETH:  You know what, we don't even

12    need the look at 6 to ask the questions that I'm going

13    to ask.  It came up in Exhibit 6, but it doesn't matter.

14         I will just tell you that Exhibit 6 refers to

15    categories.

16         And Mr. Tippman --

17         MR. LIPPMAN:  "Lippman."

18         MS. SPETH:  Lippman, I'm so sorry.

19    Q.    BY MS. SPETH:  -- asked you some questions

20    about categories.  How many different categories does a

21    consumer have to choose from when they're filing their

22    Rip-Off Report and they're going to put it under a list

23    of categories?  How big is that list?

24    A.    It's got to be more than five -- 800, maybe a

25    thousand.  I'm not sure

1    Q.    So, they have somewhere between 500 and a

2    thousand choices?

3    A.    Right.

4    Q.    And of the choices, the categories that the

5    consumer has, do you know how many of them are --

6    withdrawn.

7          Let look at Exhibit 8.

8          MR. LIPPMAN:  8?

9          MS. SPETH:  8.

10   Q.    BY MS. SPETH:  And Mr. Lippman was asking you

11   about some of the categories that was -- that were --

12   that some of the reports about what Russ Whitney are

13   listed under.

14         Would you agree with me from looking at

15   Exhibit 8 that some of those categories are things like

16   "Seminar Programs"?

17   A.    Right.

18   Q.    And one of the categories is "Multi Level

19   Marketing"?

20   A.    Correct.

21   Q.    One of them is "Financial Services"?

22   A.    Right.

23   Q.    One of them is "Business Consulting"?

24   A.    Right.

25   Q.    "Seminar Programs"?

1     A.    Correct, I see.

2     Q.    **If you look at Page 1 of 3 -- I'm sorry, Page**

3    **14 at the bottom.**

4     A.    14?

5     Q.    **Yep, 14 at the bottom, the Bates number.**

6          MR. LIPPMAN:  Look on the right-hand corner at

7    the Bates number.

8          THE WITNESS:  Okay.

9     Q.    **BY MS. SPETH:  "Home Based Businesses"?**

10    A.    Right.

11    Q.    **So, in addition to the ones that Mr. Lippman**

12   **pointed out, there's lots of times the consumer chose to**

13   **put Russ Whitney under a category was a neutral or**

14   **non-derogatory account -- category, correct?**

15         MR. LIPPMAN:  Objection to the form.

16         THE WITNESS:  It's -- I'm --

17    Q.    **BY MS. SPETH:  I'm going to ask that**

18   **differently.**

19    A.    Can you repeat that again?

20    Q.    **Yes, absolutely.**

21         **Did the witnesses -- I'm sorry, did the**

22   **authors always choose derogatory categories when they**

23   **were filing reports about Russ Whitney, referring to**

24   **Exhibit 8?**

25    A.    No.  Looks like mostly not derogatory comments

1    -- categories.

2        Q.    Take a look at Exhibit 7.  That is the one

3    that talks about the steps for filing a Rip-Off Report.

4    Look at Page 6 of that.

5        A.    Page 6?

6        Q.    Yes.

7        A.    Okay.

8        Q.    And what does it say -- what is it that the

9    consumer who's filing the report has to say or has to

10   check a box that says?  Can you read that to us?

11       A.    Oh, "Step 6.  By posting this report, slash,

12   rebuttal, I attest that the report is valid and I

13   understand and agree that my submission and use of this

14   website is subject to the state's" -- "the site's terms

15   of service above."

16       Q.    Okay.  And do those terms of service include

17   anything about the truthfulness of the report?

18           MR. LIPPMAN:  Objection to the form.

19           THE WITNESS:  Yeah, it -- we urge the consumer

20   to make sure that they're telling the truth.

21       Q.    BY MS. SPETH:  Okay.  I'm done with that

22   exhibit.

23           The CAP program.  We talked earlier about the

24   CAP program?

25       A.    Um-hum.

1    Q.    Is the CAP program -- how are the terms of the

2    CAP program decided?  Let me ask it differently.

3          Is there some sort of contract between

4    yourself and the members of the CAP program?

5    A.    Absolutely.

6    Q.    Does that -- is that --

7    A.    Well, not -- not always.  Not -- they always

8    hasn't been.  Most have actually been without a

9    contract.

10   Q.    Okay.  Some have contracts?

11   A.    Right, in recent -- yes, in -- only in recent

12   year, yes.

13   Q.    When you talk about the company's commitment

14   to satisfying the customer and giving refunds, is there

15   any reasonableness test on that?

16         MR. LIPPMAN:  Objection to form.

17   Q.    BY MS. SPETH:  Does that make sense?  Does my

18   question make sense?

