**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

WHITNEY INFORMATION NETWORK,
INC., a Colorado corporation,

                Plaintiff,

-vs-                             Case No.  2:04-cv-47-FtM-34SPC

XCENTRIC VENTURES, LLC., an Arizona
limited liability company;
BADBUSINESSBUREAU.ORG, an Arizona
limited liability company and ED
MAGEDSON, an individual,

                Defendants.

_____

**<u>ORDER</u>**

      **THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment and,

Alternatively, Motion for Reconsideration Re: Motion to Dismiss Plaintiffs' First Amended

Complaint for Lack of Personal Jurisdiction and Motion for Sanctions (Dkt. No. 115; Motion),

which was filed on June 21, 2007.  Plaintiff has filed a response in opposition to the Motion.

<u>See</u> Response to Defendants' Motion for Summary Judgment and, Alternatively, Motion for

Reconsideration Re: Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of

Personal Jurisdiction and Motion for Sanctions and Incorporated Memorandum of Law (Dkt.

No. 141; Response), filed on September 10, 2007.[1]  Accordingly, the Motion is ripe for review.

### I.    Procedural History

Plaintiffs Whitney Information Network, Inc.("WIN") and Russ Whitney, the CEO of WIN, filed an initial complaint (Dkt. No. 1; Initial Complaint) on January 27, 2004, asserting four claims against Defendants Xcentric Ventures, LLC ("Xcentric"), badbusinessbureau.org, and Ed Magedson ("Magedson") (collectively "Defendants"): (1) federal trademark infringement (Count I); (2) false designation of origin, false description and false representation under 15 U.S.C. § 1125(a) (Count II); (3) common law trademark infringement (Count III); and (4) defamation per se of business reputation (Count IV).  See generally Initial Complaint.  With respect to Count IV, Plaintiffs alleged the following: (1) Defendants published more than a dozen consumer reports[2] regarding Plaintiffs on their website, "www.ripoffreport.com"; (2) these consumer reports contain false information regarding Plaintiffs' products and services; (3) Defendants failed to verify the truth or accuracy of these reports prior to publishing them; and (4) by publishing the defamatory reports, Defendants have damaged Plaintiffs' business and reputation.  See Initial Complaint at ¶¶ 38, 44, 65-72.

On June 28, 2004, Defendants moved to dismiss Plaintiffs' claims against them for lack of personal jurisdiction, arguing that their activities in Florida did not satisfy Florida's

---

[1]  On February 6, 2008, the Court entered an order granting Defendants' motion for leave to file a reply. See Order (Dkt. No. 177).  Defendants filed their reply on February 12, 2008. See Defendants' Reply in Support of Defendants' Motion for Summary Judgment (Dkt. No. 185; Reply).  While the Court permitted Defendants leave to file a reply, it determined that reference to the reply was not necessary in ruling on the Motion.

[2]  While the Initial Complaint refers to the postings on the website as "complaints", the parties later refer to the postings as reports.  For consistency purposes, the Court will refer to the postings at issue as reports.

long-arm statute, Florida Statutes section 48.193, and that the exercise of jurisdiction over them would offend due process.  See generally Defendants' Motion to Dismiss Complaint for Lack of Personal Jurisdiction with Supporting Memorandum of Law (Dkt. No. 6; First Motion to Dismiss).  The Court entered an order denying the First  Motion to Dismiss on September 8, 2004.  See Opinion and Order (Dkt. No. 24; September 8, 2004 Order).  In the September 8, 2004 Order, the Court found that the undisputed facts alleged in the Initial Complaint, namely, that Defendants published and continue to publish infringing marks in Florida on their websites[3], which are directed at Florida and cause injury in Florida, were sufficient to subject Defendants to the Court's jurisdiction under section 48.193(1)(b) of Florida's long-arm statute.  See September 8, 2004 Order at 5-7.  The Court also concluded that Plaintiffs had sufficient minimum contacts with Florida to satisfy the due process requirements of the Fourteenth Amendment.  See id. at 8-9.

On September 21, 2004, Defendants filed a second motion to dismiss.  See Defendants' Second Motion to Dismiss Complaint for Lack of Personal Jurisdiction with Supporting Memorandum of Law (Dkt. No. 26; Second Motion to Dismiss).[4]  In the Second Motion to Dismiss, Defendants argued that Count IV of the Initial Complaint was barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  See Second Motion to Dismiss at 2-5.  They also asserted that Counts I, II, and III failed to state a claim upon which relief could be granted.  See id. at 6-17.  On July 14, 2005, the Court entered an order granting

---

[3] According to the Initial Complaint, a consumer accessing "www.ripoffreport.com" can click on a link to a second website published by Defendants entitled "www.ripoffrevenge.com."  See Initial Complaint at ¶¶ 35, 40.

[4] On September 27, 2004, Defendants filed a Notice of Errata (Dkt. No. 27), stating that they incorrectly titled their Second Motion to Dismiss.

3

the Second Motion to Dismiss and dismissing the Initial Complaint without prejudice.[5]  See Order (Dkt. No. 49; July 14, 2005 Order).  With respect to Count IV, the Court noted that, based on the allegations in the Initial Complaint, Defendants merely published messages written by consumers about companies or products that they believed had defrauded them. See July 14, 2005 Order at 6.  As Plaintiffs did not allege that Defendants had written the messages contained on their websites, the Court found that Defendants were immune from liability under the CDA which protects an interactive computer service provider from liability for information developed by a third party that is published on the Internet.  See id. at 6-7.

On July 28, 2005, Plaintiffs filed a motion, asking the Court to reconsider its July 14, 2005 Order or, alternatively, grant Plaintiffs an extension of time to file an amended complaint.  See generally Plaintiffs' Motion for Reconsideration of Order on Defendants' Motion to Dismiss, or, in the Alternative, Motion for Clarification of Order and Unopposed Motion for Enlargement of Time to File Amended  (Dkt. No. 51).  On August 3, 2005, the Court entered an Order (Dkt. No. 52) denying Plaintiffs' request to reconsider the July 14, 2005 Order but granting Plaintiffs an extension of time to file an amended complaint.

Plaintiffs' First Amended Complaint (Dkt. No. 56; Amended Complaint) was filed on September 27, 2005.  The Amended Complaint names WIN as the sole Plaintiff and reasserts only the defamation claim.  See generally Amended Complaint.  In addition, the Amended Complaint adds several new factual allegations.  See generally id.  Specifically, the Amended Complaint alleges that, in addition to failing to verify the accuracy of the

---

[5] The Court dismissed Counts I, II, and III for failure to state a claim.  See July 14, 2005 Order at 8, 11-12.