19   A.    He asked easier questions.

20   Q.    Sorry.  He's better at it than I am.

21         MR. LIPPMAN:  Pay me instead of her.

22   Q.    BY MS. SPETH:  When --

23   A.    I'd much rather move to Florida.

24   Q.    When the companies who would join the CAP

25   program agree to give refunds and satisfy the customers,

1  is that subject to or limited by it being a reasonable

2  refund or reasonable satisfaction to the customer?

3          MR. LIPPMAN:  Objection to the form.

4          THE WITNESS:  Yes, it needs to be a reasonable

5  resolution to -- to the program -- I mean, to -- to --

6  between the part- -- between the con- -- the customer

7  and the business.

8      Q.    BY MS. SPETH:  Okay.  Take a look at Exhibit

9  10.  And --

10     A.    Hold on.  Okay.

11     Q.    In the third paragraph it says "No trivial

12 comments will accepted."  And Mr. Lippman was asking you

13 about that earlier, remember --

14     A.    Okay.

15     Q.    -- for rebuttals?

16     A.    Right.

17     Q.    Is it -- if there's a -- if there's a trivial

18 comment inside of a rebuttal, does -- what would you do?

19     A.    You know, it's like our laws we have in the

20 United States.  Some things are enforced and some things

21 aren't.  I don't -- you know, we leave it up to -- the

22 monitor really has no agenda.

23          There's -- it -- it depends on what -- maybe

24 they might look at the -- take the time to look at the

25 report and see if somebody made it -- like, a trivial

1   comment before.  So, of course, you know -- and maybe we

2   shouldn't have ever let that trivial comment go, so we

3   go ahead and the monitor will let the trivial comment --

4   because they go on back and forth.  We can't let one do

5   it and then not another respond.

6          And hopefully I'm answering your question if I

7   think I understand it right.

8      Q.    **You're saying you enforce it when you feel**

9   **like it needs to be enforced?**

10     A.    It's up to the individual monny, the monitor

11   that's doing this.

12     Q.    **Okay.  Oh, Exhibit 19?  Did you get Exhibit**

13   **19?  Could you look at 19, please?**

14     A.    Okay.

15     Q.    **On Page 4 of Exhibit 19, I can't remember if**

16   **Mr. Lippman read it himself out loud or if he had you**

17   **read it, but a certain portion of Page 4 was read, the**

18   **part about, no, we do not give access to that info, we**

19   **do not give out your info.  Do you remember --**

20     A.    Okay.

21     Q.    **-- somebody read that out loud.**

22           **And then the question that Mr. Lippman asked**

23   **you was if that was your response, and you said yes.**

24   **But let me ask you:  Was that your complete response,**

25   **the part that was read out loud?**

1      A.    No.

2      Q.    In fact, your response goes over to the next

3   page for another few paragraphs, doesn't it?

4      A.    Yes.

5      Q.    Okay.  And I only have one final question.

6            When Mr. Lippman asked you whether anyone from

7   Whitney ever threatened you, did you interpret that

8   question to mean physical threats only?

9            MR. LIPPMAN:  Objection to the form.

10           THE WITNESS:  Today I think of things as

11   physical threats, because I get threats all the time but

12   you never know when -- who's meaning what --

13     Q.    BY MS. SPETH:  Okay.

14     A.    -- today, so...

15     Q.    I'm just saying, when you --

16     A.    I was probably -- I was probably thinking

17   physical threats.

18     Q.    When he asked the question earlier?

19     A.    Yes, I was probably thinking physical threats.

20   That's what comes to mind.

21           MS. SPETH:  I have no further questions.

22

23                    FURTHER EXAMINATION

24   BY MR. LIPPMAN:

25     Q.    Just two follow-ups.

1  A.  Two foul-ups or follow-ups?

2  **Q.  Follow-ups.**

3  A.  Okay.

4  **Q.  Did the folks at Whitney ever threaten you**

5 **about anything other than potentially bringing a lawsuit**

6 **against you?**

7  A.  Not that I have any evidence of, no, I have

8 none.

9  **Q.  And earlier your counsel pointed out to you**

10 **that in filing a Rip-Off Report the person states that**

11 **they're going to be truthful in what's contained in the**

12 **report, right?**

13  A.  Okay.

14  **Q.  The person that submits the report, correct?**

15  A.  Correct.

16  **Q.  But you don't know whether they are, in fact,**

17 **truthful or not, right?**

18  A.  No, I would have no way of knowing.

19  **Q.  People lie, right?**

20  A.  I -- I tend to think that most people tell the

21 truth.