4

reports, Defendants add additional language to the reports in order to give the appearance that the company named in the report is "ripping off" consumers.  See id. at   ¶ 38. Moreover, the Amended Complaint asserts that Defendants often tailor and rewrite the consumer reports, by adding words such as "ripoff," "dishonest," and "scam", and, that after making these changes, Defendants asks the "client" to anonymously post the report on the website.  See id. at ¶ 39.  The Amended Complaint further alleges that Defendants created fictional reports, "which were then attributed to people with false names or 'anonymous' titles from fictional locations around the United States . . . and were false and slanderous."  See id. at ¶ 40.[6]

Defendants filed a third motion to dismiss on October 21, 2005, arguing again that the Court lacked personal jurisdiction over them and that the grounds the Court previously relied upon for finding jurisdiction were not present in the Amended Complaint.  See generally Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Personal Jurisdiction (Dkt. No. 58; Third Motion to Dismiss).  Noting that Russell Whitney, a resident of Florida, was no longer a party to the action, Defendants argued that "[t]he remaining claim for defamation [was] brought by a Colorado corporation that does business all over the country and did not suffer the brunt of the harm in Florida."  See id. at 3.  In addition, Defendants maintained that Florida's long-arm statute was not satisfied in the instant case. See id. at 4-5.  Specifically, Defendants argued that they did not author or publish the reports

---

[6]  WIN also alleges that Defendants published the reports as part of an attempted extortion scheme. See Amended Complaint at ¶¶ 34-43.  However, WIN notes that they commenced this action before Defendants had an opportunity to seek any money from WIN, and, in any event, WIN would have refused to pay Defendants.  See id. at ¶ 43.   As noted above, WIN only asserts a defamation claim in the Amended Complaint.

regarding WIN, and, therefore, they were immune from WIN's defamation claim under the CDA.  See id.  In support of this assertion, Defendants submitted declarations from Magedson and Ben Smith ("Smith"), an individual who had provided technology services to the operator of "www.ripoffreport.com" for over six years.  See id. at Exhs. A, E.  Magedson declared that "neither [he] nor any agent of Xcentric authored the statements that are the subject of this lawsuit."  See id., Exh. A at 4.  Moreover, Magedson asserted that, before a report is posted, Xcentric agents review the report solely to redact profanity, obscenity, and personal contact information.  See id.  Magedson also stated that "Xcentric agents are instructed to never add content to a report."  See id.  In his declaration, Smith declared that he captured IP addresses[7] for all but three of the postings submitted on the website about WIN or Russell Whitney.  See id., Exh. E at 3.  According to Smith, the IP addresses that he was able to capture did not match the IP address of any computer used by Xcentric or its agents.  See id.  In regard to the three remaining postings, Smith stated that two of the postings contained what appeared to be valid names, e-mail addresses, mailing addresses, and telephone numbers.  See id.  The third posting did not provide a name, address, or telephone number and the e-mail address provided was invalid.[8]  See id.

The Court entered an order granting the Third Motion to Dismiss on February 15, 2006.  See Order (Dkt. No. 69; February 15, 2006 Order) at 13.  In the February 15, 2006 Order, the Court found that it lacked personal jurisdiction over Defendants because WIN

---

[7]  Smith described an IP address as "a unique address that identifies the computer that the submission came from."  See Third Motion to Dismiss, Exh. E at 2.

[8]  The same e-mail address was later used to file rebuttal postings from which Smith was able to capture an IP address.  See Third Motion to Dismiss, Exh. E at 3.

failed to satisfy the requirements of Florida's long-arm statute. <u>See</u> February 15, 2006 Order at 12.   The Court noted that WIN's allegations in the Amended Complaint that Defendants had authored some of the reports on their website are essential to the survival of its argument that this Court has personal jurisdiction over Defendants, because, if Defendants did not author any reports, then they are immune from liability under the CDA and did not commit a tortious act in Florida. <u>See</u> <u>id.</u> at 9.  Upon review of the declarations submitted in support of the Third Motion to Dismiss, the Court determined that Defendants had rebutted WIN's allegations that they had authored some of the reports on the website and the burden had shifted to WIN to demonstrate a sufficient basis for jurisdiction by affidavit or other sworn statement. <u>See</u> <u>id.</u> at 9-11.  As WIN failed to provide any affidavit or sworn statement, the Court found that WIN failed to carry its burden. <u>See</u> <u>id.</u> at 11.  After determining that WIN failed to satisfy the requirements of Florida's long-arm statute, the Court declined to conduct a due process analysis and dismissed the Amended Complaint with prejudice. <u>See</u> <u>id.</u> at 12-13.  Final Judgment (Dkt. No. 70; Final Judgment) was entered on February 16, 2006.

      After WIN appealed the Court's February 15, 2006 Order and Final Judgment, <u>see</u> Plaintiff's Notice of Appeal (Dkt. No. 72), filed on March 16, 2006, the Eleventh Circuit Court of Appeals vacated the Final Judgment and remanded the case to this Court for further proceedings. <u>See</u> <u>Whitney Information Network, Inc. v. Xcentric Venture, LLC</u>, 199 Fed. Appx. 738 (11th Cir. 2006).  In its Order and Opinion, the Eleventh Circuit concluded that the Court erred by finding that WIN failed to satisfy section 48.193(1)(b) of Florida's long-arm statute. <u>See</u> <u>id.</u> at 744.  Specifically, the Eleventh Circuit found that the declarations submitted by Defendants did not adequately rebut WIN's allegations in the Amended

Complaint.  See id.  In regard to Magedson's declaration, the Court noted that, while Magedson stated that the agents of Xcentric are instructed not to add content to a report and that they solely review the reports before they are posted to remove profanity, obscenity, and personal contact information, Magedson failed to make any representations about what actually occurred with respect to the website postings about WIN.   See id. at 743. Moreover, the Eleventh Circuit observed that Magedson did not explain the basis for his knowledge regarding actions taken by Xcentric's agents.  See id.  With respect to Smith's declaration, the Eleventh Circuit noted that Smith admitted that he was unable to capture IP addresses for three of the reports about WIN.  See id. at 743-44.  In addition, the Eleventh Circuit observed that "it is not clear that the IP addresses of computers used by Xcentric's agents would have even appeared during Smith's search if those computers were used merely to revise consumer reports submitted by others, rather than to submit a fabricated complaint."  See id. at 744.  Based on the above omissions, the Eleventh Circuit found that Defendants had failed to establish that they were entitled to immunity under the CDA and remanded the case to this Court for consideration of whether the exercise of personal jurisdiction over Defendants would violate the due process requirements of the Fourth Amendment.  See id.