22  **Q.  Have you ever found that there are**

23 **circumstances where people filed Rip-Off Reports that**

24 **you subsequently discovered were not truthful?**

25  A.  I would have no way of knowing.

1      **Q.    You're telling me in all these years you never**
2    **saw a report that somebody said, "Hey, this is wrong and**
3    **here's why," and you looked at it and you said, "Hey,**
4    **you know what, this guy's right.  This report's not**
5    **right"?**
6      A.    I -- the way I answer this question, and
7    probably you'll all get pissed off at me for answering
8    it this way, but look, our country puts people to death
9    after one, maybe two jury trials, and countless appeals
10   to only find out later that they weren't guilty after
11   all.
12        I'm going to find out and make a decision on
13   some document or something that somebody tells me over
14   the phone, they send me a check.  They could have forged
15   the check.  They could have made it up on a computer.
16   Who the heck's going to ever check?
17        The consumer needs to make their own educated
18   consumer -- decision when they log -- look on the
19   internet.
20        People lie, but I tend to think most people
21   don't lie.  I like to think that most people are good,
22   honest, hard working people, and I think they outnumber
23   the liars.
24        So, just like people file frivolous lawsuits
25   every day, but probably there are more truthful

1    lawsuits, I would like to think, than there are

2    frivolous lawsuits that are out there.

3            You know, so -- you know, the Better Business

4    Doesn't work.  Rip-Off Report, I think, is better.  And

5    consumers are better off seeing how a company takes care

6    of its problems instead of hiding it from you and your

7    wife who are consumers, and buy cars and call up on the

8    phone, see an ad on TV.

9            You're just better off -- that's why the

10   internet is here today.  Everything has changed.

11           (Court reporter clarification.)

12           MS. SPETH:  That's why the internet is here

13   today.  Everything has changed.

14           THE WITNESS:  I can't remember what I said.

15   Don't ask me.

16      Q.    **BY MR. LIPPMAN:  My question to you, though,**

17   **is a little different.**

18      A.    Go ahead.  All right.  I just --

19      Q.    **In all these years --**

20      A.    Yeah.

21      Q.    **-- have you ever found -- I've got to imagine**

22   **you have.  Did you ever find a report that somebody**

23   **posted on the Rip-Off Report saying, "Hey, I was wrong**

24   **and somebody did this," and you subsequently find out --**

25   **I don't know, however, somebody shows you the opposite**

1    -- or the company files a rebuttal and you look at it

2    and you say, "Hey, you know what, these people are

3    wrong.  The company they complained about is right.

4    This is" -- "This was not a good complaint"?  It's

5    happened, right?

6        A.    Has it -- has it -- has it happened?  Yeah,

7    sure, I've found things that in my opinion -- but, I

8    don't know.

9        Q.    Have you found occasions where people lied in

10   their Rip-Off Report submittals?

11       A.    I -- I -- but I wouldn't -- I wouldn't know if

12   it -- definitively if that is the case, if I'm using the

13   right word.

14       Q.    Okay.

15       A.    I mean, you know, I wouldn't ultimately know.

16   I -- I -- there are times, yeah.  In answer to your

17   question, there have been things that -- there's over

18   260 something odd thousand reports, and growing by the

19   minute.

20            I have absolutely no clue which ones are which

21   and no way of knowing.  Sure, when something -- we get

22   an e-mail or somebody may write -- you know, they -- or

23   something and something comes to my attention, you know.

24   But I can't make -- I can't make that decision.

25            How many times you defend a client that you

1   found out was lying and it was a bad guy?  I guess that

2   has nothing to do with it.

3          Go ahead.  What's your next question?  I'm

4   getting bad here.  I got to go to sleep.  Go ahead.

5   What else do you want to ask me?

6          MR. LIPPMAN:  I don't want to ask you anything

7   else.

8          VIDEOGRAPHER:  This is the conclusion of the

9   deposition of Ed Magedson and Tape No. 3.

10         Off the record.  The time is 6:10 p.m.

11         MS. SPETH:  We want to read and sign.

12         MR. LIPPMAN:  You want to read?

13         MS. SPETH:  Yes.

14         (Whereupon, the proceedings were concluded at

15   6:10 p.m.)

16                                     _____
                                       EDWARD MAGEDSON

17

18

19

20

21

22

23

24

25

1 STATE OF ARIZONA      )
                        )   ss.
2 COUNTY OF MARICOPA    )

3

4           BE IT KNOWN that the foregoing deposition

5 was taken before me, DEBORAH L. TUCKER, a Certified

6 Reporter, Certificate No. 50464, for the State of

7 Arizona; that the witness before testifying was duly

8 sworn by me to testify to the whole truth; that the

9 questions propounded to the witness and the answers of

10 the witness thereto were taken down by me in shorthand

11 and thereafter reduced to written form under my

12 direction; that pursuant to request, notification was

13 provided that the deposition is available for review and

14 signature; that the foregoing pages are a true and

15 correct transcript of all proceedings had upon the

16 taking of said deposition, all done to the best of my

17 skill and ability.