Following remand, the Court denied the Third Motion to Dismiss, finding that the exercise of personal jurisdiction over Defendants comported with due process.  See generally Order (Dkt. No. 82; February 23, 2007 Order).  In the February 23, 2007 Order, the Court found that WIN demonstrated that Defendants had sufficient minimum contacts with Florida.  See February 23, 2007 Order at 6-7.  With respect to this finding, the Court

8

noted that Defendants' website published information on Florida companies, such as WIN, and allowed consumers to target or search for companies in a specific state, including Florida.  See id. at 7.  The Court further observed that Defendants solicited donations from Florida consumers and that Defendants had accepted at least one donation from a Florida resident.  See id.   In addition, the Court noted that, based on WIN's unrebutted allegations, the reports published on Defendants' website about WIN caused substantial harm to WIN's business and reputation and most of this harm had occurred in Florida.  See id.  Turning to the second step of its due process analysis, the Court found that its exercise of personal jurisdiction did not offend the ideals of fair play and substantial justice because "Florida has an interest in resolving disputes arising from the publication or dissemination of defamatory information in Florida or about a Florida company" and many of the witnesses in the case were located in Florida.  See id.  Following entry of the February 23, 2007 Order, the parties were directed to submit a new Case Management Report.  See Order (Dkt. No. 96).  They did so, and on April 16, 2007, the Court entered an Amended Case Management and Scheduling Order setting October 1, 2007, as the discovery deadline and November 5, 2007, as the deadline for submission of dispositive motions.  See Amended Case Management and Scheduling Order (Dkt. No. 105; Amended CMSO).  The parties have proceeded in accordance with the Amended CMSO.

9

## II. Background Facts[9]

WIN, a Colorado corporation, provides "post-secondary educational and training products and services in the areas of real estate investing, business development, financial investment and asset protection real estate."  See Amended Complaint at ¶ 19.  In addition to advertising its products and services through infomercials, WIN conducts approximately 150 free real estate seminars each month.  See id. at ¶¶ 20-21; see also Separate Statement of Facts in Support of Defendants' Motion for Summary Judgment (Dkt. No. 116; MSJ Facts) at ¶ 1.

Xcentric, is an Arizona limited liability company that operates a website known as "The Rip-Off Report" ("ROR") which is located at "www.ripoffreport.com" and "badbusinessbureau.com."  See MSJ Facts, Exh. 1 at ¶ 2; Plaintiff's Notice of Filing Deposition of Ed Magedson in Support of its Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 153; Deposition of Magedson)[10], Exh. 1 at 27.  Magedson is the founder and managing member of Xcentric.  See MSJ Facts, Exh. 1 at ¶ 2; Deposition of Magedson, Exh. 1 at 24.  The ROR website allows its visitors to post and view reports about a wide variety of companies that have purportedly "ripped off" consumers,[11] see MSJ Facts at ¶¶ 3, 4; Deposition of Magedson, Exh. 1 at 27, Exh. 10 at 1, and informs its visitors that "[f]iling a

---

[9]   As discussed above, because this case is before the Court on Defendants' motion for summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed by the Court in a light most favorable to WIN.

[10]   WIN filed Magedson's deposition as well as the exhibits referenced in it as 29 separate attachments to the Notice of Filing.  The attachments are referenced herein as "Deposition of Magedson, Exh. ___."

[11]   The ROR website contained almost 220,000 individual reports as of December 13, 2006.  See MSJ Facts at ¶ 6.

Rip-Off Report is important because you are helping us to help you, and others like you, achieve justice," see Deposition of Magedson, Exh 2 at 5-6, Exh. 10 at 2.  In this regard, the ROR website explains that it works with government authorities and attorneys to help organize lawsuits and that it may contact posters if a lawsuit is being considered or has been filed to which they may wish to be named as a party.  See id., Exh. 2 at 6-13, Exh. 10 at 2-3.[12]  The ROR also notifies its visitors that it regularly works with the media and will put posters in contact with the media if the media is interested in their reports.  See id., Exh. 2 at 22-23, Exh. 10 at 3.

In order to submit a report on the ROR website, a poster must first sign up for a free account with the ROR website.  See MSJ Facts at ¶ 7, Exh. 1 at ¶ 6.   While Xcentric asks posters to provide truthful and accurate information, it is possible for individuals to sign up for an account using forged or fraudulent names, phone numbers, etc., and, given the high volume of traffic to the ROR website, Xcentric does not verify the authenticity of the personal information provided by each poster.  See id.  After signing up for an account, the poster must, inter alia, categorize his or her report by selecting a "topic" and a "category" from a drop-down menu.  See Deposition of Magedson, Exh. 4 at 7-8, Exh. 16 at 5.  The topics from which a poster must select include "outrageous & popular rip-off" and "unusual-rip off", as well as more generic topics such as "automotive", "dining", and "travel."  See id., Exh. 4 at 16-17, Exh. 16 at 5.  Similarly, the categories provided by Xcentric include "con artist", "corrupt companies," and "false TV advertisements", as well as "seminar programs", "multi

---

[12]   At his deposition, Magedson testified that, upon request, he provides government authorities and attorneys with posters' contact information.  See Deposition of Magedson, Exh. 2 at 8-9.  Magedson also acknowledged that, on a few occasions, he submitted unsolicited materials to the government regarding a particular business or industry.  See id. at 9-11.

level marketing", "financial services", and "business consulting." <u>See</u> <u>id.</u>, Exh. 4 at 21-27, Exh. 6 at 34-35, Exh. 16 at 5.[13] As part of the submission process, a poster must also create a title for his or her report. <u>See</u> <u>id.</u>, Exh. 16 at 2-3; MSJ Facts at ¶ 10, Exh. 1 at ¶ 9.  The ROR website advises a poster to "[b]e creative" when selecting descriptive words for his or her title because "it will make [his or her] report more interesting." <u>See</u> Deposition of Magedson, Exh. 16 at 3.[14]  In addition, prior to submitting his or her report, a user must check a box to attest that the report is valid. <u>See</u> <u>id.</u>, Exh. 6 at 36, Exh. 16 at 6.[15]

Once a user submits a report, the report is held until it can be reviewed by Xcentric's staff of content monitors. <u>See</u> MSJ Facts at ¶ 11, Exh. 1 at ¶ 10.  The content monitors review the report to confirm that it does not contain "blatantly illegal, inappropriate, or offensive materials", such as pornographic images, social security numbers, credit card numbers, or physical threats, and they have the discretion to delete or redact any report that contains this type of material. <u>See</u> <u>id.</u>  However, the content monitors do not verify the

---

[13]  At his deposition, Magedson testified that the ROR website provides posters with approximately 500 category choices.  <u>See</u> Deposition of Magedson, Exh. 6 at 33-35.