18           I FURTHER CERTIFY that I am in no way

19 related to any of the parties hereto nor am I in any way

20 interested in the outcome hereof.

21           DATED at Phoenix, Arizona, this 1st day of

22 August, 2007.

23           _____
             DEBORAH L. TUCKER
24           Certified Reporter
             Certificate No. 50464

25

**A**

**ABC** 159:7,11
**ability** 207:13
  271:17
**able** 213:1 249:11
  255:21,22,23
**absolutely** 176:11
  191:24 247:23
  248:2 250:21
  254:11,22,24
  260:20 262:5
  269:20
**Academy** 149:13
**accept** 228:25
**acceptable** 180:16
  185:3 187:10,23
  189:3
**accepted** 183:19
  263:12
**access** 219:8
  264:18
**accommodate**
  135:12
**account** 204:12
  227:14 228:11
  256:16 260:14
**accounts** 183:8
**accruing** 235:25
**accurate** 234:13
**act** 241:12 257:7
**acted** 204:9
**action** 129:4
  215:25 216:6
  220:15 224:3
**actions** 220:14
**actual** 170:11
  246:20
**actuality** 186:24
  248:15
**ad** 268:8
**Adam** 130:14
**Add** 143:14
**adding** 136:10,11
  136:14
**addition** 260:11
**address** 165:15
  166:9 188:3,7
  189:13,15
  190:17,22,24
  191:1 192:9
  196:20,22

198:25 199:1,15
  199:16,18
  225:15
**addressed** 205:22
**adds** 136:14
**Adler** 130:10
**admit** 162:9
**ads** 157:7,8,10,12
  157:23,24 158:1
  158:1,2,3,18,19
  158:20
**advantage** 172:23
**advertise** 188:8
**advertisement**
  156:20
**advertisements**
  149:16,18 150:7
  150:10,13,23
  151:6,23 152:20
  153:2,5
**advertising**
  128:11 156:24
  157:5 233:21
  234:23,24
  235:14
**advocacy** 153:20
  153:21 154:7
  230:24
**affidavit** 246:6
**agency** 202:17
**agenda** 263:22
**ago** 135:10 157:22
  178:16 201:19
  204:21,25
  221:15 222:9
  223:18 248:10
  251:6
**agree** 160:1 170:9
  171:18 172:21
  173:2 232:8
  259:14 261:13
  262:25
**agreed** 165:23
**agrees** 159:20,22
  160:19,23
**ahead** 136:1,2
  137:20 154:23
  168:2 195:16
  202:5 220:5
  264:3 268:18
  270:3,4
**ain't** 205:9

**aka** 149:9,11
**Alert** 150:4
**allegedly** 242:18
**allow** 186:25
  187:15,24 188:2
  189:5
**allowed** 176:10
**alluded** 167:24
  171:13 227:11
  228:9
**alternative** 150:15
**alternatives**
  133:23,23
  142:23 143:10
  143:12 148:1
  151:24
**amends** 171:3,5
**analogy** 173:1
**Angeles** 146:24
**animal** 135:25
**answer** 135:3
  149:2 165:1
  166:5,24 174:2
  177:15 188:15
  196:15 207:8,13
  210:22 230:11
  231:8,11,12,14
  231:21 232:1,1
  233:10,11,13
  236:12,15,17
  237:5,11,14,20
  237:21,23 238:6
  238:13,15,25,25
  239:2,5,15,15
  239:24,24 240:2
  240:3,12,13,15
  240:23,24 241:2
  244:16 245:12
  245:13 267:6
  269:16
**answered** 165:1
  206:7
**answering** 177:7
  178:6,9 264:6
  267:7
**answers** 271:9
**anybody** 192:17
  203:7 205:23
  235:21 243:24
  244:4,20 246:25
  250:5
**anymore** 164:25

188:13 204:10
  205:9 207:22
**apologize** 167:15
  180:23 188:24
  218:21
**apologized** 166:23
  242:9
**apparently**
  199:13 238:4
**appeals** 267:9
**appears** 251:15
  252:14
**appreciate** 172:20
  207:10,18
**appropriate**
  171:15 177:16
  177:21
**appropriately**
  204:9
**April** 145:8
  251:17
**arbitration** 161:1
  161:3
**areas** 142:16
**argue** 250:2
**argument** 228:3
**Arizona** 127:9,9
  127:10 130:4,6
  131:1 271:1,7
  271:21
**arose** 251:10
**arriving** 206:19
**article** 184:1
  220:22 224:18
**articles** 220:18
**artist** 147:12,16
**asked** 128:14
  132:9 158:14
  165:5,6 168:4,5
  168:8 178:15
  209:11 218:10
  219:1 247:20
  258:19 262:19
  264:22 265:6,18
**asking** 134:9
  135:7 154:20
  167:12 173:20
  177:10 178:13
  179:9 191:3
  199:20,23 204:9
  204:14 205:16
  212:7 239:18