[14]  In another section of the ROR website, Defendants advise its posters as to "[w]hat makes a good Rip-Off Report."  <u>See</u> Deposition of Magedson, Exh. 15 at 7.  Defendants state that "[t]he report should be relating an honest, factual, and impartial story."  <u>See</u> <u>id.</u>  They also direct posters to "[u]se any details such as names, times, places, tape recorded evidence (where legal), pictures, and witnesses statements, that will reveal the facts and support your Report."  <u>See</u> <u>id.</u>

[15]  The home page of the ROR website features "Top Rip Off Reports."  <u>See</u> Deposition of Magedson, Exh. 11 at 1.  These reports are selected by Defendants after posters e-mail them to a special e-mail address.  <u>See</u> <u>id.</u>, Exh. 2 at 1-4, Exh. 15 at 7.  The ROR website advises posters that, in order to be featured on the home page, their stories need to be especially convincing and must include "[a] clear photo, drawing, or cartoon" related to the report.  <u>See</u> <u>id.</u>, Exh. 15 at 7.  Defendant Magedson testified that he did not believe that WIN was ever featured on the home page, <u>see</u> <u>id.</u>, Exh. 2 at 5, and WIN has not provided any evidence to dispute this statement.

accuracy of the reports submitted to the ROR website, and they are not permitted, as a matter of policy, to add to or rewrite the reports that are posted.  See id.

Xcentric permits a company against whom a report has been filed or another consumer who has had a positive experience with such a company to file a rebuttal to a report.  See Deposition of Magedson, Exh. 5 at 7, Exh. 19; MSJ Facts at ¶ 8, Exh. 1 at ¶ 7. Rebuttals are not automatically posted on the ROR website.  See Magedson Deposition, Exh. 5 at 14.  Instead, a rebuttal will only be posted if an Xcentric employee determines that the rebuttal is "acceptable."  See id.

In addition to providing a forum in which visitors may post reports or rebuttals regarding companies , the ROR website provides a link to another website that sells a "Do-it-Yourself Guide: How to get Rip-Off Revenge," which was prepared by Magedson.  See id., Exh. 3 at 2-4, 10, Exh. 12.  The ROR website also solicits donations from its visitors and has sold advertising on a few occasions.  See id., Exh. 3 at 11-13, Exh. 14.  In addition, the ROR website offers a Corporate Advocacy Business Remediation and Consumer Satisfaction Program ("CAP Program") to companies which have had reports posted against them.  See id., Exh. 4 at 27-31, Exh. 18.  In order to participate in the CAP Program, a company must pay a fee and fulfill other requirements.  See id., Exh. 4 at 29-30.  In the future, when a poster submits a report to the ROR website regarding this company, the report is not automatically posted on the ROR website.  See id. at 40-41.   Instead, the ROR website sends an e-mail to the poster who submitted the report to let him or her know about the company's participation in the program.  See id. at 34.  The company is then given the opportunity to address the report with the poster.  See id. at 40. If the poster is satisfied with

13

the response provided by the company, then the report is not published on the ROR website. See id. at 40-41.[16]

The ROR website contains several reports that refer to WIN in a derogatory manner. See MSJ Facts at ¶ 14, Exh. 1 at ¶ 16, Exh 2.[17]  In support of the Motion, Magedson has provided a sworn declaration stating that he has not authored, altered, or modified any of these reports. See MSJ Facts, Exh. 1 at ¶¶ 17-21.  Magedson also provides a complete list of those individuals who have had administrative access[18] to the ROR website since the beginning of 1993: (1) Ed Magedson; (2) Amy Thompson; (3) G. Young; (4) Heather Dorton; (5) Kim Jordan; (6) Jackie Wynne; (7) Kim Smith; (8) Lynda Craven; (9) Mary Jo Baker; (10) C.S. Bowen; (11) Paulette Griffith; and (12) Ben Smith.  See MSJ Facts at ¶ 13, Exh. 1 at ¶ 15.[19]  All of these individuals have provided declarations attesting that they did not author or submit any of the postings regarding WIN.  See MSJ Facts, Exhs. 1 at ¶ 19, Exh. 3 at ¶ 6,  Exh. 4 at ¶ 6, Exh. 5 at ¶ 6, Exh. 6 at ¶ 6, Exh. 7 at ¶ 6, Exh. 8 at ¶ 6, Exh. 9 at ¶ 6, Exh. 10 at ¶ 6, Exh. 11 at ¶ 18, Exh. 12 at ¶ 6, and Exh. 13 at ¶ 6.  In addition, these individuals  aver that they did not add any content to any of the postings regarding WIN or add content to the titles or headings of these postings.  See id., Exhs. 1 at ¶ 21, Exh. 3 at ¶ 7,  Exh. 4 at ¶ 7, Exh. 5 at ¶ 7, Exh. 6 at ¶ 7, Exh. 7 at ¶ 7, Exh. 8 at ¶ 7, Exh. 9 at ¶ 7, Exh.

---

[16]  WIN has not alleged that it participated in the CAP Program.

[17]  Defendants have attached a complete print out of every reported posted on the ROR website regarding WIN to their MSJ Facts.  See MSJ Facts at Exh. 2.

[18]  Once a report or rebuttal is submitted to the ROR website, only individuals with administrative access have the ability to make any changes to the report or rebuttal.  See MSJ Facts at ¶ 12, Exh. 1 at ¶ 14.

[19]  At times, Defendants mistakenly refer to Paulette Griffith as "Paulette Craven" and Heather Dorton as "Heather Norton."  See MSJ Facts at ¶ 13, Exh. 1 at ¶ 15.

10 at ¶ 7, Exh. 11 at ¶ 19, Exh. 12 at ¶ 7, and Exh. 13 at ¶ 7.[20]   However, WIN argues that

evidence exists that Magedson prepares the reports posted on the ROR website.  <u>See</u>

Response at 12-13.  In support of this argument, WIN has provided the deposition of Dickson

Earl Woodard ("Woodard") in the matter of GW Equity, LLC v. Dixon Woodard, which was

an action filed in the 116th Judicial District Court, Dallas County, Texas.  <u>See</u> Response at

Exh. 2.  During his May 8, 2007 deposition, Woodard answered affirmatively when asked

whether Magedson writes reports and the headings on the reports on the ROR website.  <u>See</u>

<u>id.</u> at 3-4.  He also testified that Magedson indirectly told him that he is responsible for

making posts about companies on the ROR website.  <u>See</u> <u>id.</u> at 6.