240:18 259:10
  263:12
**asks** 218:20,22,22
  219:21
**assume** 159:6
  166:7 217:17
  222:23 223:25
  226:3 232:13
  234:8,16 243:11
**assumed** 198:18
**assuming** 226:12
**Atlanta** 225:18,25
**attempting** 213:9
**attention** 180:19
  197:16 252:17
  269:23
**attest** 261:12
**attorney** 143:8
  210:25 211:15
  221:9,14 222:2
**attorneys** 130:9
  130:13 143:8
  200:7 230:22
**attorney/client**
  174:17 175:13
  176:24 177:11
  178:1,19,25
**audible** 256:17
**Aug** 151:16
**August** 127:9
  130:2 131:1
  151:17 271:22
**Author** 146:9,19
  146:23
**authors** 260:22
**auto** 143:9
**Automation**
  128:25 190:1,8
**available** 143:3,4
  148:25 153:6
  271:13
**Avenue** 130:3
**avoiding** 162:6
  246:3
**aware** 213:16
  246:3
**a.m** 127:10
  189:25

**B**

**B** 132:23 140:14
  141:3,7,7
**back** 135:10

138:12 157:21
162:1 166:1
167:14 172:6
180:19 181:23
183:23 194:18
197:18 200:19
203:20 205:1,3
208:4 210:2
219:5,19 220:1
220:8,17 221:1
221:7,12,14,22
222:6,24 223:13
224:11 241:22
242:11 251:4
257:12,18 264:4
**backwards**
218:16
**bad** 163:1,5,6
164:19 171:16
196:2 214:4
216:8,13,15
257:11 270:1,4
**Badbusinessbur...**
127:10 130:12
**bag** 201:24
**balance** 233:15
234:15 235:2
**bank** 183:8
185:13 227:14
228:11
**banked** 243:2
**banning** 190:9
**bans** 190:2
**bar** 129:15 225:17
**bar@hotmail.c...**
225:15
**based** 151:9 260:9
**basic** 135:6,11
**basically** 161:13
188:1 242:1
**basis** 135:14
198:12,14
237:19,20,22
**bastards** 172:5
205:12
**Bates** 129:3,5,7,9
129:11,13,15
197:24 202:25
210:19 260:5,7
**BBB** 143:9
**beginning** 131:12
135:5 217:21

218:10 225:3
**belief** 179:6
**believe** 171:20,20
171:20,21
179:19 194:25
195:1,6,13
217:15 224:21
224:21 231:11
239:5 249:5,6
252:20
**believes** 208:6
226:14
**beneficial** 227:23
228:21
**benefit** 227:24,25
229:5
**benefits** 256:10
**benign** 135:6
**best** 142:6 207:9
220:14 271:16
**bet** 164:24
**better** 143:9
144:23 162:19
163:16 216:9
220:15 255:9
262:20 268:3,4
268:5,9
**beyond** 266:21
**bias** 237:1,5
**big** 211:4 258:23
**bills** 232:18,19,20
232:21,22,25
235:8,12,17,24
236:7
**Birken** 130:10
176:3 248:3,7
248:11
**bit** 147:4 157:18
162:18 181:14
188:23 206:16
206:19,23
233:20
**black** 229:19
**blackmailing**
245:6
**block** 242:7
**blog** 184:1
**blogs** 184:2,5
**blurb** 144:23
**bodily** 242:2,17
242:24 243:5
252:22

**bona** 215:13,15
215:19,23
**book** 238:5
**books** 238:5
**bother** 229:23
**bottom** 132:1
148:7 180:20,23
181:11 187:12
192:22 193:1,4
193:5,6 200:10
202:24 208:24
220:11 221:13
221:18 226:25
260:3,5
**bought** 210:3
**box** 156:16 215:5
215:6 261:10
**break** 203:12
207:3,11 208:3
**breaks** 176:9,12
176:14,19 177:4
177:17
**breath** 154:2
**bright** 201:18
**bring** 197:15
236:3 252:16
**bringing** 266:5
**brought** 172:17
212:21
**buff** 255:4
**Buffy** 255:3,5
**Building** 145:12
**bunch** 205:12
**Bureau** 143:9
**business** 143:9
151:9,10 153:20
153:21 154:7
161:9,18,23
162:7,19 163:4
163:13,18,21
164:11,11,15,16
169:14,14,22
171:3,4 180:4
204:17,17,20
211:25 227:24
228:21 259:23
263:7 268:3
**businesses** 164:17
164:17 243:9
260:9
**butchering**
142:18