### III.   Discussion

In the Motion, Defendants ask the Court to enter an Order granting summary

judgment in the instant case.  <u>See</u> Motion at 4-11.  In addition, Defendants request that the

Court reconsider its prior rulings on personal jurisdiction and issue an order requiring WIN

and WIN's counsel to appear and show cause why sanctions should not be imposed against

them pursuant to Rule 11(c).  <u>See</u> Motion at 11-13.  The Court will address each request in

turn.

### A.   Motion for Summary Judgment

Under Rule 56(c), summary judgment is appropriate if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[20]   Specifically, these individuals declare that they "did not add the words 'rip-off', 'dishonest,' or 'scam' or any other words to the title or to the content of any report" regarding WIN.  <u>See</u> MSJ Facts, Exhs. 1 at ¶ 19, Exh. 3 at ¶ 6,  Exh. 4 at ¶ 6, Exh. 5 at ¶ 6, Exh. 6 at ¶ 6, Exh. 7 at ¶ 6, Exh. 8 at ¶ 6, Exh. 9 at ¶ 6, Exh. 10 at ¶ 6, Exh. 11 at ¶ 19, Exh. 12 at ¶ 6, and Exh. 13 at ¶ 6.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 919 (11th Cir. 1993)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

In their motion for summary judgment, Defendants argue that the CDA bars WIN's defamation claim.  See Motion at 4-11.  They maintain that they are immune from liability under the CDA because the ROR website is a provider of an interactive computer service, the defamation claim treats them as publishers of the reports posted about WIN, and all of the reports that were posted about WIN were created by third parties.  See id. at 7-11.

WIN responds that Magedson does not qualify for immunity under the CDA because he is not a provider or user of an interactive computer service.  See Response at 4-5.  In addition, WIN argues that Defendants are not protected by the CDA because the undisputed

16

facts establish that they are responsible, in whole or in part, for the creation or development of the defamatory postings on the ROR website.  See id. at 5-11.  Alternatively, WIN argues that a genuine issue of material fact exists as to Defendants' activities based upon the testimony of Woodard.  See id. at 12-13.

Pursuant to the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The CDA further preempts state law that is inconsistent with this subsection.  See id. § 230(e)(3) (stating that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."); Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006).[21] In accordance with these provisions, Defendants will be entitled to immunity from WIN's state law defamation claim under the CDA if they are able to establish that:  (1) they are "provider[s] or user[s] of an interactive computer service";  (2) the claim treats them "as the publisher or speaker" of information; and (3) the claim against them is based on "information provided by another information content provider".  See Universal Communications Systems, Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007); F.T.C. v. Accusearch, Inc., No. 6:CV-105-D, 2007 WL 4356786, at * 3 (D. Wyo. Sept. 28, 2007).

The Court will first address whether Defendants are providers or users of an "interactive computer service."  The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer

---

[21]  The Eleventh Circuit has recognized that "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of a service.'"  Almeida, 456 F.3d at 1321 (quoting Zeran v. American Online, Inc.,129 F.3d 327, 330 (4th Cir. 1997)).

access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . ." Id. § 230(f)(2).   While WIN does not dispute that Xcentric and badbusinessbureau.org are providers or users of an interactive computer service[22], WIN argues that Magedson is not a provider or user of an interactive computer service because he does not own or operate the ROR website.   See Response at 4-5.   In support of its argument, WIN relies on MCW, Inc. v. Badbusinessbureau.com, LLC, No. Civ.A. 3:02-CV-2727-G, 2004 WL 833595 (N.D. Tex. April 19, 2004), which is another defamation action involving the ROR website in which Magedson and badbusinessbureau.com were named as defendants.   In that case, Magedson argued, in a motion to dismiss, that he qualified for immunity under the CDA as a provider of an interactive computer service because he operated the ROR website.   See id. at *9.   The court found that Magedson was not a provider or user of an interactive computer service. See id.   In reaching this conclusion, the court noted that the defendants failed to provide any evidence establishing that Magedson was a provider or user of an interactive computer service, and that "more importantly", Defendants had "consistently portrayed Magedson as an individual who neither own[ed] nor operate[d]" the ROR website.   See id.   As these

---

[22]   Defendant badbusinessbureau.org, is a provider of an "interactive computer service" because it "enables computer access by multiple users" to its computer server.   See Universal Communications Systems, Inc., 478 F.3d at 419; see also Batzel v. Smith, 333 F.3d 1018, 1030 n.16 (9th Cir. 2003) (recognizing that several courts have concluded that a website meets the definition of an "interactive computer service".). Moreover, Xcentric, as the operator of the ROR website, is also a provider of an "interactive computer service." See Roskowski v. Corvallis Police Officers' Ass'n, No. Civ. 03-474-AS, 2005 WL 555398, at *11 (D. Or. March 9, 2005) (holding that a defendant acted as an "interactive computer service" by creating, providing, and maintaining a website); Chicago Lawyers' Committee for Civil Rights Under the Law, Inc. v. Craigslist, Inc., 461 F.Supp.2d 681, 698 (N.D. Ill. 2006) (finding, in an Order on a motion for judgment on the pleadings in a Fair Housing Act action, that Craigslist is a provider of an interactive computer service because Craigslist "operates a website that multiple users have accessed to create allegedly discriminatory housing notices.").

circumstances are factually distinct from those before the Court, the MCW Inc. decision is not determinative.