**button** 132:20
**buy** 268:7

---

**C**

**C** 140:17
**California** 146:24
**call** 133:5 164:6,7
185:17 188:11
210:7 215:17
216:6 223:1,5
223:10 224:20
241:13 242:11
268:7
**called** 213:12
221:16,20
237:24 242:4,6
242:16
**calls** 176:20
241:18,21
**calm** 165:20
238:11
**CAP** 153:24 154:1
154:6,10,15,24
154:25 155:5,10
155:23 156:3,12
158:22 159:3,4
159:7,13,19
165:12 166:8
167:1 168:1,1
168:13,13 169:4
169:6,16 170:4
170:5,19 173:17
173:21 179:10
180:1,7,14
181:18 203:22
203:23 230:25
232:10 233:4
234:5,25 235:14
256:8,9 261:23
261:24 262:1,2
262:4,24
**capital** 141:7
189:11
**capitals** 189:14
**caps** 186:15
187:10
**car** 201:20 256:12
**care** 160:24
161:21 162:5,7
162:20 163:8,8
163:9 164:1,11
164:15 165:25

166:2,21 168:1
168:6 172:15
177:5 205:15
239:11,12 268:5
**cars** 268:7
**case** 127:3 180:5
189:14 192:22
193:2,7 198:1
202:16 216:18
236:24 239:7
246:3 247:5,5
248:13,14,18,20
256:6 269:12
**cases** 216:4
220:16 247:12
**cash** 158:5,6
**catch** 258:10
**categories** 133:2
133:20 134:3,18
134:20,24 135:1
135:2,6,11,12
135:15 136:4
142:16 145:21
147:17 148:24
149:19 151:22
258:15,20,20,23
259:4,11,15,18
260:22 261:1
**categorize** 133:1
141:25 142:3
**categorized** 229:3
**category** 134:15
135:8,13,14,17
135:21,25 136:3
136:10,16 137:3
142:6,13,17
143:8 145:25
147:11,16,22
148:18 149:14
150:6,10,22
151:13,19,25
152:7 187:23,24
189:4 260:13,14
**cause** 252:20
**causes** 195:5,12
**cell** 223:14
**Central** 130:3
**certain** 139:6
155:12,15 232:9
264:17
**certainly** 175:5
178:24 227:23

228:25 237:18
**Certificate** 127:25
 130:5 271:6,24
**certified** 127:24
 130:5 271:5,24
**CERTIFY** 271:18
**cetera** 143:9
 145:13 220:18
**chairman** 200:13
**change** 163:22
 188:12 224:22
 240:9
**changed** 128:20
 149:2 160:11
 207:1 254:25
 268:10,13
**changes** 161:19
**chase** 201:20
**chat** 183:21
**check** 132:5
 188:18 216:2,3
 229:14 261:10
 267:14,15,16
**checked** 188:18
 204:8
**checking** 216:24
**child** 162:10
**choices** 133:10,11
 149:20 259:2,4
**choose** 133:7
 136:16 142:6,13
 142:20 143:5,8
 147:18 153:7
 258:21 260:22
**chooses** 135:1
 142:12 143:4,11
 147:19
**chose** 260:12
**chronological**
 218:16 252:15
**Circuit** 172:1
**circumstances**
 204:7 266:23
**city** 140:17 146:12
**Civil** 130:6
**claim** 236:24
**claims** 245:21
**clarification**
 171:9 244:10
 268:11
**clarify** 168:9
**class** 129:4 216:5

**220:**9,9,14
**click** 133:6,8,22
 138:23
**clicks** 139:4
**client** 176:10,13
 177:19,20
 231:24 269:25
**clients** 211:17,25
 212:9 250:22
**close** 132:20
**closely** 202:10
**clue** 189:22
 269:20
**coach** 177:14
**Collect** 128:10
**collected** 186:17
 187:5
**Colorado** 127:5
**com** 199:17
**come** 145:21
 158:25 166:1
 173:7 182:20,24
 183:1 184:2
 192:5 210:18
 211:1 231:5
 232:9 233:7,15
 234:16,21 235:3
 235:6 250:8
**comes** 159:1
 160:19 233:4
 234:5,7 235:8
 250:12 265:20
 269:23
**coming** 200:12
 205:24,25
 250:17 253:6,9
 256:8
**comma** 145:12
**commenced** 131:4
**comment** 184:7
 194:14 249:22
 263:18 264:1,2
 264:3
**comments** 183:18
 260:25 263:12
**commitment**
 160:10,14 162:7
 170:6,8 179:11
 180:1,7 204:16
 204:18 206:25
 262:13
**committed** 169:15