The Court previously found Defendants to be providers of an interactive computer service, see July 14, 2005 Order at 7, February 15, 2006 Order at 6-9,  and WIN failed to properly dispute this finding on appeal.[23]   Nevertheless, as the matter is now before the Court on a motion for summary judgment, the Court again considers the issue.  Upon review of the undisputed facts, the Court finds that, unlike in MCW, Inc. where the defendants failed to produce evidence that Magedson was a provider or user and affirmatively maintained that he was not an owner or operator, here, Magedson has produced evidence supporting his claim that he is a provider of an interactive computer service.  In the declaration Magedson submitted in support of the motion for summary judgment, he avers that he is the founder and managing member of Xcentric, the operator of the ROR website.  See MSJ Facts, Exh. 1 at ¶ 2; see also Roskowski, 2005 WL 555398, at *11.   In addition, the declaration establishes that even if Magedson did not qualify as a provider of an interactive computer service, Magedson, himself and as the managing member of Xcentric, is certainly a user of an interactive computer service, namely, the ROR website.  See also Batzel, 333 F.3d at 1030 (noting that "§ 230(c)(1) confers immunity not just on 'providers' of [interactive computer] services, but also on 'users' of such services.").  Plaintiff has failed to identify any

---

[23]   When WIN appealed the February 15, 2006 Order to the Eleventh Circuit, it argued in its reply brief that Defendant Magedson did not qualify for CDA immunity because he failed to submit any evidence establishing that he is an "interactive computer service." See Whitney Information Network, Inc., 199 Fed. Appx. at 742 n.3.  In its Opinion and Order, the Eleventh Circuit recognized that it did not need to address this issue as WIN raised this argument for the first time in its reply brief but nevertheless noted that "§ 230(c)(1) requires only that Magedson have been a 'provider or user' of an interactive computer service, not the service itself." See id.

genuine issue of fact as to this determination, thus, the Court finds that Magedson is a provider or user of an interactive computer service as that term is defined by the CDA.

Next, the Court will consider whether WIN's claim treats Defendants as the publisher or speaker of the information at issue.  WIN does not challenge Defendants' assertion that this element of CDA immunity has been established.  <u>See</u> <u>generally</u> Response. Nevertheless, the Court finds that the defamation claim treats Defendants as the publisher of the allegedly defamatory statements made against WIN on the ROR website. <u>See</u> <u>Ben Ezra Weinstein, and Company, Inc. v. America Online Inc.</u>, 206 F.3d 980, 983, 986 (10th Cir. 2000) (holding that American Online, Inc. ("AOL") was immune under the CDA from a defamation action in which the plaintiff, a publicly owned company, claimed that AOL defamed it by publishing incorrect information regarding its stock price); <u>Whitney Information Network, Inc. v. Verio, Inc.</u>, 2:04CV462FTM29SPC, 2006 WL 66724, at * 3 (M.D. Fla. Jan. 11, 2006) (finding that the CDA barred the plaintiffs' defamation claim which attempted to treat the defendant as the publisher of allegedly defamatory statements against plaintiffs).

Finally, the Court turns to the question of whether the defamation claim is based on "information provided by another information content provider".  The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).  Thus, in the instant case, the critical issue for the Court to resolve, based upon a review of the evidence that the parties submitted in support or in opposition to the motion for summary judgment, is whether the individuals submitting posts to the ROR website were the sole information content providers of the

postings about WIN, or whether Defendants were responsible, in whole or in part, for the creation or development of the information contained in these postings. See Batzel v. Smith, 333 F.3d 1018, 1031 (9th Cir. 2003); see also Carafano v. Metrosplash.com, Inc.,339 F.3d 1119, 1125 (9th Cir. 2003) (noting that the CDA would operate to bar the plaintiff's claim unless the defendant "created or developed the particular information at issue."). In the response, WIN contends that Defendants are responsible, in whole or in part, for the creation or development of the allegedly defamatory postings because Defendants created the "con artists", "corrupt companies," and "false TV advertisements" categories that were used on some of the postings regarding WIN. See Response at 5-11. WIN further asserts that Defendants have engaged in activities that preclude them from utilizing the immunity afforded by the CDA. See id. Alternatively, WIN contends that the deposition of Woodard, at a minimum, creates an issue of fact as to whether Magedson authors reports posted on the ROR website. See id. at 12-13.[24] The Court finds WIN's arguments to be without merit.

Defendants presented evidence establishing that Xcentric created categories, such as "con artists", "corrupt companies" and "false TV advertisements", from which a poster must make a selection to categorize his or her report as part of the submission process. A review of the evidence demonstrates that some of the reports about WIN contain the "con artists", "corrupt companies" and "false TV advertisements" categories. See MSJ Facts at

---

[24] While not argued by WIN, the Court finds that Defendants should not be treated as information content providers of the defamatory posts about WIN based on the content monitors having the discretion to delete or redact reports that contain "blatantly illegal, inappropriate, or offensive materials". As noted by the Tenth Circuit in Ben Ezra,"Congress clearly enacted [the CDA] to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions. Ben Ezra, 206 F.3d 980; see also Batzel, 333 F.3d at 1031 (finding that a defendant was not an information content provider of an e-mail even though he made minor alterations to the e-mail before it was posted on a website and made the choice to publish the e-mail).

Case 2:04-cv-00047-MMH-SPC   Document 190   Filed 02/15/08   Page 22 of 30 PageID 2343

Exh. 2. Nevertheless, the Court finds that Defendants cannot be considered to be information content providers of the reports about WIN that include these categories. WIN has not presented any evidence demonstrating that Defendants participated in any way in the selection of these categories to describe WIN. Indeed, WIN simply contends that Defendants supplied a list of categories from which some users selected the phrases "con artists", "corrupt companies," and "false TV advertisements" to categorize their reports. <u>See</u> Response at 5-6. However, the Court finds that the mere fact that Xcentric provides categories from which a poster must make a selection in order to submit a report on the ROR website is not sufficient to treat Defendants as information content providers of the reports about WIN that contain the "con artists", "corrupt companies", and "false TV advertisements" categories. <u>See</u> <u>Global Royalties, Ltd. v. Xcentric Ventures, LLC</u>, No. 07-956-PHX-FJM, 2007 WL 2949002, at * 3 (D. Ariz. Oct. 10, 2007); <u>see also</u> <u>Carafano</u>, 339 F.3d at 1124; <u>Prickett v. InfoUSA, Inc.</u>, No. 4:05-CV-10, 2006 WL 887431, at *5 (E.D. Tex. March 30, 2006). Rather, the authors of the postings made the decision to select these categories to describe WIN. <u>See</u> <u>Carafano</u>, 339 F.3d at 1124.[25] Moreover, Xcentric did not