**committing** 160:8
 168:21 169:7
**communications**
 246:25
**companies** 147:23
 148:19,23
 150:25 151:2,4
 151:8,14,20,23
 152:7,16 153:5
 162:8 187:1,15
 188:3 206:5
 213:5 262:24
**company** 127:9
 127:10 140:9,17
 140:20 141:5
 159:7,11,20,22
 160:6,7,19,23
 160:23 161:15
 161:16,19,20,25
 162:2,21,22
 163:7,8,24
 164:17 166:21
 167:14 168:22
 168:23 179:5
 181:12,15
 187:16 188:5
 206:4 227:4
 229:5 242:19
 243:7,8,20
 245:3 268:5
 269:1,3
**company's** 160:8
 167:12 179:24
 262:13
**complain** 207:13
 207:16
**complained**
 182:12,21 183:2
 269:3
**complaining**
 171:15 235:18
 236:6
**complains** 168:14
**complaint** 169:7,8
 170:12 171:15
 171:19 179:18
 179:19,20,20
 180:3,8,15
 269:4
**complaints** 164:1
 164:4 171:14
 179:6,25 181:15

188:4,5
**complete** 264:24
**completely** 164:15
**comprehending**
 199:22
**computer** 172:17
 192:14 267:15
**con** 147:12,16
 263:6
**concentrate** 207:8
**concern** 185:17
**concluded** 270:14
**conclusion** 224:23
 270:8
**confess** 192:12
**confessed** 192:14
**confidential** 213:6
**consisted** 249:12
**consists** 132:23
**constant** 184:2
**Consulting**
 259:23
**consumer** 135:1
 135:16 136:15
 147:19 148:2
 149:20 150:15
 151:25 153:7
 154:8 162:2,3
 162:20 163:3,12
 166:1,7,13,15
 167:4,9,10,25
 168:2,14 171:19
 171:24 172:15
 173:18 179:6,7
 179:8,12,17,21
 179:23,25 180:2
 180:8,15 204:4
 204:12,15,19
 258:21 259:5
 260:12 261:9,19
 267:17,18
**consumers** 134:4
 136:4 137:8
 160:5 162:6
 163:2,11,25
 164:8,9 171:13
 171:21,21
 172:22 188:10
 211:19 212:11
 268:5,7
**consumer's** 136:7
**consuming** 186:2

**contact** 161:17
 165:16 205:8
 206:1 213:2,3
 215:11,18
**contacted** 221:15
 221:24
**contacting** 221:22
**contained** 146:3
 159:15 266:11
**content** 229:9
 245:23 246:10
 246:12
**continued** 129:1
 130:2
**continues** 147:9
**continuing** 131:13
 224:24 225:4
**contract** 262:3,9
**contracts** 262:10
**contribute** 236:9
 239:19 240:8
**contributed**
 238:19 240:19
**control** 183:22
**conversation**
 183:21 247:7
 249:7
**conversations**
 246:24 248:16
 249:13
**cooperate** 213:7
**copy** 166:8,11
 167:1,3 186:25
 186:25 192:23
 192:24,25
 194:18 195:3,7
 195:13 196:11
 198:9 199:25
 218:6 225:13
 258:7,8
**corner** 144:13
 197:24 209:4,7
 210:19 260:6
**corporate** 153:20
 153:21 154:7
 179:16 230:24
**corporation** 127:5
**correct** 132:25
 136:6 137:21
 138:5,21,22
 140:12,13,16
 141:1,20 142:2

143:2,12,13
145:16 146:1,2
147:14 148:4,17
148:21,22 149:4
149:21,23,24
150:17,24 151:1
151:3,5,7,11,12
151:14 152:2,18
153:25 155:6
156:6,8,19
159:5,16 173:2
179:13 182:3,4
182:9,10,19
183:13 185:1,8
185:18 187:25
189:5 192:6
194:18,21 195:3
195:6,13,24
196:11 198:9
199:25 212:13
229:17 234:3
246:11 259:20
260:1,14 266:14
266:15 271:15
**correctly** 157:3
202:8 242:7
**corresponding**
196:25
**corrupt** 147:22
148:19,23
150:25 151:2,4
151:8,9,13,19
151:23 152:7,16
153:4 164:7
**cost** 233:1
**counsel** 198:1
199:24 207:11
208:4,16 209:9
210:18 217:13
233:1,2 234:17
245:1 247:18,22
249:24 250:3,4
266:9
**counsel's** 208:5
232:23 233:12
**countless** 267:9
**country** 162:24
267:8
**COUNTY** 271:2
**couple** 162:25
168:9 201:19
203:21 222:5