_____

[25] WIN cites to <u>MCW, Inc.</u> and <u>Fair Housing Council of San Fernando Valley v. Roommates.com, LLC</u>, 489 F.3d 921 (9th Cir. 2007), <u>reh'g granted</u>, 506 F.3d 716 (9th Cir. 2007), to support its argument that Defendants should be treated as information content providers due to their provision of categories from which a poster must make a selection in order to submit a report on the ROR website. <u>See</u> Response at 5-6. However, the Court finds WIN's reliance on these cases to be misplaced. Since entry of the decision upon which WIN relies, the Ninth Circuit Court of Appeals has ordered that the <u>Fair Housing Council of San Fernando Valley</u> case be reheard by the <u>en banc</u> court and that the opinion by the three judge panel shall not serve as precedent except to the extent adopted by the <u>en banc</u> court. <u>See</u> <u>Fair Housing Council of San Fernando Valley v. Roommates.com, LLC</u>, 506 F.3d 716 (9th Cir. 2007). In addition, the Court finds WIN's reliance on the <u>MCW, Inc.</u> decision to be unpersuasive. In <u>MCW, Inc.</u>, in ruling on a motion to dismiss, the district court for the Northern District of Texas rejected the defendants' argument that they were entitled to immunity under the CDA. <u>See</u> <u>MCW, Inc.</u>, 2004 WL 833595, at * 9-10. There the court found that defendants were information content providers of the defamatory postings at issue because they created report titles such as "Con Artists," "Scam", and "Ripoff". In doing so, however, the court noted that defendants failed to dispute the plaintiff's "allegations that they <u>personally</u> write <u>and</u> create numerous disparaging and defamatory messages about [plaintiff] in the (continued...)

solely provide posters with a selection of categories that were negative and/or defamatory in nature.   <u>See</u> Deposition of Magedson, Exh. 6 at 34-35, Exh. 16 at 5.  As noted above, the categories from which a poster must select include "seminar programs", "multi level marketing", "financial services", and "business consulting", as well as hundreds of other choices. <u>See</u> Deposition of Magedson, Exh. 4 at 21-27, Exh. 6 at 33-35, Exh. 16 at 5.  Thus, the posters who submitted the reports about WIN that were categorized within the "con artists", "corrupt companies," and "false TV advertisements" categories could have chosen another category to describe their reports about WIN but decided not to do so.[26]  In light of the foregoing, the Court declines to deny the motion for summary judgment based on WIN's argument that Defendants are information content providers of the reports about WIN that contain the "con artists", "corrupt companies", and "false TV advertisements" categories.

As noted above, WIN also argues that Defendants have engaged in activities that deprive them of the benefit of the immunity afforded by the CDA.  Specifically, WIN contends that the following activities foreclose Defendants from being immune from liability in the instant action: (1) on the ROR website, Defendants actively solicit visitors to post reports about companies that rip-off consumers; (2) Defendants take an active role in shaping the content of the postings on the ROR website by providing guidance to users regarding what

---

[25](...continued)
form of report titles <u>and</u> various headings." <u>See</u> <u>id.</u> (emphasis added).  Thus, it appears that, in <u>MCW, Inc.</u>, the plaintiff asserted, in its complaint, that the defendants independently created these titles and/or headings in the defamatory posts at issue. <u>See</u> <u>id.</u> at *9.  Moreover, it appears that the court also based its decision on plaintiff's allegation that the defendants created and posted disparaging editorial messages about plaintiff and encouraged a consumer to include particular photos in his report about plaintiff on the ROR website. <u>See</u> <u>id.</u> at *10.

[26]   Indeed some posters did use the"seminar programs", "multi level marketing",  and "business consulting" categories to categorize their reports about WIN.  <u>See</u> MSJ Facts at Exh. 2.

to think about in preparing their reports and what type of reports are selected as "Top Rip Off Reports"; (3) Magedson sells a "Revenge Guide" on the ROR website; (4) Defendants sell advertising and solicit donations on the ROR website; and (5) Defendants offer the CAP Program to companies who wish to avoid having reports posted about them on the ROR website.  <u>See</u> Response at 7-12.  In support of its contention, WIN relies extensively on the Ninth Circuit's decision in <u>Fair Housing Council of San Fernando Valley</u>.  <u>See</u> <u>id.</u>  However, as previously noted, the Ninth Circuit has ordered that <u>Fair Housing Council of San Fernando Valley</u> be reheard by the court <u>en</u> <u>banc</u> and that the opinion by the three judge panel shall not serve as precedent except to the extent adopted by the <u>en</u> <u>banc</u> court.  <u>See</u> <u>Fair Housing Council of San Fernando Valley v. Roommates.com</u>, 506 F.3d 716 (9th Cir. 2007).   In addition, the portion of <u>Fair Housing Council of San Fernando Valley</u> upon which WIN relies is dicta about a hypothetical website:

> Imagine, for example www.harrassthem.com with the slogan 'Don't Get Mad, Get Even.'  A visitor to this website would be encouraged to provide private, sensitive and/or defamatory information about others-all to be posted online for a fee.  To post the information, the individual would be invited to answer questions about the target's name, addresses, phone numbers, social security number, credit cards, bank accounts, mother's maiden name, sexual orientation, drinking habits and the like.  In addition, the website would encourage the poster to provide dirt on the victim, with instructions that the information need not be confirmed, but could be based on rumor, conjecture or fabrication.

> It is not clear to us that the operator of this hypothetical website would be protected by the logic of *Carafano* . . . By providing a forum designed to publish sensitive and defamatory information, and suggesting the type of information that might be disclosed to best harass and endanger the targets, this website operator might well be held responsible for creating and developing the tortious information.

See Fair Housing Council of San Fernando Valley, 489 F.3d at 928.  Contrary to WIN's suggestion, the dicta in the opinion does not even resolve the question of whether the hypothetical website should be treated as an information content provider.  Moreover, the website described by the Ninth Circuit bears little resemblance to the ROR website.  The undisputed facts establish that, while Defendants do encourage users of the ROR website to post reports about companies that rip-off consumers, they require a user, as part of the submission process, to acknowledge that a report is valid.  See Deposition of Magedson, Exh. 6 at 36, Exh. 16 at 6.  Defendants also advise users that reports should be honest, factual, and impartial.  See id., Exh. 15 at 7.  Moreover, Defendants do not charge users a fee to post a report.  In light of the foregoing, the Court finds WIN's reliance on Fair Housing Council of San Fernando Valley to be without merit.

The Court recognizes WIN's assertion that Defendants provide users with guidance as to what makes a good report and what to include in a report.  See Response at 10.  However, WIN simply has not provided the Court with any evidence to create a genuine issue of fact as to whether Defendants played a role in creating or developing the postings regarding WIN that are the subject of the instant action.[27]  The Court finds the absence of such a conflict in the record to be fatal to WIN's defamation claim.