243:8
**coupons** 216:6
**course** 167:11
173:6 176:15
177:15,23
237:22 264:1
**court** 127:1 171:9
174:5 193:11
239:4,4 244:10
268:11
**cover** 234:8
235:15
**covered** 136:11
**cracks** 161:20
**crazy** 168:17
182:17
**cream** 129:15
225:15,17
**cream_bar@ho...**
226:13
**create** 135:15,21
136:2,2 228:24
**created** 133:11,24
134:1,1,1,20,22
135:7,17
**creates** 135:7
**creating** 227:25
**creative** 141:11
**Crimi** 130:14
**customer** 153:22
160:10,12
163:10 169:12
170:12 171:4
187:1 188:6,9
188:11 205:13
206:2 262:14
263:2,6
**customers** 262:25
**customer's** 169:9
**cute** 189:19

_____ **D** _____
**D** 128:1 140:20
**da** 172:7,7,7,7
223:9,9,9,10,10
223:10,11,11,11
223:11,11
**Dad** 162:11
**Dale** 215:17
**damn** 162:12
**date** 145:6 166:17
166:19 208:24

209:6 252:6
**DATED** 271:21
**dates** 252:4
**day** 163:15 171:16
173:12 205:19
219:19 221:8,13
256:4 267:25
271:21
**days** 161:18,23,24
165:16
**dead** 198:23
**deal** 207:25
**dealers** 143:9
**dealing** 179:24
206:17
**deals** 153:20
**death** 267:8
**Deborah** 127:24
130:4 271:5,23
**decide** 169:21
187:22 216:24
231:24 232:3,5
**decided** 262:2
**decides** 136:7
168:2 169:19
**deciding** 180:14
**decision** 236:20
267:12,18
269:24
**deemed** 138:2
**defend** 269:25
**Defendants**
127:12 130:11
**defense** 236:24
**define** 255:9
**definitely** 190:15
**definitively**
250:18 269:12
**degree** 188:21
**department**
188:19
**depending** 161:24
**depends** 180:4,10
263:23
**depose** 176:13
**deposition** 127:17
130:1 131:10,13
138:10 144:4
153:13 178:16
181:20 184:19
189:7 193:23
197:13 200:17

207:6,15 210:10
213:19 214:13
217:9 224:24
225:4,7 270:9
271:4,13,16
**depositions** 201:8
**depositive** 204:16
**derogatory**
260:22,25
**describe** 141:4
**descriptive** 140:14
141:4
**designate** 146:15
**detail** 141:3
**detailed** 191:16
**determination**
170:24 171:1
180:17 184:12
184:14
**determine** 181:11
204:2
**deters** 205:23
**developing** 222:19
**dial** 242:7
**Dickson** 241:4,6
243:25
**different** 157:12
157:22,23
162:13 172:19
180:5,14 188:23
195:20 199:14
238:2,4 243:8,9
253:24,25 254:1
258:20 268:17
**differently** 154:22
254:7,8 260:18
262:2
**dime** 255:19
**direct** 180:19
**directed** 214:24
**direction** 271:12
**directly** 215:3
**dirty** 164:7 172:5
205:12
**disagree** 172:21
237:13
**disconnected**
241:22
**discoverable**
233:10
**discovered** 266:24
**discovery** 248:4

**disguise** 213:6
**dishonest** 152:9
**disposal** 181:14
**DISTRICT** 127:1
127:2
**doctor** 239:9
**doctored** 198:2
**document** 129:4
138:15 144:9,15
144:17,22
193:10 194:17
195:19 197:22
197:25 198:2
202:6,15 210:5
210:5,16,23
213:22 217:13
217:19,23
225:11 267:13
**documented**
214:2,4
**documents** 203:11
217:8
**dog** 135:20,21
**doing** 153:10
160:14 161:10
162:9 169:14
211:18 212:10
212:12,15 213:4
213:11 214:10
215:13,16,20,25
247:13 264:11
**donate** 230:22
**dont** 201:5
**dos** 163:13
**dot** 199:17
**doubts** 195:6
**downs** 133:6
**dozen** 162:25,25
162:25 211:17
212:9
**Do-It-Yourself**
128:19
**dragging** 161:3
**drops** 133:6,22
**drop-down** 133:6
133:10 134:16
134:17,18
136:14 145:21
**drop-downs** 142:9
**drug** 156:17 242:6
**duly** 131:7 271:7