Lastly, the Court considers WIN's contention that the testimony given by Woodard demonstrates that a genuine issue of material fact remains as to whether Magedson

---

[27]  WIN also relies on MCW, Inc. in arguing that the defendants are information content providers because they actively solicit visitors to post reports about companies on the ROR website.  See Response at 10.  However, as noted above, the Court finds WIN's reliance on MCW, Inc. to be misplaced.  Indeed, this case is in stark contrast to MCW, Inc. where the plaintiff alleged that the defendants encouraged a poster to take particular photos related to the plaintiff and post them on the ROR website. See MCW, Inc., 2004 WL 833595, at * 10.

prepared any of the reports at issue in the instant case.  As noted above, Magedson and all of the individuals who had administrative access to the ROR website provided declarations attesting that they did not author or submit any of the postings regarding WIN and did not add any content to these postings.  See MSJ Facts, Exhs. 1 at ¶¶ 19, 21, Exh. 3 at ¶¶ 6-7, Exh. 4 at ¶¶ 6-7, Exh. 5 at ¶¶ 6-7, Exh. 6 at ¶¶ 6-7, Exh. 7 at ¶¶ 6-7, Exh. 8 at ¶¶ 6-7, Exh. 9 at ¶¶ 6-7, Exh. 10 at ¶¶ 6-7, Exh. 11 at ¶¶ 18-19, Exh. 12 at ¶¶ 6-7, and Exh. 13 at ¶¶ 6-7. In doing so, Defendants discharged their burden of demonstrating to the Court, by reference to the record, that they did not author or add content to the postings about WIN on the ROR website that are the subject of the instant action.  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995).  Accordingly, WIN, as the party opposing summary judgment, must go beyond its pleadings and designate specific facts showing that a genuine issue of fact remains for trial regarding whether Defendants authored or added content to the postings about WIN on the ROR website.  See id.  While WIN presented evidence from an unrelated action, in which Woodard testified that Magedson writes reports and  headings on reports posted on the ROR website, this testimony does not rebut Magedson's affirmative testimony that he did not author or add content to any of the postings **about WIN**.

As noted above, the issue in the instant case is whether Defendants are responsible, in whole or in part, for the creation or development of the particular postings relating to WIN that are the subject of this lawsuit.  Even if Woodard's testimony creates an issue of fact as to the question of whether Magedson was an information content provider of some other postings on the ROR website, this conflict would be insufficient to forestall summary

judgment in this case on the basis of CDA immunity.[28]  See Carafano, 339 F.3d at 1125 (stating that, even assuming that the defendant could be considered an information content provider, the CDA would still bar the plaintiff's claims as long as the defendant did not create or develop the information for which plaintiff seeks to hold the defendant liable); Ben Ezra, 206 F.3d at 986 (holding that plaintiff's defamation claim was barred by the CDA where the plaintiff failed to present any evidence to contradict the evidence submitted by the defendant which demonstrated that a third party alone created the inaccurate stock information at issue).  In light of the foregoing, the Court finds that the deposition of Woodard does not create a genuine issue of material fact sufficient to warrant the denial of the motion for summary judgment.

In light of the foregoing, the Court determines that Defendants have demonstrated that they are entitled to immunity under the CDA from the instant action, and Defendants' motion for summary judgment is due to be **granted**.

## B.  Motion for Reconsideration

Defendants also ask the Court to reconsider its prior rulings regarding personal jurisdiction.  See  Motion at 11-12.  Defendants contend that, because the evidence in the instant case demonstrates that they are not the authors of any defamatory statements about WIN on the ROR website, they have not committed a tort in Florida merely by publishing these statements.  See id. at 12.  WIN responds that the Court should deny the Motion for

---

[28]   While in no way necessary to this decision given WIN's failure to bring forth any evidence to rebut Magedson's statement that he did not author any of the reports that are the subject of this lawsuit, the Court notes that Woodard has provided an affidavit verifying that he has no information which would create a genuine issue of material fact.  See Reply, Exh. A at ¶ 7.

Reconsideration because Defendants have failed to offer any basis for this Court to reconsider its and the Eleventh Circuit's prior decisions regarding personal jurisdiction.  See Response at 13-17.  As the Court has already determined that Defendants' motion for summary judgment is due to be granted in the instant action, the Court declines to address this issue.

   **C.**  **Request for Order to Show Cause**

   Finally, Defendants ask the Court to enter an Order requiring WIN and WIN's counsel to appear and show cause why they should not be sanctioned pursuant to Rule 11(c) of the Federal Rules of Civil Procedure for knowingly making false statements of fact to the Court, namely, that Defendants created the defamatory postings about WIN.  See Motion at 13.  WIN responds that the Court should deny the motion for sanctions because it is procedurally deficient under Rule 11(c) of the Federal Rules of Civil Procedure and no basis exists for the imposition of sanctions.  See id. at 17.

   Notably, Rule 11(c) provides that, "[o]n its own, [a] court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)."  Fed.R.Civ.P. 11(c)(3) (emphasis added).  Thus, Defendants acted improperly in asking the Court to enter an order to show cause as Rule 11 clearly provides that this measure should be taken by a court on its own initiative.  Moreover, to the extent that Defendants' request is a motion for sanctions, the Court notes that Defendants have failed to comply with the requirements of Rule 11.  First, it is improper for a party to file a motion for sanctions together with any other motion.  See Fed.R.Civ.P. 11(c)(2) (stating that "[a] motion for sanctions must be made separately from any other motion . . .").  Second,

Defendants have failed to suggest that they provided WIN with the requisite notice before submitting the request. <u>See</u> Response at 17; <u>see</u> <u>also</u> Fed.R.Civ.P. 11(c)(2).  Accordingly, the Court finds that the motion for sanctions is due to be **denied**.

       **IV.**    **Conclusion**

       In light of the foregoing, it is hereby **ORDERED**:

       1.    Defendants' Motion for Summary Judgment and, Alternatively, Motion for Reconsideration Re: Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Personal Jurisdiction and Motion for Sanctions (Dkt. No. 115) is **GRANTED, IN PART, AND DENIED, IN PART**.

            a.    To the extent that Defendants seek summary judgment as to Plaintiff's defamation claim, the Motion is **GRANTED**.

            b.    To the extent that Defendants ask the Court to reconsider its prior rulings on personal jurisdiction, the Motion is **DENIED**.

            c.    To the extent that the Defendants seek Rule 11 sanctions against Plaintiff, the Motion is **DENIED**.

       2.    The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants, Xcentric Ventures, LLC, badbusinessbureau.org, and Ed Magedson, and against Plaintiff, Whitney Information Network, Inc.

3.     The Clerk of the Court is further directed to close the file and terminate any remaining motions and deadlines as moot.

**DONE AND ORDERED** at Fort Myers, Florida, this 15th day of February, 2008.


MARCIA MORALES HOWARD
United States District Judge


lc3

Copies to:

Counsel of Record